# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CAYUGA NATION, by its Council of Chiefs and Clan Mothers; Clan Mother PAMELA TALLCHIEF; Clan Mother BRENDA BENNETT; Sachem Chief SAMUEL GEORGE; Sachem Chief WILLIAM JACOBS; Representative AL GEORGE; Representative KARL HILL; Representative MARTIN LAY; Representative TYLER SENECA, | Civil Action No.: |
| Plaintiffs, | |
| vs. | |
| The Honorable RYAN ZINKE, in his official capacity as Secretary of the Interior; MICHAEL BLACK, in his official capacity as Acting Assistant Secretary – Indian Affairs and in his individual capacity; BRUCE MAYTUBBY, in his official capacity as Eastern Regional Director, Bureau of Indian Affairs, United States Department of the Interior; WELDON "BRUCE" LOUDERMILK, in his official capacity of Director, Bureau of Indian Affairs, United States Department of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; and the BUREAU OF INDIAN AFFAIRS, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.       The Cayuga Nation is a sovereign federally recognized Indian Nation, 82 Fed. Reg. 4915, 4916 (Jan. 17, 2017), whose longstanding government to government relationship with the United States is recognized and confirmed by the Canandaigua Treaty with the Six Nations, 7 Stat. 44 (1794).  Since long before European contact, the Nation has governed itself through a Council of Chiefs selected and overseen by Clan Mothers. The Nation is a matriarchal society and since time immemorial, the Clan Mothers have served a critical function in appointing, advising and removing Chiefs and Council members. This centuries old governmental process is governed by the oral tradition embodied in the Haudenosaunee Great Law of Peace.

2.       In this action, the Cayuga Nation ("Nation"), by its Council of Chiefs and Clan Mothers, seeks equitable relief to remedy unlawful administrative decisions approving the usurpation of governmental authority from the lawful leaders of the Nation and denying the Clan Mothers' authority to perform their traditional role within the Nation's government.  Without legal or factual basis, the Bureau of Indian Affairs ("BIA") approved a wholesale change in the Nation's governance, supplanting well-established traditional processes for selecting leaders with a deeply flawed and admittedly biased mail-in survey.

3.       The BIA's decision followed months of secret meetings between BIA officials and one set of federally recognized Nation leaders, to the exclusion of other federally recognized Nation leaders who are Plaintiffs here. Even after those meetings were revealed to Plaintiffs, the BIA refused to reconsider its predetermined judgment that a mail-in survey process opposed by Plaintiffs "would be… viable" and secretly supported that effort with BIA technical assistance and federal funds. Department of Interior officials then attempted to deny Plaintiffs any administrative review; reversed course by withdrawing that attempt; and took jurisdiction over

Plaintiffs' administrative appeal from the Interior Board of Indian Appeals ("IBIA") such that an official who participated in the BIA decision also reviewed the decision on appeal.

4. The Nation asks the Court to vacate the December 15, 2016 Decision of Bureau of Indian Affairs Eastern Regional Director Bruce Maytubby, and the July 14, 2017 Decision of Acting Assistant Secretary – Indian Affairs Michael Black as arbitrary, capricious and contrary to law; to enjoin reliance on the decision; and to remand this matter to the BIA for reconsideration.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1362. This action arises under the Administrative Procedures Act, 5 U.S.C. §§ 551 et seq., and §§ 701-706; the United States Constitution, arts. V and XIV; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. Plaintiffs are an Indian Nation and individual leaders of that Nation, including leaders recognized by the United States. Because Defendants are agencies and officers of the United States, venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PARTIES

**Plaintiffs**

6. Plaintiffs are the Cayuga Nation by its Council of Chiefs and Clan Mothers. Since time immemorial, the Nation has governed itself according to the Great Law of Peace. Pursuant to the Great Law, the Nation's government is comprised of a Council of Chiefs and of Clan Mothers, who appoint, remove, and oversee the Council members. In this capacity, the Clan Mothers provide a check on the power of members of the Council.

7. Until its dramatic reversal on December 15, 2016, the United States had always respected the authority of the Clan Mothers to determine membership within the Nation's

Council, a core governmental function they have performed since time immemorial. The United States recognizes Plaintiff Clan Mothers as leaders of the Nation.

8.      Sachem Chief William Jacobs is a condoled Chief and represents the Heron Clan on the Council.  Chief Jacobs has been a Council member for more than three decades.

9.      Sachem Chief Samuel George is a condoled Chief and represents the Bear Clan on the Council.  Chief George has been a Council member for nearly two decades

10.     Clan Mother Brenda Bennett is the Turtle Clan Mother. As Turtle Clan Mother, Bennett has the authority and responsibility to nominate and oversee Turtle Clan representatives on the Council.  She also holds the power to remove a clan representative from the Council. No party disputes Bennett's status as Turtle Clan Mother.

11.     Clan Mother Pamela Tallchief is the Bear Clan Mother. As Bear Clan Mother, Tallchief has the authority and responsibility to nominate and oversee Bear Clan representatives on the Council.  She also holds the power to remove a clan representative from the Council.  No party disputes Tallchief's status as Bear Clan Mother.

12.     Karl Hill is a representative for the Heron Clan on the Council.

13.     Al George is a representative for the Bear Clan on the Council.

14.     Martin Lay is a representative for the Turtle Clan on the Council.

15.     Tyler Seneca is a representative for the Turtle Clan on the Council.

**Defendants**

16.     Defendant Ryan Zinke is sued in his official capacity as the Secretary of the Interior. Defendant Zinke is responsible for the overall administration of the Department of the Interior, including the BIA, an agency within the Department tasked with managing the federal government's relationship with American Indians and Alaska Natives. 43 U.S.C. § 1457.

17.     Defendant Michael Black is sued in his official capacity as the Acting Assistant Secretary – Indian Affairs, a title he purportedly held when he adjudicated Plaintiffs' appeal from Defendant Maytubby's December 15, 2016 Decision. He is sued in his individual capacity as well. Prior to assuming the title Acting Assistant Secretary – Indian Affairs and adjudicating the appeal of the Regional Director's decision, Black participated in the decision itself, first as BIA Director and, on information and belief, later as Special Advisor to the BIA Director.

18.     Defendant Weldon "Bruce" Loudermilk is sued in his official capacity as Director of the BIA. The BIA Director monitors and oversees the BIA headquarters organization and field activities, including the activities of the Regional Offices.

19.     Defendant Bruce Maytubby is sued in his official capacity as the Regional Director for the Eastern Region, Bureau of Indian Affairs. "The Regional Director serves as the representative for the [BIA] Director." *See* https://www.bia.gov/WhoWeAre/RegionalOffices/Eastern/index.htm (last visited Sept. 20, 2017).

20.     The Department of the Interior serves as the lead federal agency responsible for carrying out the government to government relationship between the United States and Indian nations.

21.     The Bureau of Indian Affairs is a federal agency within the Department of the Interior with special responsibilities for conducting government to government relations with Indian nations. "The Bureau of Indian Affairs' mission is to enhance the quality of life, to promote economic opportunity, and to carry out the responsibility to protect and improve the trust assets of American Indians, Indian tribes and Alaska Natives." https://www.bia.gov/bia (last visited Sept. 20, 2017).

## RELEVANT TREATIES AND STATUTES

### I.      The 1794 Treaty of Canandaigua

22.      The Cayuga Nation's government to government relationship with the United States is recognized and confirmed in the Treaty with the Six Nations, 7 Stat. 44 (1794), commonly known as the Treaty of Canandaigua. By this Treaty, the United States recognized the territory and sovereignty of the Cayuga Nation and promised never to "disturb them, or any of the Six Nations… in the free use and enjoyment" of their reservation territory. The terms of the Treaty guarantee the Nation's right to self-government. The Nation's right to self-government includes its exclusive right to determine how its leaders are selected.

### II.     The Administrative Procedures Act

23.      The Administrative Procedures Act ("APA") provides for judicial review of final agency actions in suits by persons "adversely affected or aggrieved" by the agency action. 5 U.S.C. § 702. Agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," "without observance of procedure required by law" or "contrary to constitutional right" must be set aside. 5 U.S.C. § 706(2).

### III.    United States Constitution

24.      The United States Constitution's Fifth and Fourteenth Amendments guarantee procedural due process. *See, e.g.,* U.S. Const. amend. V (declaring that no one shall be "deprived of life, liberty or property without due process of law"). Due process requires that proceedings be heard by an unbiased tribunal or decision-maker and prohibits a decision-maker from adjudicating appeals from her own decision.

## FACTUAL ALLEGATIONS

25.     The existence of the sovereign Cayuga Nation predates the existence of the United States.

26.     When the federal government engages in government to government or Nation to Nation relations with the Cayuga Nation or any other Indian tribe, it must ensure that it is dealing with a duly constituted government that represents the Nation as a whole.

27.     The federal common law doctrine of Indian sovereignty requires the United States to respect the authority of each Indian nation's government and the right of each Indian nation to choose its form of government. The sovereign right to choose a form of government includes the power to determine how leaders are chosen; what limitations are placed on their authority; and when and whether chosen leaders must step down.

28.     Officials within the Department of the Interior have the principal responsibility for maintaining the federal government's relationship with Indian nations.  25 U.S.C. §§ 2 and 9.

29.     When leadership disputes arise within Indian nations, the Bureau of Indian Affairs may be called upon to determine, for purposes of the government to government relationship, which group or individual it will recognize as a Nation's lawful government.

30.     Indian nation law and custom may be written or unwritten. *See, e.g.*, Kelly Kunsch, A Legal Practitioners Guide to Indian and Tribal Law Research, 5 Amer. Ind. L. J. at 134-135 (2017).

31.     Cayuga Nation leaders are selected pursuant to the Great Law of Peace, which gives that responsibility of nomination and removal to the women who serve as Clan Mothers, based on input from the members of their clans.

32.     Cayuga citizens express their will and their choices for leadership through the clan system and the Clan Mothers.

6

33.     Selection of Cayuga Nation leaders is deliberative and consensus-based. Clan members under the guidance of Clan Mothers participate in a deliberative process of listening, questioning, discussing and exchanging ideas before reaching consensus on appointments to the Council.

34.     It has been the longstanding position of the United States to recognize that the Cayuga Nation is governed by a Council of Chiefs whose members represent each of three active clans within the Nation and whose positions on the Council are determined through this deliberative, consensus-based process led by the Clan Mothers.

35.     On February 20, 2015, then-Acting Bureau of Indian Affairs Regional Director Tammie Poitra issued a decision recognizing, as the Cayuga Nation's "last undisputed government," a Council of Chiefs comprised of six individuals, including Plaintiffs Sachem Chiefs Samuel George and William Jacobs. Ms. Poitra's decision also recognized Chester Isaac as a Bear Clan Representative. Representative Isaac was later succeeded on the Council by Plaintiff Alan George.

36.     Acting Regional Director Poitra's decision rejected an effort by a faction within the last undisputed government led by Clint Halftown (the "Halftown Group") to secure BIA support for the use of a mail-in survey to reconfigure the Nation's government. The BIA had rejected such an effort in 2012, as well.

37.     On June 17, 2016, Defendant Maytubby wrote to three of these six recognized Cayuga leaders – Plaintiffs here, sometimes referred to as the "Jacobs Group" – that the Halftown Group intended to conduct a mail-in survey ("statement of support campaign") in order to create a new form of government and slate of leaders for the Cayuga Nation.

38.     In a subsequent telephone conference with Plaintiffs' counsel, Defendant Maytubby revealed that for at least six months, he had conducted secret meetings with the Halftown Group to the exclusion of the Jacobs Group and the Clan Mothers.

39.     The Halftown Group publicly corroborated Defendant Maytubby's account of this series of ex parte meetings, informing Cayuga citizens by letter in mid-June 2016, that "we have been working extensively over the past several months with responsible federal officials" on the proposed mail-in survey campaign. None of the Plaintiffs, including the federally recognized Chiefs and Clan Mothers, was invited to participate in these "extensive" preparations or informed they were taking place.

40.     In his June 17, 2016 letter, Defendant Maytubby stated that he had reviewed the Halftown Group's proposed mail-in survey process and had concluded the survey "would be a viable way of involving the Cayuga people in a determination of the form and membership of their government."

41.     Defendant Maytubby provided Plaintiffs six (6) business days in which to respond to the proposed mail-in survey campaign and the BIA's decision to support it.

42.     Plaintiffs, including the Cayuga Nation's Council of Chiefs and Clan Mothers, immediately objected to the Halftown Group's effort and to Defendant Maytubby's prejudged conclusion regarding its validity, pointing out that Cayuga law precludes mail-in survey campaigns from being used to choose governmental representatives and instead entrusts that solemn responsibility to the Clan Mothers, working directly and deliberatively with citizens through their respective clans. Defendant Maytubby ignored Plaintiffs' objections. Denying the Clan Mothers' role in governance violates Nation law and sovereignty and the right of Cayuga citizens to choose their own means of determining leadership.

43.     Plaintiffs also objected to Defendant Maytubby's admission that he had conducted secret meetings and communications with one faction of the Nation's then-recognized Council of Chiefs without consulting or even informing the other half or the Nation's Clan Mothers. Plaintiffs requested that Defendant Maytubby provide "complete details of all contact with the [the Halftown Group] and your office and that of Deputy Bureau Director Smith."

44.     Defendant Maytubby never responded to Plaintiffs' request for information about the series of secret meetings and teleconferences with the Halftown Group he had admitted conducting.

45.     Defendant Maytubby never responded to Plaintiffs' letters.

46.     Defendant Maytubby never reconsidered his conclusion that the mail-in survey process "would be… viable" for purposes of establishing a new government at Cayuga.

47.     Defendant Maytubby never informed Plaintiffs, including federally recognized Chiefs and Clan Mothers, that he had on behalf of the BIA provided technical assistance to the Halftown Group to support the mail-in survey campaign.

48.     Even after receiving Plaintiffs' vigorous objections to ex parte meetings with the Halftown Group, Defendant Maytubby continued to secretly meet and consult with the Halftown Group, who utilized federal funds from the BIA to proceed with their mail-in survey campaign. A number of such meetings took place in August and September of 2016.

49.     Defendant Maytubby sent BIA officials to Cayuga territory – again without consultation or even notification to the federally recognized Council members and Clan Mothers who are Plaintiffs here – to secretly review the results of the disputed survey campaign. None of the Plaintiffs was present at these meetings.

50.     On November 1, 2016, Defendant Maytubby contacted both factions within the Nation's federally recognized government and requested briefing on several questions: "the validity of the [Halftown Group's] statement of support process as a matter of law;" "the process by which the statement of support process was actually conducted," and whether "tribal traditions support the Jacobs Council."

51.     Asserting that his decision was governed by the 90 day limitation applicable to Indian Self-Determination and Education Assistance Act ("ISDEAA") contract applications, Defendant Maytubby allowed just twenty-seven (27) days for the development of the record and completion of briefing on these questions, which go to the heart of the Cayuga Nation's sovereign right to self-government. No hearing was provided.

52.     Plaintiff Cayuga Nation's submissions included testimony from Cayuga and Haudenosaunee legal experts whose analyses unequivocally demonstrated that the mail-in survey campaign violated Cayuga law.  In particular, the testimony showed that the campaign violated the well-established requirement that the Nation's Council make decisions by consensus; conflicted with the Clan Mothers' ancient role in choosing and overseeing members of Council through a deliberative, clan-based process; and wholly supplanted the process under the Great Law of Peace by which the Nation's Chiefs are appointed or "condoled."

53.     In addition, the Nation produced uncontroverted testimony from experts in the field of public opinion survey research that found that the mail-in survey campaign as conducted was "a deeply flawed process from which no information may confidently be gathered."

54.     On December 15, 2016, Defendant Maytubby issued a set of decisions (1) recognizing the Halftown Group as the government of the Cayuga Nation for purposes of entering into a contract under the ISDEAA and declining to recognize Plaintiffs for such purposes; (2) awarding an ISDEAA contract grant to the Halftown Group, on behalf of the

Cayuga Nation; and (3) declining to award an ISDEAA contract grant to the Jacobs Group

(including the Clan Mothers) on behalf of the Cayuga Nation (hereinafter "Decision").

Defendant Maytubby characterized the Decision as final agency action for which administrative

review was unavailable. *See* December 15, 2016 Decision, attached as Exhibit "A."

55.     Defendant Maytubby's Decision was accompanied by a purported delegation of

authority to take final agency action ("Delegation") also dated December 15, 2016. The

purported Delegation was signed by Principal Deputy Assistant Secretary Lawrence Roberts and

Deputy Bureau of Indian Affairs Field Director for Field Operations Michael R. Smith, who

purported to sign on behalf of Defendant BIA Director Loudermilk.

56.     At the time, Defendant Black served as Special Advisor to Defendant

Loudermilk.

57.     The purported Delegation stated that Defendant Maytubby's recognition and

ISDEAA decisions were "final agency action" not subject to administrative review and

reviewable only in federal court.

58.     The effort to deprive Plaintiffs of administrative review through a Delegation of

Final Agency Action was ineffective.

59.     At the time of the purported Delegation, Principal Deputy Assistant Secretary

Roberts had served as Acting Assistant Secretary for 209 days, from January 1 to July 1, 2016.

*See* https://www.bia.gov/cs/groups/xopa/documents/text/idc1-033489.pdf.  Federal law limits to

210 days the time that any federal official may serve as "Acting Official." *See* 5 U.S.C. §

3346(a) (1).

60.     At the time of Defendant Maytubby's December 15, 2016, decision, Roberts was

no longer eligible to serve as Acting Official and took action in his capacity as Principal Deputy

Secretary – Indian Affairs.

61.     Decisions of the Principal Deputy Secretary – Indian Affairs are not "final agency actions" and are reviewable by the Interior Board of Indian Appeals. 25 C.F.R. § 2.4(e).

62.     In addition, Indian Affairs Manual Part 3, Chapter 4, "Delegation of Authority: Delegations to the Deputy Bureau Director, Field Operations, and to the Regional Organizations" requires that delegations to the Regional Directors and the Deputy Director for Field Operations go through the BIA Director prior to redelegation. *See* https://www.indianaffairs.gov/cs/groups/xraca/documents/text/idc1-6032031.pdf; *see also* 230 DM 1 (Department of the Interior Departmental Manual, Delegation Series, Director, Bureau of Indian Affairs).

63.     Though the Delegation was styled as "passing through" the BIA Director, as required by the Indian Affairs Manual, in fact the BIA Director did not participate in the redelegation and did not sign the purported Delegation.

64.     Instead, Deputy Field Director for Operations Michael R. Smith purported to redelegate on the BIA Director's behalf.

65.     Further, the decision to delegate lacked any intelligible principle.

66.     The only rationales for delegation provided for the December 15, 2016, purported Delegation were (1) the existence of a dispute within the Cayuga Nation about its form of government and (2) the fact that an "extensive" administrative record had been compiled.

67.     In his December 15, 2016 Decision, Defendant Maytubby found that the mail-in survey process would have violated federal tribal election law in several ways, had the process been a tribal election subject to 25 C.F.R. Part 81. Among other violations, the voter list was kept secret from Nation leaders and citizens; biased language favored one side; no option was given to support anyone but the Halftown Group; and "ballots" were non-anonymous.

12

68.     Defendant Maytubby found that the survey campaign was "biased" toward the Halftown Group.  Decision at 11.

69.     Defendant Maytubby accepted the undisputed evidence that 90% or more of the individual recipients of the survey campaign accepted cash payments from Mr. Halftown in the weeks prior to completing the survey. Decision at 12 ("[c]hecks were sent out on June 15… prior to distribution of the [survey materials] on July 6.").

70.     Defendant Maytubby acknowledged that the mail-in survey campaign results conflicted with governmental determinations made by the Heron Clan Mother and the Bear Clan Mother, whose authority to appoint and remove Council Members the United States had never before questioned.

71.     Defendant Maytubby identified and discussed one provision of Cayuga law but declined to review Cayuga law on the specific question of whether a mail-in survey could be used to override the decisions of the Clan Mothers as to the composition of the Nation's Council of Chiefs or supplant the deliberative process by which individual clan members come to consensus on Clan Mother appointments.

72.     Defendant Maytubby reversed longstanding federal policy on whether any "majority rule" or elective process can be used to choose leaders of the Cayuga Nation under Cayuga law.

73.     Defendant Maytubby reversed longstanding federal policy on whether mail-in surveys can be used to choose leaders of the Cayuga Nation under Cayuga law.

74.     Defendant Maytubby reversed longstanding federal law and policy on the role of consensus in the governance of the Cayuga Nation.

75.     Defendant Maytubby reversed longstanding federal policy on the authority of the Cayuga Nation Clan Mothers to determine membership in the Nation's Council of Chiefs.

76.     Defendant Maytubby reversed longstanding federal policy on the question of whether an inactive clan with no Clan Mother or eligible representatives may nonetheless have a representative on the Nation's Council of Chiefs.

77.     Defendant Maytubby failed to explain or justify these reversals of longstanding federal policy.

78.     Defendant Maytubby invoked a legal principle that neither group had argued: that for the Nation to use any means of choosing leaders other than a "plebiscite" would violate the human rights of Cayuga citizens.

79.     Defendant Maytubby concluded that the mail-in survey campaign was "valid" as the new means by which the citizens of the Cayuga Nation will choose their leaders.

80.     Based on the mail-in survey campaign, Defendant Maytubby recognized the Halftown Group as the lawful government of the Nation for nation to nation purposes.

81.     Defendant Maytubby's letter further denied Appellants' application on behalf of the Nation for contract assistance pursuant to the ISDEAA.

82.     On January 13, 2017, Plaintiffs filed a Notice of Appeal with the IBIA, asserting jurisdiction on the grounds that the purported delegation of authority to Defendant Maytubby to take final agency action was ineffective and that 25 U.S.C. § 450(f)(b) and 25 C.F.R. Part 900 provide for IBIA review of ISDEAA contract denials.

83.     Plaintiffs requested that Defendant Maytubby's Decision be vacated because it was arbitrary and capricious and contrary to law.

84.     By order of January 23, 2017, the IBIA docketed the appeal and took jurisdiction for the purpose of determining its jurisdiction over Plaintiffs' administrative appeal of denial of its ISDEAA contract application. The IBIA made a preliminary determination on Plaintiffs' entitlement to a hearing, and set a schedule for briefing on that issue.

85.     In addition, the IBIA requested briefing on the lawfulness of the purported

Delegation. The IBIA found that "the purported Delegation identifies neither the source of the

Principal Deputy's authority to render a decision that is final for the Department, nor the

authority which would allow him to delegate this authority to the Regional Director." Jan. 23,

2017, Order at 4-5.

86.     On January 31, 2017, Defendant Michael Black withdrew the contested

Delegation. In a Memorandum addressed to Defendant Maytubby, Black stated:  "upon further

review of [the purported Delegation], I have determined that the purported delegation was not

necessary and that you otherwise possess all the power (under the Departmental Manual and the

Indian Affairs Manual) necessary to approve a self-determination act proposal. As a part of

deciding which self-determination contract to approve, the Regional Director was required to

determine which governing council to recognize. Thus, there was no need to issue the December

15, 2016 purported delegation, and the Department is therefore withdrawing the purported

delegation."

87.     Also on January 31, 2017, Defendant Black informed the IBIA that he was

assuming jurisdiction over the appeal pursuant to 25 C.F.R. § 2.20(c) and 43 C.F.R. § 4.332(b).

88.     Pursuant to the IBIA scheduling order, the parties submitted briefs on

jurisdictional issues. In his brief, Defendant Maytubby argued that Defendant Black had properly

assumed jurisdiction. In the event the IBIA found otherwise, however, Defendant Maytubby

requested that the matter be remanded to him for "further development of the record" on the core

issues of tribal recognition and eligibility to receive ISDEAA contract funds.

89.     On March 10, 2017, over Plaintiffs' objections, the IBIA held that Plaintiffs'

appeal was governed by 25 C.F.R. Part 2 and that Defendant Black therefore had authority to

assume jurisdiction over the appeal. Pursuant to 25 C.F.R. § 2.20(c), the IBIA transferred appeal of Defendant Maytubby's decision to Defendant Black.

90.     Like Defendant Maytubby, Defendant Black was represented by the Office of Solicitor.

91.     The IBIA maintains a body of written precedent available to litigants and the public, see https://www.doi.gov/oha/organization/ibia/findingIBIA, and operates according to written rules of procedure, see https://www.doi.gov/oha/organization/ibia/IbiaRegsIndex. By contrast, ASIA maintains no publicly available precedents or rules of procedure other than those contained in 25 C.F.R. § 2.20.

92.     Defendant Black informed the parties that "[a]ny party that has questions regarding scheduling or procedure may submit questions by email." Defendant Black provided no information about measures to be taken by the federal government, if any, to ensure a sufficient ethical screen between Office of the Solicitor attorneys representing Defendant Maytubby before Defendant Black, and Office of the Solicitor attorneys representing Defendant Black in his review of this matter.

93.     Pursuant to a scheduling order issued on March 15, 2017, Plaintiffs filed a Brief on the Merits on March 30, 2017. Defendant Maytubby filed a Response Brief on April 27, 2017, as did the Halftown Group. On May 15, Plaintiffs filed a Reply. No further briefing was conducted and no hearing was provided.

94.     On June 16, 2017, the *Washington Post* reported that Defendant Black was among several dozen career employees of the Department of Interior who had been "reassigned" from their positions by Defendant Zinke, effective June 28, 2017.

95.     On July 14, 2017, Defendant Black issued a Decision denying Plaintiffs' appeal and affirming Defendant Maytubby's December 15, 2016, Decision. *See* July 14, 2017 Decision, attached as Exhibit "B."

96.     On July 28, 2017, Plaintiffs moved for resumption of jurisdiction over their appeal by the IBIA based on Defendant Black's reported reassignment from his position as Acting Assistant Secretary.

97.     On August 2, 2017, the IBIA denied Plaintiffs' motion, finding that previously undisclosed Secretarial Orders and a presumption of regularity sufficed to confirm Defendant Black's authority as Acting Assistant Secretary.

98.     Two days later, on August 4, 2017, the Halftown Group filed suit in New York state court seeking to permanently ban Plaintiffs, including the Nation's undisputed Clan Mothers, from setting foot on Cayuga Nation properties in Seneca County, New York.

99.     On September 8, 2017, the Supreme Court for the County of Seneca, State of New York, granted the Halftown Group's requested injunction. The Supreme Court stayed the injunction until September 26, 2017, to allow Plaintiffs here to file this federal action.


///


///


///


///

## CLAIMS FOR RELIEF

### COUNT I:  Agency Action Contrary to Law in violation of the APA

100.    Paragraphs 1 through 99 are hereby incorporated by reference.

101.    APA 706(2) directs the courts to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2), 706(2)(A).

102.    Federal law confirms Indian nations' right to choose their own form of government according to their own law and custom. 25 U.S.C. § 3601(3), (4) (affirming the "inherent authority [of Indian nations] to establish their own form of government"). This includes the right to determine how governmental leaders are chosen. 25 U.S.C. § 5123(h); *In re Sac & Fox Tribe of the Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 763–64 (8th Cir. 2003).

103.    Indian nation law and custom may be written or unwritten.

104.    Cayuga Nation leaders are chosen pursuant to the Haudenosaunee Great Law of Peace, which grants exclusive authority to select, oversee, and remove Chiefs and Council members to the Clan Mothers, based on input from the members of their clans.

105.    Cayuga citizens express their will and their choices for leadership through the clan system and the Clan Mothers.

106.    The Cayuga Nation has never used a mail-in survey or electoral process to choose its leaders.

107.    Defendant Maytubby determined, prior to requesting or receiving briefing on Cayuga law from the Nation's federally recognized government, that a sui generis mail-in survey campaign designed by one faction "would be a viable way of involving the Cayuga people in determination of the form and membership of their government."

108.    Likewise, Defendant Maytubby determined independently of Cayuga law that with respect to the Cayuga Nation, "a plebiscite must be a valid mechanism by which a body politic may decide matters of governance." In his view, no other means of choosing leaders could imbue a government with "consent of the governed."

109.    Defendant Maytubby ignored the lack of legitimacy of a plebiscite under Cayuga law and the fact that, under Cayuga law, the consent of the governed is preserved and expressed through each clan by its Clan Mother.

110.    Defendant Black affirmed Defendant Maytubby's determinations.

111.    While the United States may, under certain circumstances, interpret Nation or tribal law in order to make a recognition determination, it may not impose its own views of good governance or beliefs about the most effective governmental structures on sovereign Indian nations.

112.    Defendants' determinations, independent of Cayuga law, that a plebiscite "must be a valid mechanism" for the Cayuga Nation to choose leaders, violates Plaintiffs' right to self-government, and are therefore contrary to law. 5 U.S.C. § 706(2), § 706(2)(A).

**COUNT II:  Arbitrary and Capricious Agency Action Not Based on Consideration of Relevant Factors and Lacking Reasoned Explanation in Violation of the APA**

113.    Paragraphs 1 through 112 are hereby incorporated by reference.

114.    The APA requires the district court to set aside agency action found to be "arbitrary, capricious, or an abuse of discretion," 5 U.S.C. § 706(2)(A).

115.    When a decision departs from a longstanding agency position, the APA requires that the agency provide more than "conclusory statements" to explain and justify the change. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

116.    For many decades, the Department of the Interior, the Bureau of Indian Affairs, and the Interior Board of Indian Appeals have consistently recognized and respected the role of the Clan Mothers in appointing and removing members of the Cayuga Nation Council.

117.    Pursuant to the Great Law of Peace, Clan Mothers base their appointment of Council members on deliberative input from the members of their clans. In this way, the choices made by Clan Mothers express the will of the Cayuga people through a participatory, consensus-based process.

118.    The Cayuga Nation has never used a mail-in survey process as a "tribal mechanism" to choose its leaders.

119.    The BIA has never approved or recognized such a mail-in survey process as a means of choosing leaders of the Cayuga Nation and has twice rejected such processes.

120.    Upon information and belief, the BIA has never approved or recognized such a mail-in survey process as a means of choosing leaders for any federally recognized Indian tribe or nation.

121.    Neither Defendant Maytubby nor Defendant Black provided a reasoned explanation why the BIA's position on this fundamental issue of Indian self-governance should be changed with respect to the Cayuga Nation.

122.    Neither Defendant Maytubby nor Defendant Black considered core provisions of Cayuga law relevant to this matter.

123.    The decisions of Defendants Maytubby and Black approving a mail-in survey as a lawful method for selecting governmental leaders for the Cayuga Nation are arbitrary and capricious because the decisions were not based on consideration of relevant factors, failed to provide reasoned explanation, and showed clear errors of judgment. 5 U.S.C. § 706(2)(A).

**COUNT III: Arbitrary and Capricious Agency Action With No Rational Connection Between Facts Found and Conclusions Made in Violation of APA**

124.    Paragraphs 1 through 123 are hereby incorporated by reference.

125.    The mail-in survey process approved by the BIA purported to override the appointments made by Cayuga Nation Clan Mothers and to disregard the well-established requirement in Cayuga law that new Council members be appointed, presented, and monitored by their Clan Mother based on deliberative input from the clan.

126.    Even if a plebiscite had been authorized by the self-governing Cayuga Nation, the mail-in survey here was unreliable.  The only expert evidence submitted to the Defendants Maytubby and Black on the question of whether the mail-in survey campaign accurately assessed the views of Cayuga Nation citizens as to the composition of their government found the survey to be "a deeply flawed process from which no information may confidently be gathered."

127.    The experts who reviewed the mail in survey process found these grave flaws to include, among others: biased language; internal inconsistencies; acquiescence bias; and multiple questions subsumed in one. Respondents were asked to agree to a detailed statement regarding Cayuga law and governance with no option to disagree with any aspect stated. Further, only one choice was provided to respondents: a "straight ticket" that directly conflicted with the Clan Mothers' appointments to the Nation Council and with the document's own provisions regarding eligibility.

128.    Defendants Maytubby and Black acknowledged the flaws in the mail-in process and the fact the process had never been used as a tribal mechanism for choosing leaders, but they nonetheless accepted it as a tribal mechanism that accurately assessed the will of Cayuga citizens as to their leaders.

129.    Defendants' finding that the mail-in survey process accurately determined the will of Cayuga citizens was arbitrary and capricious in violation of 5 U.S.C. §706(2)(A). There is no

rational connection between the facts, which demonstrate fatal flaws in the survey process, and the conclusion that it accurately determined Cayuga citizens' will.

**COUNT IV: Prejudgment of Facts and Law in Agency Action Contrary to Constitutional Right in Violation of the APA, 5 U.S.C. § 706(2)(B)**

130.    Paragraphs 1 through 129 are hereby incorporated by reference.

131.    Defendant Regional Director's Decision "determine[d] which governing council to recognize for purposes of entering into a contract to provide [Self-Determination Act] services." Decision at 1. Such administrative recognition determinations are quasi-adjudicatory and must meet the basic requirements of due process and fairness. *Amos Treat & Co. v. Sec. & Exch. Comm'n*, 306 F.2d 260, 264 (D.C. Cir. 1962); *Am. Cyanamid Co. v. F.T.C.,* 363 F.2d 757, 767 (6th Cir. 1966).

132.    Due process requires a neutral administrative decision-maker. *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242 (1980); U.S. Const. amend. V, XIV.

133.    An agency official is not neutral when "a disinterested observer may conclude that the [agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Cinderella Career & Finishing School v. Federal Trade Commission,* 425 F. 2d 583, 591 (D.C. Cir. 1970).

134.    Prior to requesting or receiving briefing on the issue, Defendant Maytubby determined that a sui generis mail-in survey campaign designed by one faction of the Nation's recognized government "would be a viable way of involving the Cayuga people in determination of the form and membership of their government."

135.    Prior to requesting or receiving briefing on the issue, Defendant Maytubby also agreed to provide BIA technical assistance to the Halftown Group to support the mail-in survey process.

22

136.     Months after "agree[ing]" with the Halftown Group's proposal and providing BIA

technical assistance for it, Defendant Maytubby asked both factions to submit briefs on "the

validity of… the process" as a matter of law and as conducted.

137.     Defendant Maytubby's prior determination that the sui generis mail-in survey

process for choosing leaders was "viable" and dedication of federal funds to support it

constituted prejudgment of core legal and factual issues later presented to him for decision.

138.     Informal decision-making, behind closed doors and with an undisclosed record, is

not an appropriate process for the determination of matters of such gravity as federal recognition

of Indian nations. *Greene v. Babbitt*, 64 F.3d 1266, 1275 (9th Cir. 1995).

139.     By "adjudg[ing] the facts as well as the law of a particular case in advance of

hearing it," *Cinderella* at 591, and doing so behind closed doors with an undisclosed record,

Defendant Maytubby's Decision and Defendant Black's affirmance of it evidenced bad faith and

violated Plaintiffs' constitutionally protected right to Due Process. U.S. Const. amend. V, XIV.

**COUNT V: Collusive Agency Action Contrary to the Constitutional Right to Procedural Due Process, in Violation of the APA, 5 U.S.C. § 706(2)(B)**

140.     Paragraphs 1 through 139 are hereby incorporated by reference.

141.     Defendant Maytubby's Decision "determine[d] which governing council to

recognize for purposes of entering into a contract to provide [Self-Determination Act] services."

Decision at 1. Such administrative recognition determinations are quasi-adjudicatory and must

therefore meet the basic requirements of due process and fairness. *Amos Treat & Co. v. Sec. & Exch. Comm'n*, 306 F.2d 260, 264 (D.C. Cir. 1962); *Am. Cyanamid Co. v. F.T.C.,* 363 F.2d 757,

767 (6th Cir. 1966).

142.     Due process requires a neutral administrative decision-maker. *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242 (1980); U.S. Const. amend. V, XIV.

143.    "The absence in the administrative process of procedural safeguards normally available in judicial proceedings has been recognized as a reason for even stricter application of the requirement that administrative adjudicators be impartial." *Hummel v. Heckler,* 736 F.2d 91, 93 (3rd Cir. 1984).

144.    Constitutional due process guarantees protect both the appearance and the reality of fairness. *Marshall,* 446 U.S. at 242.

145.    A decision-maker who takes sides during the pendency of a dispute fails to preserve the reality or appearance of fairness. *Id.*

146.    The trust relationship between the United States and Indian nations imposes a heightened obligation on federal officials to treat Indian governments fairly. *North Slope Borough v. Andrus,* 642 F. 2d 589 (D.C. Cir. 1980).

147.    The trust responsibility obligates Department of the Interior officials, in exercising their authority to recognize Indian Nation governments pursuant 25 U.S.C. §§ 2, 9, to take special care to treat all federally recognized governmental leaders fairly.

148.    Fair treatment of Indian Nation governments precludes the United States from taking sides in an internal leadership dispute.

149.    By meeting secretly with one faction of a recognized government over a period of more than six months; prejudging as "valid" a proposed reformation of longstanding governance principles promoted by that faction; strictly limiting (to six business days) the time provided for participation from the competing faction; declining to respond to the competing faction's concerns and requests for information; and secretly dedicating BIA resources to supporting, reviewing, "verifying" and approving the proposed reformation/process, the Regional Director unlawfully chose sides in this dispute and colluded with one side to engineer a particular

outcome: the replacement of the Clan Mothers as the longstanding source of appointing leaders for the Cayuga Nation with a sui generis mail-in survey campaign.

150.    The Regional Director's actions evidence bad faith and violate Plaintiffs' constitutionally protected rights to fair and impartial administrative decision-making. *Marshall v. Jerrico, Inc.,* 446 U.S. 238 (1980); U.S. Const. amend. V, XIV.

**COUNT VI: Violation of the Constitution's Guarantee of Procedural Due Process: Participation Both as Agency Decision-Maker and as Appellate Reviewer of Agency Decision**

151.    Paragraphs 1 through 150 are hereby incorporated by reference.

152.    When review of an agency decision is mandated, the reviewing decision-maker must be other than the one who made the decision under review. *Morrissey v. Brewer*, 408 U.S. 471 (1972).

153.    A decision-maker who participates both in deciding a matter and in appellate review of that decision violates the constitutional principle of due process.

154.    In his scheduling order of November 1, 2016, Defendant Maytubby instructed the parties to submit their briefs himself and to Defendant Black, who then served as BIA Director.

155.    Following issuance of the scheduling order, Weldon "Bruce" Loudermilk became BIA Director and Defendant Black became Special Advisor to the BIA Director.

156.    In November 2016, the parties submitted their briefs to Defendant Black and Defendant Maytubby as well as BIA Director Loudermilk.

157.    The attempted Delegation of Final Agency Action that accompanied the December 15, 2016 Decision, purported to pass through BIA Director Loudermilk, for whom Defendant Black then served as Special Advisor.

158.    Upon information and belief, Defendant Black participated in the December 15, 2016 Decision.

159.    In January of 2017, Defendant Black became Acting Assistant Secretary – Indian Affairs.

160.    On January 23, 2017, the IBIA requested briefing from the United States on the issue of whether the attempted Delegation was lawful.

161.    On January 30, 2017, Defendant Black withdrew the attempted Delegation and assumed jurisdiction over Plaintiffs' administrative appeal of the December 15, 2016 Decision.

162.    In his review of Plaintiffs' appeal of Defendant Maytubby's December 15, 2016 Decision, Defendant Black was represented by attorneys for the Office of the Solicitor.

163.    In defense of his December 15, 2016 Decision before Defendant Black, Defendant Maytubby was also represented by attorneys for the Office of the Solicitor.

164.    On July 13, 2017, Defendant Black issued a decision affirming Defendant Maytubby's December 15, 2016 Decision.

165.    By both participating in the December 15, 2016 Decision and reviewing and affirming that Decision on appeal, Defendant Black acted in bad faith and violated Plaintiffs' constitutionally protected due process rights. U.S. Const. amend. V, XIV.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs request that the Court:

A.    Declare to be unlawful and vacate Defendant Maytubby's December 15, 2016 Decisions and Defendant Black's July 13, 2017 Decision;

B.    Issue preliminary and permanent injunctive relief prohibiting Defendants from relying on the vacated decisions for any action by the Department of the Interior, including but not limited to awarding or disbursement of federal funds;

C.      Issue preliminary and permanent injunctive relief prohibiting Defendant

Maytubby and Defendant Black from further adjudicating the question of the

Nation's lawful government and federal recognition of that government;

D.      Remand this matter to the Bureau of Indian Affairs for government to government

consultation and, as appropriate, decision by a neutral decision-maker on

recognition and the Plaintiffs' ISDEAA application;

E.      Award costs and attorney fees to the extent permitted by law, including but not

limited to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.      Award all such further equitable and/or legal relief this Court deems proper.


Date:  September 20, 2017                    Respectfully submitted,


By:    */s/Alexandra C. Page*
         Alexandra C. Page, D.C. Bar No. 461765
         BERKEY WILLIAMS LLP
         616 Whittier Street, NW
         Washington, D.C.  20012
         Tel: 202-302-2811
         Fax: 202-330-5293
         E-mail: alex.c.page@gmail.com

         Curtis G. Berkey, D.C. Bar No. 288647
         BERKEY WILLIAMS LLP
         2030 Addison Street, Suite 410
         Berkeley, CA  94704
         Tel: 510-548-7070
         Fax: 510-548-7080
         E-mail: cberkey@berkeywilliams.com

         Joseph J. Heath, N.Y. Bar Roll No. 505660
         512 Jamesville Avenue
         Syracuse, New York 13210
         Tel: 315-475-2559
         E-mail: jjheath1946@gmail.com

         *Attorneys for Plaintiffs*