# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CAYUGA NATION, by its Council of Chiefs and Clan Mothers; Clan Mother PAMELA TALLCHIEF; Clan Mother BRENDA BENNETT; Sachem Chief SAMUEL GEORGE; Sachem Chief WILLIAM JACOBS; Representative AL GEORGE; Representative KARL HILL; Representative MARTIN LAY; Representative TYLER SENECA, | Civil Action No.: 17-cv-01923-CKK |
| Plaintiffs, | |
| vs. | |
| The Honorable RYAN ZINKE, in his official capacity as Secretary of the Interior, United States Department of the Interior; MICHAEL BLACK, in his official capacity as Acting Assistant Secretary – Indian Affairs and in his individual capacity; BRUCE MAYTUBBY, in his official capacity as Eastern Regional Director, Bureau of Indian Affairs; WELDON "BRUCE" LOUDERMILK, in his official capacity as Director, Bureau of Indian Affairs; UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF INDIAN AFFAIRS, | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65 and LCvR 65.1, Plaintiffs the Cayuga Nation, Pamela Tallchief, Brenda Bennett, Samuel George, William Jacobs, Al George, Karl Hill, Martin Lay and Tyler Seneca respectfully move this Court for a Preliminary Injunction enjoining Defendants Ryan Zinke, Michael Black, Bruce Maytubby, Weldon "Bruce" Loudermilk, the United States Department of the Interior, and the Bureau of Indian Affairs from enforcing or otherwise relying on the December 15, 2016 Decision of the BIA's Eastern Regional Director and the July 13, 2017 appeals Decision of the Acting Assistant Secretary—Indian Affairs.

In support of this Motion, Plaintiffs rely on the attached Memorandum of Points and Authorities, along with the exhibits attached thereto, and the Declaration of Alexandra C. Page. Pursuant to LCvR 65.1, Plaintiffs respectfully request an oral hearing on this Motion at the Court's earliest possible convenience and within 21 days after the filing of this Motion.

Plaintiffs have conferred with the Defendants concerning this Motion pursuant to Local Civil Rule 7(m). See Declaration of Alexandra C. Page, ¶¶ 43, 51. Defendants have indicated that they will oppose this Motion.

Dated:  February 9, 2018                    Respectfully submitted,

By:    /s/Alexandra C. Page
        Alexandra C. Page, D.C. Bar No. 461765
        BERKEY WILLIAMS LLP
        616 Whittier Street, NW
        Washington, D.C.  20012
        Tel: 202-302-2811
        Fax: 202-330-5293
        E-mail: alex.c.page@gmail.com

        Curtis G. Berkey, D.C. Bar No. 288647
        BERKEY WILLIAMS LLP
        2030 Addison Street, Suite 410
        Berkeley, CA  94704
        Tel: 510-548-7070
        Fax: 510-548-7080
        E-mail: cberkey@berkeywilliams.com

Joseph J. Heath, N.Y. Bar Roll No. 505660
*Pro Hac Vice*
512 Jamesville Avenue
Syracuse, New York 13210
Tel: 315-475-2559
E-mail: jjheath1946@gmail.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The CAYUGA NATION, by its Council of Chiefs and Clan Mothers; Clan Mother PAMELA TALLCHIEF; Clan Mother BRENDA BENNETT; Sachem Chief SAMUEL GEORGE; Sachem Chief WILLIAM JACOBS; Representative AL GEORGE; Representative KARL HILL; Representative MARTIN LAY; Representative TYLER SENECA,<br><br>            Plaintiffs,<br><br>vs.<br><br>The Honorable RYAN ZINKE, in his official capacity as Secretary of the Interior, United States Department of the Interior; MICHAEL BLACK, in his official capacity as Acting Assistant Secretary – Indian Affairs and in his individual capacity; BRUCE MAYTUBBY, in his official capacity as Eastern Regional Director, Bureau of Indian Affairs; WELDON "BRUCE" LOUDERMILK, in his official capacity as Director, Bureau of Indian Affairs; UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF INDIAN AFFAIRS,<br><br>            Defendants. | Civil Action No.:  17-cv-01923-CKK |

# MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ......................................................................................... ii

I.    INTRODUCTION ..........................................................................................1

II.   PRELIMINARY INJUNCTION STANDARD...................................................3

III.  PLAINTIFFS HAVE SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS ......4

      A.    Defendants' Imposition of a Plebiscite Requirement Conflicts with Federal Law
            Protecting Indian Sovereignty (Count 1) .................................................................4

      B.    Defendants' Abrupt Policy Reversal is Arbitrary and Capricious Because There
            Was No Reasoned Basis for the Change (Count II) ................................................9

      C.    The Decisions are Arbitrary and Capricious Because There is No Rational
            Connection Between Facts Pertaining to the Mail-in Survey and the Conclusion
            That the Survey was Valid (Count III) .................................................................13

      D.    The BIA and DOI Violated Plaintiffs' Due Process Rights by Prejudging the
            Decision, Colluding with the Halftown Group, and Depriving Plaintiffs of a
            Neutral Decision-maker (Counts IV, V and VI)....................................................17

IV.   PLAINTIFFS ARE IRREPARABLY HARMED IN THE ABSENCE OF A
      PRELIMINARY INJUNCTION ......................................................................................25

      A.    Injury to the Ability of Plaintiff Clan Mothers and Plaintiff Chiefs to Carry Out
            Their Cayuga Governmental Functions is Irreparable Harm.................................25

      B.    Injury to the Government-to-Government Relationship between the Cayuga
            Nation and the United States, as Established by the Treaty of Canandaigua of
            1794, is Irreparable Harm .....................................................................................29

      C.    Injury to the Cayuga Nation's Administration of Governmental and Economic
            Affairs is Irreparable Harm....................................................................................31

      D.    Injury to Plaintiffs' Constitutional Rights is Irreparable Harm ............................33

V.    THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH IN
      FAVOR OF GRANTING A PRELIMINARY INJUNCTION .........................................34

VI.   CONCLUSION.............................................................................................38

i

# TABLE OF AUTHORITIES

**Page No.**

<u>**CASES**</u>

*\* Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ............................................................................... 37

*Al-Aulaqi v. Panetta*,
   35 F. Supp. 3d 56 (D.D.C. 2014) ............................................................................. 19

*Am. Cyanamid Co. v. F.T.C.*,
   363 F.2d 757 (6th Cir. 1966) ................................................................................... 18

*\* Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014) ............................................................................. 9, 13

*Amos Treat & Co. v. Sec. & Exch. Comm'n*,
   306 F.2d 260 (D.C. Cir. 1962) ................................................................................. 17

*Butte Cty., Cal. v. Hogen*,
   613 F.3d 190 (D.C. Cir. 2010) ................................................................................. 13

*Cayuga Indian Nation v. Eastern Regional Director, Bureau of Indian Affairs*,
   58 IBIA 171 (2014) ................................................................................................. 37

*Cayuga Nation v. Campbell*,
   No. 51342, 2017 WL 4079004 (N.Y. Sup. Ct. Sept. 8, 2017) .................................. 31

*Cayuga Nation v. William Jacobs*,
   17 N.Y.S.3d 353 (N.Y. App. Div. 2015) .................................................................. 16

*Cayuga Nation v. William Jacobs*,
   17 N.Y.S.3d 372 (N.Y. App. Div. 2015) .................................................................. 16

*Cayuga Nation v. William Jacobs*,
   986 N.Y.S.2d 791 (N.Y. Sup. Ct. 2014) .................................................................. 16

*\* Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) .................................................................................. 3

ii

<u>Page No.</u>

*Cinderella Career & Finishing School v. Federal Trade Commission*,
425 F. 2d 583 (D.C. Cir. 1970) .................................................................................... 18

*Cityfed Financial Corp v. Office of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) ......................................................................................... 3

*Commonwealth of the Northern Mariana Islands v. United States*,
686 F. Supp.2d 7 (D.D.C. 2009) .................................................................................. 36

*Davis v. Pension Benefit Guaranty Corp.*,
571 F. 3d 1288 (D.C. Cir. 2009) .................................................................................. 25

*Doe 1 v. Trump*,
No. 17-1597, 2017 WL 4873042 (D.D.C. Oct. 30, 2017)................................... 25, 34

*Dunlap v. Presidential Advisory Comm'n on Election Integrity, et al.*,
No. 2017-2161, 2017 WL 6880135 (D.D.C. Dec. 22, 2017) ....................................... 3

*FBME Bank Ltd. v. Lew*,
125 S. Supp. 3d 109 (D.D.C. 2015) ............................................................................. 34

*George Wash. Univ. v. Dist. of Columbia*,
148 F. Supp. 2d 15 (D. D.C. 2001) .............................................................................. 38

*Gordon v. Holder*,
721 F. 3d 638 (D.C. Cir. 2013) .................................................................................... 34

*Hammond v. Jewell*,
139 F. Supp. 3d 1134 (E.D. Cal. 2015) .................................................................. 5, 29

*Hummel v. Heckler*,
736 F.2d 91 (3rd Cir. 1984).......................................................................................... 18

*In re Sac & Fox Tribe of the Mississippi in Iowa/Meskwaki Casino Litig.*,
340 F.3d 749 (8th Cir. 2003)........................................................................................... 5

*Kirwa v. U.S. Dept. of Defense*,
No. 17-1597, 2017 WL 4862763 (D.D.C. Oct. 25, 2017)............................................ 35

**Page No.**

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................................ 36

*Marshall v. Jerrico, Inc.*,
446 U.S. 238 (1980) .......................................................................... 18

*Menominee Tribe of Indians v. United States*,
391 U.S. 404 (1968) .......................................................................... 30

*Mills v. District of Columbia*,
571 F. 3d 1304 (D.C. Cir. 2009) .......................................................... 34

*Motor Vehicles Mfrs. Assn. v. State Farm Mutual Ins.*,
463 U.S. 29 (1983) ............................................................................ 12

*North Slope Borough v. Andrus*,
642 F. 2d 589 (D.C. Cir. 1980) ........................................................... 18

*Plains Commerce Bank v. Long Family & Cattle Co.*,
554 U.S. 316 (2008) ...................................................................... 5, 29

*Poodry v. Tonawanda Band of Seneca Indians*,
85 F.3d 874 (2d Cir. 1996) .................................................................. 8

*Pursuing America's Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) ............................................................. 3

*Quaker Action Group v. Hickel*,
421 F. 2d 1111 (D.C. Cir. 1969) ......................................................... 34

*Samuel George v. Eastern Regional Director*,
49 IBIA 164 (2009) ................................................................... passim

*United States v. Michigan*,
471 F. Supp. 192 (W.D. Mich. 1979) .................................................... 30

*United States v. Washington*,
384 F. Supp. 312 (W.D. Wash. 1974) ................................................... 30

Page No.

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ................................................................................................ 3

*Veasey v. Perry*,
769 F. 3d 890 (5th Cir. 2014) ................................................................................ 27

*Virginia Jobbers Assn' v. Fed. Power Comm'n*,
259 F. 2d 921 (D.C. Cir. 1958) .............................................................................. 25

\* *Washington Legal Found. v. U.S. Sentencing Comm'n*,
89 F.3d 897 (D.C. Cir. 1996) ................................................................................. 20

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................. 25, 35

\* *Wisconsin Gas Co. v. FERC*,
758 F. 2d 669 (D.C. Cir. 1985) .............................................................................. 25

*Worcester v. Georgia*,
31 U.S. 515 (1832) ................................................................................................ 30

## STATUTES

\* 5 U.S.C. § 706(2)(A)................................................................................. 4, 9, 17
25 U.S.C. § 3601(3) ............................................................................................... 5
25 U.S.C. § 3601(4) .......................................................................................... 5, 30
25 U.S.C. § 5302(b) .............................................................................................. 35
U.S. Const. art. II, § 1; amend. XII; amend. XXIII, § 1 ........................................ 8

## RULES

Fed. R. Evid. 201(b)......................................................................................... 19, 20
Local Civil Rule 7(n)(1)........................................................................................... 4

## REGULATIONS

25 C.F.R. Part 81................................................................................................... 14
82 Fed. Reg. 4915 (Jan. 17, 2017) ....................................................................... 29

## OTHER AUTHORITIES

Cohen's Handbook of Federal Indian Law § 4.01[2][a] (N. Newton ed., 2012) ........... 5

## I.      INTRODUCTION

This motion seeks to enjoin the Department of the Interior ("DOI") from implementing a flawed decision to recognize a new Cayuga Nation ("Nation") government for purposes of a federal contract.  The decision violated the Administrative Procedures Act and the Nation's right to self-government.

The Cayuga Nation's sovereign governmental framework and foundational laws predate those of the United States and have served the Nation for centuries. Pursuant to its ancient law, Nation citizens choose their leaders through a consensual, clan-based process led by the Clan Mothers. In recent years, however, certain members of the Nation's governing Council of Chiefs have chafed against the authority held by the Clan Mothers, in whom Cayuga law places responsibility for appointing, advising, and removing members of the Council. These rogue Council members, known as the "Halftown Group," have refused to abide by Clan Mother directives, including orders removing them from the Council.  Instead, they have attempted to restructure the Nation's government to purge their political opponents and eliminate the Clan Mothers' authority altogether.[1]

In 2012 and 2014, the Halftown Group asked the Bureau of Indian affairs ("BIA") to support these efforts. The BIA declined, citing longstanding federal law and policy that recognizes the authority of the Cayuga Nation Clan Mothers and supports the Nation's right to continue its traditional governmental practices without federal interference. In 2016, however, the BIA abruptly reversed course.

Following months of secret meetings between DOI and BIA officials and the Halftown Group, to the exclusion of federally recognized leaders who are Plaintiffs here, the BIA decided

---

[1] In proceedings below, Plaintiffs were referred to as the "Jacobs Group." Plaintiffs include two federally-recognized Clan Mothers and half of the last federally recognized government of the Cayuga Nation, with the Halftown Group comprising the other half. Ex. I at 2.

to assist in restructuring the Nation's government to eliminate the authority of the Clan Mothers and Chiefs. Even after these secret meetings were disclosed to Plaintiffs, the BIA refused to reconsider its predetermined judgment that a mail-in survey process opposed by Plaintiffs "would be… viable" as a means of choosing Nation leaders and secretly supported the effort with BIA technical assistance and federal funds. Faced with competing proposals for a contract under the Indian Self Determination and Education Assistance Act ("ISDEAA"), the BIA formally approved the mail-in survey process based in part on its determination that "a plebiscite must be a valid mechanism" for the Cayuga Nation to choose its governmental leaders. DOI officials then attempted to deny Plaintiffs administrative review; reversed course by withdrawing that attempt; and finally, wrested jurisdiction over Plaintiffs' administrative appeal from the Interior Board of Indian Appeals ("IBIA"), so that an official who had participated in the BIA decision also adjudicated the decision's appeal.

Following disbursement of the contested contract funds, Plaintiffs filed this suit against the DOI, BIA, and federal officials, seeking vacatur of the agencies' deeply flawed decisions and a permanent injunction against reliance upon it.[2] Undaunted, the federal government and the Halftown Group have expanded their use of the challenged contracting decision, which by its terms was to be limited to the ISDEAA contract.

The decision and the agencies' and outside entities' reliance on it create severe and irreparable harm to the Plaintiffs and the Cayuga Nation. Plaintiff Clan Mothers and Chiefs cannot carry out their sovereign governmental functions as representatives of the Cayuga people. Plaintiffs' political adversaries are using the decisions as a weapon to evict Plaintiffs from Cayuga Nation property, dismantle longstanding relationships with federal agencies, and gain

---

[2] Plaintiffs' suit does not seek recission of the contract or disgorgement of the funds disbursed to the Halftown Council. Compl. at 26-27.

control of federal settlement funds. These harms to the Nation and its right to self-government

cannot be remedied. Plaintiffs seek limited preliminary relief here: an injunction preventing

Defendants from further relying on the challenged decisions while this Court reviews the merits

of Plaintiff's claims. Because Plaintiffs seek only to preserve the *status quo ante*; because the

balance of equities support the modest relief requested; and because Plaintiffs' claims will likely

succeed on the merits, preliminary relief is warranted.

## II.    PRELIMINARY INJUNCTION STANDARD

The standards applied to motions for preliminary injunction are well-established. "The

purpose of a preliminary injunction is… to preserve the relative positions of the parties until a

trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "To

warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of

success on the merits; (2) that it would suffer irreparable injury if the injunction were not

granted; (3) that an injunction would not substantially injure other interested parties; and (4) that

the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v.

England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

In cases against the government, the final two factors merge. *Pursuing America's

Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). A district court must

balance the strengths of the requesting party's arguments in each required area. *Cityfed Financial

Corp v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). If the showing in one

area is particularly strong, an injunction may issue even if the showings in other areas are rather

weak. *Id; Dunlap v. Presidential Advisory Comm'n on Election Integrity, et al.*, No. 2017-2161,

2017 WL 6880135 at *9 (D.D.C. Dec. 22, 2017). Notwithstanding this flexibility, a movant must

demonstrate at least some injury for a preliminary injunction to issue. *Chaplaincy of Full Gospel

Churches*, 454 F.3d at 297.

Plaintiffs have met their burden here. There is a strong likelihood of success on the merits; Plaintiffs will be irreparably harmed absent an injunction to preserve the status quo; and equity and the public interest support injunctive relief pending this Court's decision on the merits.

## III.   PLAINTIFFS HAVE SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs' complaint alleges violations of the Administrative Procedures Act ("APA"), including (a) violation of the well-established legal principal that Indian nations retain the exclusive right to govern themselves; (b) failure to provide a reasoned basis for an abrupt reversal in agency policy; (c) no rational connection between the facts about the mail-in survey approved by the BIA and the conclusion that the survey was reliable; and (d) due process violations including prejudgment, collusion with one faction, and failure to provide a neutral decision-maker. Undisputed facts in the administrative record demonstrate that Plaintiffs are likely to succeed on each of these claims.[3]

### A.   Defendants' Imposition of a Plebiscite Requirement Conflicts with Federal Law Protecting Indian Sovereignty (Count 1).

The APA requires the district court to set aside agency action found to be "not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants' determination, independent of Cayuga law, that a plebiscite "must be a valid mechanism" for the Cayuga Nation to choose its governmental leaders violates Plaintiffs' right to self-government and is therefore contrary to federal law. *Letter of Bruce W. Maytubby, BIA Eastern Regional Director to Clint Halftown and*

---

[3] Defendant agencies have not yet filed the Administrative Record or a list of its contents as required by Local Civil Rule 7(n)(1). To facilitate this Court's review of Plaintiffs' Motion for Preliminary Injunction, Plaintiffs have attached selected documents from the Administrative Record below, as supplemented by documents generated during the administrative appeal process that began in March 2017.  Some of the post-March 2017 documents are the subject of Plaintiffs' Motion to Supplement the Administrative Record and Expedite Discovery, filed concurrently with this Motion.

*William Jacobs, December 15, 2016*, Exhibit A at 8. ("Ex. A" or "*BIA Decision*"). Plaintiffs are likely to succeed on the merits of this claim.

Indian tribes and nations have the right to govern themselves according to their own law and custom. "For nearly two centuries now, [federal law has] recognized Indian tribes as 'distinct, independent political communities,' qualified to exercise many of the powers and prerogatives of self-government." *Plains Commerce Bank v. Long Family & Cattle Co.*, 554 U.S. 316, 327 (2008) (internal citations omitted). Congress has affirmed this authority. *See* 25 U.S.C. § 3601(3), (4) ("Congress, through statutes, treaties, and the exercise of administrative authorities, has recognized the . . .  inherent sovereignty of Indian tribes," which includes "the inherent authority to establish their own form of government."). Pursuant to these bedrock principles, "[j]urisdiction to resolve internal tribal disputes, interpret tribal constitutions and laws, and issue tribal membership determinations lies with Indian tribes." *In re Sac & Fox Tribe of the Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749, 763–64 (8th Cir. 2003).

Further, "[a] quintessential attribute of [an Indian nation's] sovereignty is the power to constitute and regulate its form of government. An Indian nation is free to maintain or establish its own form of government, unless Congress has passed a statute dictating the manner of choosing tribal officials or other aspects of a tribe's form of government." *Cohen's Handbook of Federal Indian Law* § 4.01[2][a] (N. Newton ed., 2012).

Congress has passed no act governing "the manner of choosing tribal officials" within the Cayuga Nation.  Thus, the Cayuga Nation is not required to use a plebiscite or any other electoral mechanism to choose its governmental representatives. Any such requirement would violate the foundational principle that "determination of tribal leadership is quintessentially an intra-tribal matter." *Hammond v. Jewell*, 139 F. Supp. 3d 1134, 1137–38 (E.D. Cal. 2015) (internal citations

omitted). The Cayuga Nation may use whatever mechanism its own law provides to choose leaders and to ensure that the will of its citizens is expressed through its government.

It is undisputed that the Cayuga Nation has never used a plebiscite to determine leadership and instead has always chosen leaders through a consensual, clan-based process led by the Clan Mothers. *Samuel George v. Eastern Regional Director*, 49 IBIA 164, 167 (2009), Exhibit B ("Ex. B"); *Decision of Assistant Secretary-Indian Affairs, July 13, 2017,* Exhibit C at 2, 16 ("Ex. C" or "*ASIA Decision*"). The Nation's clan-based, deliberative process for choosing leaders is fully consistent with the principle that the Nation's government derives its power from the Nation's people: through the clans, the voices of the people inform the Clan Mothers' determinations about leadership. This process is fundamentally inconsistent with a mail-in survey campaign designed to bypass the Clan Mothers and implemented over the Clan Mothers' opposition.

Prior to requesting briefing on whether the mail-in survey process comported with Cayuga law, Defendant Maytubby stated "[we] have been consulted by Mr. Halftown and his group [the faction opposed to Plaintiffs' leadership]… and we have agreed that a [mail-in survey process] would be a viable way of involving the Cayuga people in a determination of the form and membership of their government." *Letter from Bruce W. Maytubby, BIA Eastern Regional Director, to Anita Thompson, June 17, 2016,* Exhibit D at 1 ("Ex. D"). Maytubby's December 2016 Decision went further, stating that, in his view, "a plebiscite must be a valid mechanism by which a body politic may decide matters of governance." *BIA Decision*, Ex. A at 8-9.

Defendant Black's affirmance claimed that Maytubby's imposition of a plebiscite requirement was acceptable because it was limited to a single instance and would not permanently require the Nation to use mail-in surveys to choose leaders. *ASIA Decision*, Ex. C at

15 (deeming the survey campaign a "limited. . . [i]nitiative, designed to establish a baseline tribal government through which the BIA could perpetuate its government-to-government relationship with the Nation").  The Department implicitly acknowledged that the survey, and the BIA affirmance of it, were contrary to the Cayuga Nation's law: "Nothing in the Decision demands that the Nation… permanently discard their traditional governing structure." *Id*.  Federal agencies, however, lack authority to require that an Indian nation even *temporarily* discard its governing structure. Defendants' desire to "establish a baseline tribal government" in order to facilitate a federal funding decision cannot justify such a requirement. *Id.*

Further, no evidence exists to show that any Indian nation has *ever* used such a mail-in survey process to choose leaders. While several Indian nations hold elections and referenda, these processes are expressly authorized by their law and are subject to basic procedural safeguards wholly lacking in the BIA-supported mail-in survey process. *See discussion, infra*. Moreover, many thriving, federally-recognized Indian governments altogether reject processes such as elections, plebiscites, and referenda.  *See, e.g.,* Pueblo de Cochiti[4]; Pueblo of Jemez[5]; Ohkay Owingeh[6]; Pueblo of Acoma[7]; Pueblo of Sandia[8]; Tonawanda Seneca Nation (also known

---

[4] At the end of each year, the Cacique appoints the top six positions of the tribal government to a one-year term. *Pueblo Government*, PUEBLO DE COCHITI OFFICIAL WEBSITE, http://www.pueblodecochiti.org/about/pueblo-government (last visited Feb. 7, 2018).

[5] The Cacique and his staff select Government officials annually to carry out all secular duties and responsibilities of the tribal government. 9 JOE S. SANDO, *Jemez Pueblo*, in HANDBOOK OF NORTH AMERICAN INDIANS, SOUTHWEST 423 (William C. Sturtevant & Alfonso Ortiz eds., 1979).

[6] Two Caciques in consultation with the male heads of the Made People's societies appoint government officials annually. ALFONSO ORTIZ, THE TEWA WORLD – SPACE, TIME BEING & BECOMING IN A PUEBLO SOCIETY 62 (1969).

[7] The office of Cacique consists of the Antelope matrilineal clan brothers who have theologically vested authority over the government. The Cacique elects tribal council members for indefinite

as Tonawanda Band of Seneca Indians)[9]; Tuscarora Nation[10]; and Onondaga Nation[11]. These federally-recognized Indian governments, many centuries old, operate pursuant to their citizens' consent and express their citizens' will, but do not employ plebiscites.

Likewise, states and the federal government limit plebiscites: while a popular majority may elect a U.S. Senator, it does not determine the President. *See* U.S. Const. art. II, § 1; amend. XII; amend. XXIII, § 1.

Federal law guarantees the citizens of Indian nations the right to express their consent and their will through the processes provided by the law of their Nation.[12] Defendants nonetheless

---

terms while electing the governor and his staff annually. 9 Velma Garcia-Mason, *Pueblo of Acoma*, in Handbook of North American Indians, Southwest 463 (William C. Sturtevant & Alfonso Ortiz eds., 1979).

[8] "A Governor, Lt. Governor, Warchief, and Lt. Warchief are appointed for annual terms according to Sandia's cultural tradition. Each man can be appointed to consecutive terms. The Governor and Warchief will become Tribal Council members for life. The Warchief and Lt. Warchief are responsible for all religious activities held in the Pueblo. The Governor oversees day to day government operations, while the Lt. Governor is the Tribal Court Judge." *The Administration*, Pueblo of Sandia Official Website, https://www.sandiapueblo.nsn.us/administration/ (last visited Feb. 7, 2018).

[9] Government consists of clans who each "appoints a clan mother, who in turn appoints an individual to serve as Chief. The clan mother retains the power to remove a Chief and, in consultation with members of the clan, provides recommendations to the Chief on matters of tribal government." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 877 (2d Cir. 1996).

[10] A chief who is chosen by the Clan Mother governs each clan and represents the clan on the Tuscarora Council of Chiefs. National Geographic et al., Indian Nations of North America 65 (2010).

[11] The Council of Chiefs governs the Onondaga Nation and are selected by the Clan Mothers. Onondaga Nation Official Website, http://www.onondaganation.org/government/chiefs/ (last visited Feb. 7, 2018).

[12] The right of self-government protected by federal law is also a principle of customary international law understood to be consistent with and supportive of the rights of individual Indian people. *See*, *e.g.*, James Anaya (Special Rapporteur on the Situation of Human Rights and

imposed upon the citizens of the Cayuga Nation the obligation to accept a plebiscite in order to receive federal funds, finding that "a plebiscite must be a valid mechanism" for choosing Cayuga leaders.  Plaintiffs will likely succeed on the merits of their claim that Defendants acted contrary to law pursuant to APA § 706(2).

    **B.**    **Defendants' Abrupt Policy Reversal is Arbitrary and Capricious Because There Was No Reasoned Basis for the Change (Count II).**

The APA requires the district court to set aside agency action found to be "arbitrary, capricious, or an abuse of discretion." 5 U.S.C. § 706(2)(A). When a decision departs from a longstanding agency position, the APA requires that the agency provide more than "conclusory statements" to explain and justify the change. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

For decades, the federal courts, the Department of the Interior, the Bureau of Indian Affairs, and the Interior Board of Indian Appeals have consistently and uniformly acknowledged that the government of the Cayuga Nation follows the Great Law of Peace of the Haudenosaunee. *George v. Eastern Regional Director,* 49 IBIA at 167*,* Ex. B. Pursuant to this law, the will of the Cayuga people is expressed through their Clans, three of which are active today. *Id.* (Heron, Bear and Turtle are three active clans at Cayuga); *Declaration of Brenda Bennett, Nov. 11, 2016*, Exhibit E at 1 ("Ex. E"). Clan Mothers are responsible for guiding the selection of new Chiefs and Clan Representatives to the Nation's Council; monitoring and advising these leaders; and, if necessary, removing them pursuant to Nation law. *Declaration of Chief William Jacobs, June 9, 2014*, Exhibit F at 1-4; *Declaration of Chief Samuel George, June 10, 2014,* Exhibit G at 1-5. Chiefs serve for life and Clan Representatives serve as long as they

---

Fundamental Freedoms of Indigenous Peoples), ¶ 41 U.N. Doc. A/HRC/12/34 (July 15, 2009) ("The right of self-determination is a foundational right, without which indigenous peoples' human rights, both collective and individual, cannot be fully enjoyed.").

are needed, so the Clan Mother's monitoring and advising role is critical to the smooth functioning of the Nation's Council of Chiefs. *Id.*

The Nation's Council of Chiefs makes decisions by consensus. *George v. Eastern Regional Director,* 49 IBIA at 168, Ex. B. Citizen concerns are addressed through the clan structure. When a citizen has a complaint or concern, she may bring it to her Clan Mother, Chief, or Clan Representative to be addressed. *Declaration of Bear Clan Mother Pamela Tallchief, Nov. 13, 2016*, Exhibit H at 1 ("Ex. H"). Together, Clan Mothers, Chiefs, and Clan Representatives work to find consensus resolution to citizen concerns. *Id.* at 1-3. In this way, the clans of the Cayuga Nation provide the central framework for Cayuga citizens to express their will, inform the decisions of their leaders, and seek resolution of their concerns.

Cayuga law does not employ majority rule, voting, public opinion surveys, or mail-in survey campaigns as a means of choosing leaders. *Id.* at 2. It is undisputed that the Cayuga Nation has never before used such a process to make decisions or to choose leaders. *George v. Eastern Regional Director,* 49 IBIA at 165, Ex. B (affirming the traditional clan-based methods of determining leadership and reaching consensus, and finding that the parties "failed to provide a single factual example from the history or oral tradition of the Nation in which the Council acted by majority vote"); *ASIA Decision*, Ex. C at 16 (acknowledging that the Nation had never before employed a plebiscite to choose leaders).

The BIA has consistently rejected requests that it support mail-in surveys to determine Cayuga leaders, finding in 2015 that "we are aware of no applicable authority that provides for [BIA] verification of election results [at Cayuga] or allows BIA to provide an independent confirmation of the results of a [mail-in survey process] under these circumstances." *Letter of Tammie Poitra, Acting Eastern Regional Director, to Cayuga Nation et al., Feb 20, 2015,*

Exhibit I at 8 ("Ex. I").  Rather, BIA and DOI policy has been consistent: internal governmental disputes at the Cayuga Nation must be resolved internally according to the Nation's own law and traditional processes, and Cayuga law vests the Clan Mothers with exclusive authority to appoint and remove Council members.  *Id; see also George v. Eastern Regional Director*, 49 IBIA at 165, Ex. B.

The agency decisions challenged here, however, abruptly reversed course from this longstanding agency policy. The challenged decisions allocated federal funds to a purported tribal government created by a mail-in survey process that removed and replaced previously federally-recognized Cayuga governmental representatives against the will of their Clan Mothers and their respective clans.[13] The BIA and ASIA decisions thus sharply conflict with longtime agency policy and with judicial and administrative law on Cayuga governmental processes.[14]

---

[13] The government of the Cayuga Nation is accountable to its citizens regardless of the fact that the Nation does not and has never used referenda, elections, or mail-in surveys. Even Clint Halftown, the proponent of the survey process, acknowledged this decades ago: "Cayuga Chiefs and representatives are indeed accountable to the Cayuga People. That accountability is enforced according to traditional Cayuga law and the clan system, rather than Anglo concepts of pure majority rule." *See Letter from Joseph J. Heath to Bruce Maytubby et al., July 1, 2016*, Exhibit J at 11.

[14] The BIA-supported process challenged here is also fundamentally incompatible with Cayuga law. It conflicts with the Nation's Clan-based legal framework by overriding the Clan Mothers' authority to appoint Council members, informed by the "views of the clan" of the nominee. It also eliminates the Clan Mothers' well-established role in removing Council members when necessary. *Compare Memorandum of Law and Facts in Support of Cayuga Nation Council's Recognition as the Lawful Government of the Nation, November 14, 2016*, Exhibit K at 9, 15 (confirming that "neither party has ever denied the authority of Clan Mothers . . . to choose clan representatives who sit on the Nation's Council" and listing multiple sources confirming the Clan Mothers' authority to appoint and remove Council members) with *Halftown Group Governance Process Document, Letter of Clint Halftown et. al to Cayuga Nation, July 6, 2016*, Exhibit L at 5 (placing sole authority to approve new Council members in "the clan" of the nominee); *Id.* at 6 (stating that Council members may be removed only by "the untitled men [and/or women] of his clan at a clan meeting properly called for this purpose."). This Court need not and should not reach the issue of the meaning of Cayuga law in order to adjudicate Plaintiffs' APA claims.

Neither the BIA nor the Department of the Interior offered a reasoned basis for this abrupt reversal, and this Court cannot supply a reason where none is provided by the agencies. *Motor Vehicles Mfrs. Assn. v. State Farm Mutual Ins.*, 463 U.S. 29, 43 (1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.").  Instead, the agencies relied on the passage of time, unsupported allegations of unrest, and circular reasoning to justify their decisions. Defendants Maytubby and Black each emphasized repeatedly their belief that the purported outcome of the disputed process itself required them to accept the process as valid. In essence, they found that (1) the mail-in survey showed 60% of respondents supported the Halftown Group and their survey materials; (2) therefore the will of the Cayuga people was to support the Halftown Group; (3) therefore questioning the validity of the survey would mean disregarding the will of the Cayuga people. *See BIA Decision*, Ex. A at 14 ("Via the [mail-in survey] process, a significant majority of the Cayuga citizens have stated their support for the Halftown Council. I cannot consider this outcome as anything other than resolution of a tribal dispute by a tribal mechanism. I consider myself obligated to recognize the results of that tribal process."); *ASIA Decision*, Ex. C at 16 ("While it is true that, as Appellants argue, the Nation may not have previously selected leaders through a plebiscite, the BIA must respect the fact that 60% of eligible citizens nevertheless agreed that doing so was permissible under Cayuga law and sided with the Halftown Council"). This is classic circular reasoning that fails the APA's arbitrary and capricious test.

Defendants further opined that the passage of twenty-two months since an interim decision on a previous ISDEAA contract question required the BIA to "establish a baseline tribal government" to which to disburse federal funds, *ASIA Decision*, Ex. C at 15, and invoked

unsubstantiated and vigorously contested allegations of civil unrest. *See, e.g., Id.* at 22 (citing "two years of worsening disputes"); *cf. Letter from Brenda Bennett et. al to Bruce Maytubby, January 27, 2016*, Exhibit M (notifying federal government that an earlier dispute between the Turtle Clan and other clans had been resolved and that the Nation's Council was once again unified).

The agencies fail to meet the standard imposed by *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014), which requires an explanation for decisions reversing longstanding agency policy. Defendants' statements that "BIA must respect" the mail-in survey results and "consider [themselves] obligated to recognize the results" of the survey are both conclusory and circular: only if the survey was reliable could the results accurately reflect Cayuga citizens' views, and only if it was lawful could it constitute a valid tribal mechanism for resolving disputes. Only if both criteria were satisfied would recognition and respect from the federal government be required. Conclusions are not reasons. None of the purported rationales put forward by Defendants meets the standard required for reasoned explanation. Because an "agency's statement must be one of *reasoning*," *Butte Cty., Cal. v. Hogen,* 613 F.3d 190, 194 (D.C. Cir. 2010) (emphasis in original), and because the agencies failed to provide any reasoning beyond conclusory and circular statements, Plaintiffs are likely to succeed on the merits of their Count II claims.

### C. The Decisions are Arbitrary and Capricious Because There is No Rational Connection Between Facts Pertaining to the Mail-in Survey and the Conclusion That the Survey was Valid (Count III).

Count III of Plaintiffs' complaint alleges that Defendants' actions were arbitrary and capricious in violation of the APA because there is no rational connection between the facts relative to the mail-in survey and the conclusion reached by agency decision-makers that it was a

"viable way of involving the Cayuga people in a determination of the form and membership of their government." *Letter from Bruce W. Maytubby, BIA Eastern Regional Director, to Anita Thompson, June 17, 2016*, Ex. D at 1. The agencies are due no deference here: while the Court may defer to Defendants' expertise in supervising tribal elections, this was not an election.[15] Defendants possess no expertise in survey methodology and it is undisputed that Defendants have never before monitored, supported or otherwise participated in a mail-in survey process to choose leaders of an Indian government.

The only survey and polling experts to review the mail-in survey process as designed and implemented found multiple flaws so severe that, in their expert opinion, no reliable information could be obtained from the survey:

> The survey distributed to measure support for certain leaders and certain governance concepts among members of the Cayuga Nation is plagued by problems of biased language, confounding financial influences, insufficient response categories, acquiescence and social desirability biases, compound questions, and a potential lack of representativeness. Any one of these issues would alone be reason to question the validity of the survey. In concert, they suggest a deeply flawed method of assessment from which no information may be confidently gathered.

*Report of James N. Druckman, Ph.D., and Jacob E. Rothschild, M.A., Nov. 25, 2016*, Exhibit N ¶ 10 ("Ex. N").[16] The process was based on a secret voter list that misstated the total number of

---

[15] Indeed, while Defendant Maytubby deemed the mail-in survey campaign a "plebiscite," Defendant Black's affirmation variously described the survey as a "non-electoral solution" to the Nation's internal governance dispute, *ASIA Decision*, Ex. C at 3, and "a plebiscite." *Id.* at 14, 16. Had the survey process been a tribal election, in any event, it would have violated 25 C.F.R. Part 81, which requires that tribal elections overseen by the BIA make voter lists available for public review by tribal members; allow voters to cast ballots anonymously; and offer neutral, nonbiased information about each option being voted on. *See, e.g.,* 25 C.F.R. § 81.6(b)(1) (requiring inclusion of voter list in initial request for electoral process); 25 C.F.R. § 81.32 (requiring opportunity for tribal citizens to review and challenge the registered voter list); *see also* 25 C.F.R. § 81.29 (providing for review of whether voter participation comports with tribal and Federal law); 25 C.F.R. §§ 81.23(a)(5), (b)(6) (requiring "[a] side-by-side comparison" of voter choices). The mail-in survey process provided none of these basic procedural safeguards.

Cayuga citizens; the BIA-supported Halftown Group sent cash payments to Cayuga citizens just prior to soliciting their support; campaign materials contained biased language and offered only the option to choose the BIA-supported Halftown Group; and "voting" was non-anonymous. In addition, uncontradicted evidence produced by Plaintiffs demonstrated that the Halftown Group employs and has historically employed a range of tools to retaliate against political opponents.

The facts underlying these expert opinions were not contradicted in proceedings before the agencies. The Halftown Group presented no evidence, expert or otherwise, on the accuracy of the process as a means of gauging the views of Cayuga citizens. Defendants did not dispute the experts' conclusions. Nonetheless, the agencies disregarded each of the multiple deficiencies identified by the two experts in voting and public opinion polling, repeatedly refusing to accept the relevance of academic research on bias and other flaws in the survey methodology:

> "In the end I trust the Cayuga citizens to have understood the choice presented by the process. Were I to reject the results of the statement of support campaign, I would be disrespectful of the choice many Cayuga citizens made." *BIA Decision*, Ex. A at 12.

> "I cannot agree that the statement of support process confused the Cayuga citizens and left them susceptible to manipulation by biased language or otherwise." *Id.*

> "I am not dissuaded that such a political group [as the Cayuga Nation] could form an opinion relative to their own governance notwithstanding the potential effect of biased language." *Id.* at 11.

---

[16] James N. Druckman is the Payson S. Wild Professor of Political Science and Faculty Fellow at the Institute for Policy Research at Northwestern University. He serves on the Board of American National Election Studies, the nation's premier academic organization working to "maximize methodological excellence" in public opinion survey research. *See* AMERICAN NATIONAL ELECTION STUDIES, http://www.electionstudies.org/index.html (last visited Feb. 7, 2018). Professor Druckman is Associate Director for Northwestern University's Institute for Policy Research, an interdisciplinary and nonpartisan institution whose mission includes "stimulating and supporting excellent social science research." He edited the flagship journal on survey methods, *Public Opinion Quarterly*. *Druckman and Rothschild Report*, Ex. N at ¶ 3. Jacob Rothschild holds advanced degrees in political science from Northwestern University and the University of Southern Mississippi. He has studied survey research techniques at the University of Michigan. *Id.*

> "The difference between public opinion surveys and the statement of support process, and the absence of any evidence that the biased language actually affected any person's response, prohibits me from rejecting, due to biased language, the prima facie evidence that 60% of the Nation's citizens endorsed the Halftown Council's statements of support." *Id.*

Defendants' rejection of the unrebutted expert evidence suffers from two fatal flaws. First, it assumes the very premise the experts examined: that the campaign accurately gauged the views of Cayuga citizens. Only if the campaign accurately gauged citizen views could the Defendants reasonably rely on "the choice many Cayuga citizens made," *BIA Decision*, Ex. A at 12, or the "opinion relative to their own governance" that they "form[ed]." *Id*. at 11. Assuming that the will of Cayuga citizens was validly expressed through the campaign provided Defendants with the circular justification that any claim of bias, error or unfairness must be rejected since it undermines Cayuga citizens' will.

Second, Defendants without explanation refused to consider Plaintiffs' evidence regarding Mr. Halftown's treatment of political opponents. Plaintiffs provided the BIA in this proceeding with voluminous evidence of Mr. Halftown's political retaliation in recent years toward those Cayuga citizens who declined to support him politically. This has included retaliatory firings, preceded by Mr. Halftown's statement that "there will be layoffs and firings, that you can count on," *Affidavit of Brenda Bennett, Sept. 29, 2011*, Exhibit O at 6; evictions, *Affidavit of Justin Bennett, Sept. 29, 2011,* Exhibit P at 6 (documenting attempted eviction of pregnant Cayuga mother with three small children); state court ejectment actions seeking to prohibit Chiefs, Clan Mothers, and unnamed Cayuga citizen supporters of Plaintiffs from setting foot on Nation property, *Cayuga Nation v. William Jacobs,* 17 N.Y.S.3d 372 (N.Y. App. Div. 2015); *Cayuga Nation v. William Jacobs,* 17 N.Y.S.3d 353 (N.Y. App. Div. 2015); *Cayuga Nation v. William Jacobs*, 986 N.Y.S.2d 791 (N.Y. Sup. Ct. 2014), Exhibit Q at 1-8; and

suspension of cash distributions. *Letter of Clint Halftown et al. to Cayuga Nation Citizen, June 24, 2014,* Exhibit R at 2.

The Cayuga Nation is not large. Those who oppose Mr. Halftown do so at their peril. The crafting of the mail-in survey campaign, with its requirement that individuals identify themselves along with their pledge of support, ensured that Mr. Halftown and his group would know exactly who promised loyalty and who did not. Under these circumstances, for the BIA to have disregarded multiple flaws including admittedly biased language, non-anonymous ballots, and the timing of cash distributions was arbitrary and capricious. Because the serious defects in the survey's design and implementation rendered it "a deeply flawed method of assessment from which no information may confidently be gathered," *Report of James N. Druckman, Ph.D., and Jacob E. Rothschild, M.A., Nov. 25, 2016,* Ex. N ¶ 10, Plaintiffs are likely to prevail on the merits of their claim that Defendants' decision violated the Administrative Procedures Act's requirement of a rational connection between the facts and the decision. 5 U.S.C. § 706(2)(A).

> **D.      The BIA and DOI Violated Plaintiffs' Due Process Rights by Prejudging the Decision, Colluding with the Halftown Group, and Depriving Plaintiffs of a Neutral Decision-maker (Counts IV, V and VI).**

Plaintiffs are also likely to prevail on their Due Process claims. As alleged in the complaint, these include prejudgment of the mail-in survey process as "viable;" collusion between the BIA and one faction of the Nation's federally recognized government to the exclusion of other federally-recognized leaders; and administrative appeal review by an official who also participated in the decision.

Administrative recognition determinations such as those made by the BIA for purposes of dispensing federal funds to Indian nations are quasi-adjudicatory and must meet the basic requirements of due process and fairness. *Amos Treat & Co. v. Sec. & Exch. Comm'n*, 306 F.2d

260, 264 (D.C. Cir. 1962); *Am. Cyanamid Co. v. F.T.C.*, 363 F.2d 757, 767 (6th Cir. 1966). Due

process requires a neutral administrative decision-maker. *Marshall v. Jerrico, Inc.*, 446 U.S. 238,

242 (1980).  The neutrality requirement is particularly important in administrative decision-

making, which lacks procedural guarantees provided by judicial processes. *Hummel v. Heckler*,

736 F.2d 91, 93 (3rd Cir. 1984). The trust relationship between the United States and Indian

nations imposes a heightened obligation on federal officials to treat Indian governments fairly.

*North Slope Borough v. Andrus*, 642 F. 2d 589 (D.C. Cir. 1980). An agency official is not neutral

when "a disinterested observer may conclude that the [agency] has in some measure adjudged

the facts as well as the law of a particular case in advance of hearing it." *Cinderella Career &*

*Finishing School v. Federal Trade Commission*, 425 F. 2d 583, 591 (D.C. Cir. 1970).

From 2015 until the December 2016 Decision, Plaintiffs were recognized by the United

States as leaders of the Cayuga Nation.[17] Plaintiff Clan Mothers remain recognized by the United

States. Despite that recognition, Defendant Maytubby chose one side in an ongoing challenge to

Plaintiffs' leadership and diverted BIA resources to provide technical assistance to Plaintiffs'

political adversaries.  For months, Defendant Maytubby worked in secret with one side. Later, he

made funding decisions without consultation on the survey's legality and over Plaintiffs'

vehement objections.

---

[17] On February 20, 2015, then-Acting Bureau of Indian Affairs Regional Director Tammie Poitra
issued a decision recognizing, as the Cayuga Nation's "last undisputed government," a Council
of Chiefs comprised of six individuals, including Plaintiffs Sachem Chiefs Samuel George and
William Jacobs. Ms. Poitra's decision also recognized Chester Isaac as a Bear Clan
Representative. Representative Isaac was later succeeded on the Council by Plaintiff Alan
George. Her decision confirmed that the source of these leaders' authority was the Clan Mothers,
including Plaintiff Clan Mother Brenda Bennett and Plaintiff Clan Mother Pamela Tallchief. *See*
Ex. I at 2.

The record below includes the Halftown Group's proposal to the BIA for funding and technical support for a mail-in survey campaign to select new leaders for the Cayuga Nation. The proposal and request for BIA technical assistance are dated June 14, 2016.  *Letter from Clint Halftown et al. to Bruce Maytubby et. al, June 14, 2016*, Exhibit S ("Ex. S" or "June 14 Proposal"). In a letter dated June 17, 2016, Defendant Maytubby accepted the proposal and agreed to provide technical assistance, finding that the *sui generis* mail-in survey campaign "would be a viable way of involving the Cayuga people in determination of the form and membership of their government." *Letter of Bruce W. Maytubby, BIA Eastern Regional Director, to Anita Thompson, June 17,2016*, Ex. D at 1.  The timing and content of these communications indicate that Defendant Maytubby based his determination of "viab[ility]" on the Halftown Group's June 14 Proposal, and did so just days after receiving it. June 14 Proposal, Ex. S; *see also ASIA Decision*, Ex. C at 3-4.

The record before the Assistant Secretary for Indian Affairs on Plaintiffs' appeal of the BIA Decision, however, omitted a key document that demonstrates that Defendant Maytubby secretly had accepted the Halftown Group's June 14 Proposal *before* it was submitted on June 14. Pursuant to the Plaintiffs' Freedom of Information Act (FOIA) request, the BIA produced a letter signed by Defendant Maytubby and date-stamped June 8, 2016, six days before the Halftown Group submitted its June 14 Proposal and request for technical assistance.  *See Declaration of Alexandra C. Page ¶ 24*; *Letter of Bruce Maytubby to Cayuga Nation Council*, *June 8, 2016*, Exhibit T ("Ex. T" or "June 8 Letter").[18] This letter memorializes Defendants'

---

[18] Pursuant to Rule 201(b)(2) of the Federal Rules of Evidence, Plaintiffs request this Court take judicial notice of the June 8 Letter, which was produced by Defendant BIA in response to Plaintiffs' FOIA request.  Federal district courts may take judicial notice "of public records and government documents available from reliable sources."  *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014). Public records, as defined by this Circuit, are not limited to court

agreement with the Halftown group that the as-yet-unproposed campaign was "viable." *See* June 8 Letter, Ex. T (stating that the BIA "has been consulted by [the Halftown Group] regarding [their proposal for a mail-in survey campaign] and we have agreed that… [it] would be a viable way of involving the Cayuga people in a determination of the form and membership of their tribal government.").

The June 8 Letter illuminates grave procedural irregularities: by the letter, Defendant Maytubby purported to accept a proposal that had not yet been made or disclosed to the Plaintiffs, to whom Maytubby owed a duty of neutrality. These procedural irregularities accord with Defendant Maytubby's own statement that he had been consulting with the Halftown Group for months about the proposed survey campaign. *Letter from Joseph Heath to Bruce Maytubby, June 20, 2016*, Exhibit U (memorializing Defendant Maytubby's statement that he met and exchanged information about the proposed mail-in survey process with the Halftown Group over a period of at least six months prior to sending his June 17, 2016 letter to Plaintiffs). Plaintiffs first requested records of these consultations in June 2016. *Id.* However, no records have been produced detailing these consultations, from which Plaintiffs – including federally recognized Cayuga leaders – were excluded.

Because neither the BIA nor the DOI has produced the full set of records responsive to Plaintiffs' FOIA request and comprising the complete administrative record for this case, it is impossible for Plaintiffs or this Court to ascertain or evaluate the basis for Defendants' decision,

---

documents. *See, e.g., Washington Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 905 (D.C. Cir. 1996) (concluding that "as a matter of federal common law, that a 'public record'— that is, a record to which the public has a right of access, subject to the balance of public and governmental interests—is a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived."). The June 8 Letter was created by a department of the federal government; thus, it is a government document which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

first formulated on or prior to June 8, 2016, to accept the validity of the mail-in survey process and provide technical assistance for it. Despite significant gaps in the administrative record, the record nonetheless shows that Director Maytubby's decision to choose sides in this leadership dispute was made following months of meetings that excluded the Plaintiff Clan Mothers and other federally recognized leaders of the Cayuga Nation.

Months after agreeing with the Halftown Group's June 14 Proposal and expending substantial BIA resources to support it, Defendant Maytubby asked both factions to submit briefs on "the validity of… the process" as a matter of law and as conducted. *Letter of Bruce W. Maytubby to Clint Halftown and William Jacobs, Nov. 1, 2016*, Exhibit V at 2 ("Ex. V"). These briefs were submitted to both Defendant Maytubby and Defendant Black. *See, e.g.*, *ASIA Decision*, Ex. C at 7 (listing briefs). In fact, Maytubby had already made his decision on the "validity of . . . the process." Ex. V at 2.  Defendant Maytubby's prior determination that the *sui generis* mail-in survey process for choosing leaders was "viable" and dedication of federal funds to support it prejudged the core legal and factual issues later presented to him for decision. Prejudgment of the issue to be decided deprived Plaintiffs of due process.  Plaintiffs are likely to prevail on the merits of this claim.

Defendants Department and Black compounded Defendant Maytubby's due process violations by compromising Plaintiffs' administrative appeal rights. Under normal circumstances, BIA decisions to deny an ISDEAA contract request and/or to decline to recognize a tribal government for such contracting purposes are appealable within the Department to the Interior Board of Indian Appeals. This avenue for administrative appeal is provided to Indian nations and others for two principal reasons: to offer a low-cost mechanism to challenge a flawed decision; and to give the agency a chance to correct errors internally prior to any federal court

review of agency decisions. *See* https://www.doi.gov/oha/organization/ibia/faqs/How-Do-I-Appeal-a-Decision-to-the-Board#bullet1, last visited Feb. 7, 2018.

Defendant Maytubby's December 15 Decision, however, was treated differently. For unexplained reasons, the Decision was accompanied by a purported delegation of authority for final agency action ("Delegation") intended to deprive Plaintiffs of administrative review. *Delegation of Authority to Take Final Agency Action to Bruce Maytubby, Dec. 15, 2016*, Exhibit W (citing only "competing claims of leadership" and an understanding that the BIA decision would be based on opening and responsive briefs as justification for the delegation).  The purported Delegation was signed by Principal Deputy Assistant Secretary Lawrence Roberts and a BIA official to whom Defendant Black reported as Special Advisor. *Id*. It stated that Defendant Maytubby's recognition and ISDEAA decisions were reviewable only in federal court.

Plaintiffs resisted Defendants' efforts to foreclose administrative review of the December 15 Decision, and appealed to the Interior Board of Indian Appeals, pointing out procedural flaws that rendered the purported delegation invalid. The Board acknowledged Plaintiffs' concerns, noting that "[t]he Delegation memo identifies neither the source of the Principal Deputy's authority to render a decision that is final for the Department, nor the authority which would allow him to delegate this authority to the Regional Director," *IBIA Order for Briefing, Jan. 23, 2017*, Exhibit X at 4-5, and requesting briefing from the United States on these issues.

Prior to that briefing deadline, however, Defendant Black was elevated to the position of Acting Assistant Secretary of Indian Affairs and promptly used the authority of his new office to retroactively "withdraw" the disputed delegation and wrest jurisdiction over Plaintiffs' appeal from the IBIA. *Memorandum of Michael Black to Bruce Maytubby Withdrawing Delegation of Authority, Jan. 31, 2017*, Exhibit Y. In this new position, Defendant Black was able to and did

review a decision he had participated in below – the briefs prepared for Mr. Maytubby in

November 2016 were submitted to Mr. Black at that time. *See, e.g.*, *ASIA Decision*, Ex. C at 7

(listing briefs submitted to Mr. Maytubby and Mr. Black).

Thus, Defendant Black granted himself the authority to review a decision in which he had

actively participated.  Defendant Black's assumption of jurisdiction over Plaintiffs' appeal was

not harmless error.  His participation in both a decision and its appeal tainted his appellate

decision.  On appeal he ignored key evidence of collusion by the BIA, failing to address

Defendant Maytubby's admission that multiple meetings took place with the Halftown faction

between late 2015 and mid-2016 without notice to Plaintiffs. Instead, Defendant Black

concluded that Plaintiffs' failure to "provide concrete examples of specific meetings,

conversations or other occurrences where the Regional Director deliberately excluded the Jacobs

Council in order to benefit the Halftown Council" defeated Plaintiffs' objections to these

meetings. *ASIA Decision*, Ex. C at 20.[19] Plaintiffs cannot be expected to possess detailed

knowledge of secret meetings from which they were deliberately excluded. For over eighteen

months, Defendants have stonewalled Plaintiffs' requests for precisely this information. *See*

*Declaration of Alexandra C. Page* ¶¶ 16, 29, 48. Notably, the documents provided by Defendant

---

[19] In a similar vein, Defendant Black opined that Plaintiffs should have challenged his appellate
jurisdiction before the BIA, a logical impossibility. *ASIA Decision*, Ex. C at 9 n.64 ("[Plaintiffs]
never specifically argued I lacked authority under the VRA to adjudicate this appeal… before the
Regional Director"). In addition, he erroneously characterized the BIA-imposed deadline for
Plaintiffs to brief concerns about the mail-in survey process as a mere "suggestion," *Id.* at 17-18,
n. 125. In fact, the BIA denied Plaintiffs' request for a modest extension of that deadline, citing a
perceived need for the mail in survey process to move forward quickly. *Letter from Johnna*
*Blackhair, Acting Eastern Regional Director, to Joseph Heath, June 23, 2016*, Exhibit Z (stating
that "[r]egarding your request for an extension [of 20 days], we grant an extension [of 4 days]…
We believe it is important that your comments be provided as soon as possible because *the*
*[mail-in] process described in my letter... is going to be getting underway*.") (emphasis added).

Department of Interior in its initial FOIA production date from *after* the period in which these secret consultations took place. *See Declaration of Alexandra C. Page* ¶ 42. DOI has provided no responsive records from the relevant period between late 2015 and June 7, 2016, despite DOI's preliminary determination that a search for records related to DOI communications with the Halftown Group and their lawyers during this period would "promptly identify a body of responsive documents, none of which would be subject to privilege." *Letter from Lance Purvis, Department of Interior Office of the Solicitor, to Martha Morales, Berkey Williams LLP July 27, 2017* at 2, Exhibit AA at 2; *see also See Declaration of Alexandra C. Page* ¶ 34.[20]

For its part, Defendant BIA has produced only one responsive document not already in Plaintiffs' possession: the June 8, 2017 Letter. That document supports Plaintiffs' claim of collusion by showing that Defendants agreed to accept the Halftown Group's June 14 Proposal before it was ostensibly made, and well before any notice or opportunity to be heard by Plaintiffs. *See Declaration of Alexandra C. Page* ¶ 24. Defendants admit meetings and communications occurred prior to June 2016. They have thus far refused to produce documents related to these meetings and communications despite FOIA's requirement that they do so. Nonetheless, even the incomplete record before the Court amply demonstrates that Defendants colluded with one political faction to the exclusion of the other; prejudged a process that would radically reshape the Nation's government and expended BIA resources to implement it; and rigged the system of administrative review to deny Plaintiffs due process. For all these reasons, Plaintiffs are likely to succeed on the merits of their due process claims. Until the merits can be addressed, a preliminary injunction should issue so that the status quo may be maintained.

---

[20] Defendants have produced an email chain alluding to a June 8 phone call between Defendants and lawyers for the Halftown Group, begging the question of whether the mail-in survey campaign was discussed on that date. *See Declaration of Alexandra C. Page* ¶ 40.

## IV.     PLAINTIFFS ARE IRREPARABLY HARMED IN THE ABSENCE OF A PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish that . . . [it]

is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural*

*Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  "The key word in this consideration is

'irreparable.'" *Virginia Jobbers Assn' v. Fed. Power Comm'n*, 259 F. 2d 921, 925 (D.C. Cir.

1958).  The decisive factor in determining whether harm is irreparable is whether the loss is

"recoverable" or compensable.  *See, e.g., Wisconsin Gas Co. v. FERC*, 758 F. 2d 669, 674 (D.C.

Cir. 1985) (rejecting interim relief where petitioners could likely recover their losses through

contract or rate filings); *Davis v. Pension Benefit Guaranty Corp.*, 571 F. 3d 1288, 1295 (D.C.

Cir. 2009) (claims of monetary loss are not irreparable where they could be compensated by a

favorable ruling).  To establish that irreparable harm is "likely," the plaintiff must provide "proof

that the harm has occurred in the past and is likely to occur again," or "proof indicating that the

harm is certain to occur in the near future." *Wisconsin Gas Co.*, 758 F. 2d at 674.  The injury

must be both "certain and great" and must be "actual and not theoretical." *Doe 1 v. Trump*, No.

17-1597, 2017 WL 4873042 *32 (D.D.C. Oct. 30, 2017) (internal citations and quotation marks

omitted). Plaintiffs meet these requirements. The harm to the Cayuga Nation's interests and the

loss of its governmental integrity caused by the BIA's recognition decision are not recoverable

even if Plaintiffs succeed in this lawsuit. These harms are occurring now and will continue unless

a preliminary injunction is ordered.

### A.     Injury to the Ability of Plaintiff Clan Mothers and Plaintiff Chiefs to Carry Out Their Cayuga Governmental Functions is Irreparable Harm.

By requiring the Cayuga Nation to reorganize its government according to

results of a mail-in survey, the BIA imposed an ongoing barrier to the Clan Mothers' and Chiefs'

ability to carry out their governmental responsibilities.  Plaintiffs submitted evidence establishing

that under the Haudenosaunee's Great Law of Peace, the Cayuga Nation government assigns to the Clan Mothers the authority to select, monitor, advise and – when necessary -- remove leaders. *Declaration of Oren Lyons, Nov. 4, 2011*, Exhibit BB. This fundamental tenet of Cayuga law has served the Nation well for centuries. *Id.* Plaintiff Clan Mothers are responsible not only for appointing members of the Nation's Council but also for advising these leaders based on the views of the members of the clan. *Declaration of Brenda Bennett, Nov. 11, 2016,* Ex. E at 3-4. This ongoing responsibility requires each Clan Mother to work closely with individual citizens and her clan's representatives on Council. *Id.* at 4 ("The Clan Mothers are essential to the function of the Cayuga Nation government because they represent the voice of their respected clan and the only means of ensuring that voice is properly respected by the men who serve as Chiefs and Clan Representatives.").

It is undisputed that the Turtle Clan Mother and the Bear Clan Mother, who remain federally-recognized Nation officials, did not agree that a mail-in survey campaign could be used to override their appointments to Council based on the views of their respective clans about the proper Cayuga government leaders. Ex. E at 2-4; *Declaration of Bear Clan Mother Pamela Tallchief, Nov. 13, 2016,* Ex. H at 1-3. Nor did the Turtle or Bear Mother agree that Clan Representatives they had previously removed from Council based on clan input could be reinstated, against their objections, via a mail-in survey campaign. *Id.*

Likewise, Plaintiff Clan Mothers never agreed to permanently relinquish their governmental authority. The mail-in survey campaign supported by Defendants, however, expressly abolishes the Clan Mothers' governmental role in appointing and removing Council members, turning that role over to "the clan" and/or "the untitled men [and/or women] of [the] clan." *See Halftown Group Governance Process Document, Letter of Clint Halftown et. al to*

*Cayuga Nation, July 6, 2016*, Ex. L at 5 (placing sole authority to approve new Clan Representatives in "the clan" of the nominee); *Id.* (stating that Clan Representatives may be removed only by "the untitled men [and/or women] of his clan at a clan meeting properly called for this purpose.").

Defendants' decision to support the mail-survey campaign as a means of "establishing a baseline tribal government" prevents Plaintiff Clan Mothers from carrying out essential governmental functions. By overriding the Clan Mothers' appointments, severing the governmental relationship between the Clan Mothers and their clan's representatives, and permanently abolishing the Clan Mothers' role in appointments and removals, the mail-in survey campaign "destroy[s] our Clan Mothers' ability to provide the checks and balances that have helped our traditional government for centuries."[21] *Declaration of Brenda Bennett, Nov. 11. 2016,* Ex. E at 4. "The [mail-in survey] campaign… prevent[s] me, as a Clan Mother, from bringing the voices of members of my clan to bear on Nation decision-making." *Id*.

Impairment of Plaintiff Clan Mothers' governmental function in this way is irreparable harm.  Imposing a plebiscite requirement that supplants the traditional Cayuga government with an elective system orchestrated by the BIA for purposes of a federal contract prevents the Clan Mothers from exercising the sovereign governmental authority vested in them, and thereby creates an ongoing harm that cannot be remedied with money damages or other forms of compensation.  The harm will intensify unless a preliminary injunction is granted.  *See, e.g., Veasey v. Perry*, 769 F. 3d 890 (5th Cir. 2014) (enjoining fundamental changes in the method of

---

[21] Equally egregious is the fact that the mail-in survey campaign created a Wolf Clan representative position on the Council despite the fact there is no Wolf Clan Mother. It is undisputed this purported leader was never appointed by a Clan Mother and cannot be overseen by one. *See* Ex. E at 1 (listing the three active Cayuga clans: Heron, Turtle and Bear).

electing state officials in order to protect state's "significant interest in ensuring [a] proper and consistent" system of electing leaders).

Using a plebiscite requirement to displace the traditional Cayuga government also impairs the governmental functions of the Council of Chiefs of the Cayuga Nation.  For over a decade prior to the challenged decisions, Plaintiffs Samuel George and Williams Jacobs were recognized by the BIA as authorized leaders of the Nation. *Letter of Tammie Poitra, Acting Eastern Regional Director, to Cayuga Nation et al., Feb 20, 2015*, Ex. I at 2. Under the Great Law of Peace, upon appointment by the Clan Mothers, members of the Council are vested with authority to govern Cayuga internal and external affairs. The Council carries out its responsibilities with the advice of the Clan Mothers, who deliberate with Clan members, so that the voices of the Clan are heard by the Council.

The decisions challenged here dramatically impair Plaintiff Council members' ability to execute their obligations under Cayuga law. The Council members are faced with an impossible choice.  Either they must accept the federal agencies' decisions as binding on them and relinquish their roles as members of Council and advocates for their clan, or they must seek to continue to function as a government in the face of a federal agency decision and practice that denies their authority. An individual Chief can hear a complaint from a citizen of his clan but cannot bring the matter to Council without running afoul of federal "plebiscite" policy. And a Chief whose clan wishes him to take up a matter related to the Nation to Nation relationship between the Cayuga Nation and the United States is barred by the agency decisions from advocating with the federal government on the Nation's behalf.

The challenged decisions, although purportedly limited to a single federal contract, prevent Plaintiffs from carrying out core governmental functions accorded to them under Cayuga law. The resulting harms to sovereign and the right of self-government are irreparable.

**B.      Injury to the Government-to-Government Relationship between the Cayuga Nation and the United States, as Established by the Treaty of Canandaigua of 1794, is Irreparable Harm.**

The Cayuga Nation is a sovereign Indian nation recognized by the United States as entitled to all the rights and benefits available to Indian nations under federal law. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 82 Fed. Reg. 4915, 4916 (Jan. 17, 2017).  The Nation's legal and political relationship with the United States is established and recognized in the Treaty with the Six Nations of 1794, 7 Stat. 44, also known as the Treaty of Canandaigua.  Under this Treaty, the United States acknowledged the territory and sovereignty of the Cayuga Nation and promised never to "disturb them, or any of the Six Nations . . . in the free use and enjoyment" of their lands and way of life. By recognizing the sovereignty of the Cayuga Nation, and by promising not to interfere in or "disturb" the internal governmental affairs of the Nation, the United States in the Treaty of Canandaigua guaranteed the Nation's right to self-government.  The Treaty is consistent with bedrock principles of federal Indian law, which "[f]or nearly two centuries now, [have] recognized Indian tribes as 'distinct, independent political communities,' qualified to exercise many of the powers and prerogatives of self-government." *Plains Commerce Bank v. Long Family & Cattle Co.*, 554 U.S. 316, 327 (2008) (internal citations omitted).  Among the sovereign powers of an Indian nation is the authority to choose its own form of government and the manner in which its leaders are selected. *Hammond v. Jewell*, 139 F. Supp. 3d 1134, 1137-1138 (E.D. Cal. 2015) ("determination of tribal leadership is quintessentially an intra-tribal

matter"); 25 U.S.C. § 3601(4) (affirming Indian nations' "inherent authority to establish their own form of government.").

The BIA's decision imposing a plebiscite process on the Cayuga Nation inflicts incalculable damage to the Nation's treaty relationship with the United States. The Canandaigua Treaty protects the right of the Nation to choose its own form of government without interference by the BIA. *See, e.g., Menominee Tribe of Indians v. United States*, 391 U.S. 404, 406 (1968) (describing the "essence" of a treaty as the protection of the Indian nation's ability to "maintain . . . their way of life . . . "); *United States v. Michigan*, 471 F. Supp. 192, 254 (W.D. Mich. 1979) (the doctrine that Indian treaties are a reservation of inherent rights not granted to the United States applies to Indian self-government); *Worcester v. Georgia*, 31 U.S. 515, 556 (1832) (by explicitly acknowledging the national character of Indian tribes, treaties guarantee their right of self-government). The Cayuga Nation's treaty right to self-government can never be secure if the United States may choose sides in an internal leadership dispute and use federal funds to engineer, in collaboration with one faction, a federally-desired governmental result. The Nation's loss of the ability to choose its own form of government cannot be recovered. Injury to the treaty right to self-government cannot be fully monetized or adequately compensated with money damages. *See, e.g., United States v. Washington*, 384 F. Supp. 312, 404 (W.D. Wash. 1974) ("[T]reaty rights . . . are unique and the damages which have been or will be sustained are not susceptible of definite monetary determination."). The Nation's government-to-government relationship, as established by the Treaty of Canandaigua, has been irretrievably impaired. A preliminary injunction is necessary to prevent further injury.

C.    **Injury to the Cayuga Nation's Administration of Governmental and Economic Affairs is Irreparable Harm.**

Immediately following the BIA's decision to recognize the Halftown Group for ISDEAA contracting purposes, the Halftown Group acted to expand its control over Cayuga Nation affairs and to undermine the authority of the Plaintiffs under Cayuga Nation law.  These actions include litigation in New York State court to evict the Plaintiffs from Cayuga Nation properties; assertion of exclusive authority to represent the Cayuga Nation in a federal interpleader action; and efforts to terminate the longstanding relationship between the Environmental Protection Agency ("EPA") and the Haudenosaunee Environmental Task Force, the Nation's agent for environmental projects.  These actions were taken even though Defendants' decisions were limited to a federal ISDEAA contract. The Halftown Group's unfounded assertion of exclusive authority over all Cayuga legal, political and economic affairs prior to this Court's review of the legality of the disputed decision irreparably harms the Plaintiffs.

Halftown's state court action demonstrates the severe harm suffered by the Plaintiffs.  On the very day Plaintiffs received the Interior Board of Indian Appeals' final ruling in the administrative proceedings below,[22] the Halftown Group filed an action in state court seeking Plaintiffs' immediate and permanent eviction from Nation properties and businesses based on the federal decisions challenged here.  On September 8, 2017, the state Supreme Court, Seneca County, issued a preliminary injunction granting the relief Halftown requested, ordering the Plaintiffs to "immediately vacate" and deliver "possession and control" over five Nation properties and businesses, including a convenience store and gas station, to the Halftown Group. *Cayuga Nation v. Campbell,* No. 51342, 2017 WL 4079004 (N.Y. Sup. Ct. Sept. 8, 2017),

---

[22] The IBIA Order denying Plaintiffs motion to reassume jurisdiction was dated August 2, 2017 and was received by Plaintiffs' counsel in Washington, D.C. via U.S.P.S. on August 4, 2017. *Cayuga Nation v. Eastern Regional Director*, IBIA No. 17-025 (Aug. 2, 2017), Exhibit CC.

Exhibit DD at 2. The preliminary injunction further ordered the Plaintiffs to "surrender all dominion" over Cayuga Nation personal property.  Plaintiffs were required to expend scarce resources to defend their rights, and succeeded in winning a stay of the preliminary injunction pending appeal, following Plaintiffs' posting a $129,000 appeal bond.  Although for now the status quo is being maintained due to the appellate stay, the Halftown Group's state court action poses a grave threat to the functioning of the Cayuga Nation Council of Chiefs government and the revenue on which it depends for governmental operations.  The Halftown Group will likely seek to dismiss Plaintiffs' appeal and/or to vacate the stay now in place. If granted, such relief will enable the Halftown Group to physically evict the Plaintiffs from Nation properties.  A preliminary injunction in the case at bar is necessary to ensure peace within the Cayuga Nation and to prevent the Halftown Group from using the untested BIA recognition decision to dispossess the Plaintiffs from Nation properties.

The Halftown Group has also asserted exclusive control over the legal affairs of the Cayuga Nation.  The Cayuga Nation is a member of a class of tribal plaintiffs that recently settled claims against the BIA for alleged underpayments of contract support costs under the ISDEAA during fiscal years 1994 through 2013.  Payment of the Cayuga Nation's share of the $94 million settlement was held in abeyance pending resolution of the dispute between the Halftown Group and the Plaintiffs.  The plaintiffs in that case filed an interpleader action asking the federal district court in New Mexico to determine which Cayuga group is entitled to the payment of the Nation's share of the settlement.  Shortly after the IBIA issued its final ruling below, the Halftown Group filed a motion asking the federal district court to lift the stay of the interpleader action, presumably to allow the filing of a request that the funds be distributed to the Halftown Group. *See Halftown Group's Motion to Lift Stay of Interpleader Action Concerning*

*Cayuga Nation*, *Ramah Navajo Chapter v. Jewell,* No. 90-cv-957-JAP/KBM (D.N.M. Aug. 28,

2017), Exhibit EE. In the absence of a preliminary injunction here, the district court in New

Mexico may treat the BIA recognition decision as final and adjudicate the interpleader action

before resolution of the merits of the Plaintiffs' claims that the recognition decision is unlawful.

Although the BIA decision properly applies only to a federal contract with that agency

under the ISDEAA, the Halftown Group is wielding the decision to arrogate to itself exclusive

authority to deal with *all* federal agencies on all matters, and thereby impair Plaintiffs' nation to

nation relationship with the United States and cut off federal funding to the Plaintiffs.  For

example, in September 2017, the Halftown Group purported to withdraw the Cayuga Nation

from the Haudenosaunee Environmental Task Force ("HETF"), an Indian organization that has

represented the Cayuga Nation for decades and has served as the vehicle by which the Nation

receives grant funding from the EPA. *Email from Argie Cirillo, Assistant Regional Counsel,*

*Environmental Protection Agency, to Joe Heath, September 20, 2017, 11:03 AM ET*, Exhibit FF.

Plaintiffs have relied on HETF for this source of funding to support a range of environmental

protection efforts in and around Cayuga ancestral territory.  EPA has responded by noting that,

based on the decisions challenged here, the Halftown Group is applying for EPA funding, and by

declining to fund the Cayuga Nation through HETF for activities from January 1, 2018 through

December 31, 2018.  *Id*.  This loss of funding cannot be recovered by subsequent EPA grants if

EPA issues those funds to the Halftown Group.  The harm to the Cayuga Nation and Plaintiffs is

irreparable.

### D.    Injury to Plaintiffs' Constitutional Rights is Irreparable Harm.

The Plaintiffs have shown a strong likelihood of prevailing on the merits of their claims

that the Defendants violated their constitutional due process rights by presupposing the validity

of the mail-in survey; colluding with the faction seeking to overthrow the Cayuga Council of Chiefs; and depriving them of a neutral decision-maker on the administrative appeal.  This Court has acknowledged a well-established "line of authority" in this Circuit holding that plaintiffs' allegation of "constitutional injury is sufficient to satisfy the irreparable injury requirement for issuance of a preliminary injunction." *Doe 1 v. Trump*, No. 17-1597, 2017 WL 4873042, at *32 (D.D.C. Oct. 30, 2017) (citing *Mills v. District of Columbia*, 571 F. 3d 1304 (D.C. Cir. 2009) and *Gordon v. Holder*, 721 F. 3d 638 (D.C. Cir. 2013)).  Although *Doe 1* involved violations of the 5th Amendment's Equal Protection Clause, violations of the Due Process Clause as shown here just as readily qualify as irreparable constitutional injury.   Defendants' due process violations deprive Plaintiffs of their sovereign right to self-government, as discussed *supra*. Because of the resulting harms to the right of self-government, Plaintiffs' injury cannot be remedied by providing another opportunity to argue their case to the BIA in a subsequent administrative proceeding.  Absent an injunction, the agency decisions challenged here will be used to compound these severe harms. The Cayuga Nation's right to self-government is fundamental to the Nation's existence and is irretrievably impaired so long as the decisions remain in effect. Like constitutional rights, Indian nations' right to self-government is "so basic to our society that any deprivation might well be found to constitute irreparable injury." *Quaker Action Group v. Hickel*, 421 F. 2d 1111, 1116 (D.C. Cir. 1969).

## V.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION

A party seeking a preliminary injunction must also show that the balance of equities favors the injunction and that the injunction is consistent with the public interest.  *FBME Bank Ltd. v. Lew*, 125 S. Supp. 3d 109, 127 (D.D.C. 2015).  The Supreme Court has directed courts to balance "competing claims of injury and consider the effect on each of the granting or

withholding of the requested relief." *Winter v. NRDC,* 555 U.S. at 24.  Where, as here, the

federal government is the opposing party, balancing hardships and assessing the public interest

are merged into a single determination, so that the court considers them together.  *Kirwa v. U.S.*

*Dept. of Defense*, No. 17-1597, 2017 WL 4862763 *10 (D.D.C. Oct. 25, 2017).

Absent a preliminary injunction, the Plaintiffs will continue to suffer concrete and

significant harm.  The BIA's decision recognized the Halftown Group on an interim basis for

purposes of federal contracting under the ISDEAA, but the Halftown Group has not and will not

confine their claimed authority to that context.  They will continue to assert exclusive access to

federal and state funding, exclusive control over Nation resources and assets, and exclusive

authority to speak for the Cayuga Nation regarding the Nation's government-to-government

relationship with the United States.  Plaintiffs have been subjected to the Halftown Group's state

court eviction action, the loss of federal environmental funding and the loss of the right to share

in the ISDEAA contract support costs class action judgment.  In addition, the challenged

decisions deprive Plaintiff Clan Mothers and Chiefs of their authority and ability to govern their

Nation. These harms to Plaintiffs will continue throughout the pendency of this litigation, which

is not likely to be resolved quickly.  The severity of these injuries to Plaintiffs' governmental

interests strongly weighs in their favor in the equities determination.

To allow the Halftown Group to amplify its power in these ways while Plaintiffs' claims

are being litigated will cause immense hardship to Plaintiffs.  Such harm is especially acute when

viewed in the context of the long-standing federal policy promoting self-determination for Indian

nations, which includes the goal of assisting Indian nations to build strong governments.  *See,*

*e.g.,* ISDEAA, 25 U.S.C. § 5302(b) (federal policy of self-determination means that "the United

States is committed to supporting and assisting Indian tribes in the development of strong and

stable tribal governments…").  This self-determination policy favors maintaining the status quo while courts assess the legality of BIA actions purporting to resolve tribal governmental disputes. The harm to Plaintiffs cannot be undone if the BIA's decision is ultimately vacated.

The hardship imposed on the Nation's Clan Mothers is particularly significant.  Under Cayuga law, the Clan Mothers have sole responsibility for appointing, advising and removing the men who make up the Council of Chiefs. The challenged mail-in survey campaign eviscerated the governmental role of the Clan Mothers and replaced them with a majoritarian system that is alien to Cayuga legal principles.  The Clan Mothers' central role will continue to be diminished during the pendency of this case in the absence of a preliminary injunction.  Contrasted with the *de minimis* harm suffered by the Defendants, the harm to Plaintiff Clan Mothers is so severe that it tips the balance of equities in favor of Plaintiffs.

Further, Plaintiffs have shown they are likely to succeed on the merits. That showing "is a strong indicator that a preliminary injunction would serve the public interest," because of the substantial public interest "in having governmental agencies abide by the federal laws that govern their existence."  *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation and citations omitted); *see also Commonwealth of the Northern Mariana Islands v. United States*, 686 F. Supp.2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").  The public interest in agency compliance with laws and policies designed both to hold federal agencies accountable and to protect and enhance Indian self-determination argues for a preliminary injunction here.

The balance of equities also favors Plaintiffs because the requested preliminary injunction would not alter the status quo.  "The primary purpose of a preliminary injunction is to

preserve the object of the controversy in its then existing condition—to preserve the status quo."

*Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014).  Plaintiffs seek no relief on this motion

that would require the Bureau of Indian Affairs or Department of the Interior to take any

affirmative action.  Plaintiffs do not request that the court order the BIA to reach a different

recognition decision or to seek reimbursement from the Halftown Group of the ISDEAA grant

funds already disbursed.  Rather, Plaintiffs seek merely to return the parties to the status quo that

existed before Defendant Maytubby issued his decision recognizing the Halftown Group as the

government for the Cayuga Nation for purposes of the ISDEAA contract.

By contrast with the harms suffered by the Plaintiffs, the Defendants would incur no

appreciable hardship if an injunction to maintain the *status quo ante* is issued.  There are no

pending issues before the Department related to Cayuga Nation business that cannot await

resolution of the Plaintiffs' claims.  The DOI's administrative burden would not be increased,

because the injunction would not require any affirmative action by any departmental agency.  To

the extent DOI argues that an injunction would impair the government-to-government

relationship with the Cayuga Nation, that alleged harm is not sufficiently grave to outweigh the

substantial harm to the Plaintiffs, particularly since that relationship turns on the very right to

Indian nation self-government Plaintiffs seek to vindicate here.

Nor would an injunction harm the DOI's administration of federal Indian programs.

Department policy is to make recognition decisions only when a compelling need related to the

administration of federal programs and benefits arises. Continuous, affirmative recognition of a

tribal government is not required.  *See Cayuga Indian Nation v. Eastern Regional Director,*

*Bureau of Indian Affairs*, 58 IBIA 171, 180 (2014), Exhibit GG (principles of tribal sovereignty

constrain the BIA from intervening in tribal governmental disputes when there is "no separate

matter that requires or separately triggers a need for BIA action that implicates the government-to-government relationship, and which in turn necessitates a BIA decision on the tribal dispute.") Neither Plaintiffs nor the Halftown Group has any legal entitlement to a particular source or amount of federal program money, and DOI has no legal obligation to fund the Nation.[23]

The Department will not be disadvantaged by the issuance of a preliminary injunction while the Court reviews the merits of Plaintiffs' claims. Even if Defendants prevail on the merits, the only consequence of an injunction will be a limited period of time in which the BIA is constrained from dealing exclusively with the Halftown Group. There are no pending issues there that cannot await the outcome of this litigation. A delay of implementation of the BIA's recognition decision while this Court considers the merits of Plaintiffs' claims does not harm the Defendants. *See George Wash. Univ. v. Dist. of Columbia*, 148 F. Supp. 2d 15, 19 (D. D.C. 2001) (injunction warranted where it merely preserved the status quo and the only harm to the defendant would be delay).

## VI.    CONCLUSION

The decisions challenged in this action represent a dramatic reversal by federal agencies following months of secret meetings with one governmental faction to the exclusion of Plaintiffs, culminating in the announcement of a plebiscite requirement and the award of funds pursuant to a Federal contract. While those funds have already been disbursed – and Plaintiffs do not seek disgorgement of them – the deeply flawed decisions challenged here have been weaponized in ways that irreparably harm Plaintiffs. Grave deficiencies in the agencies' decisions suggest

---

[23] Nor can the Halftown Group complain that it will suffer hardship if a preliminary injunction is issued. Even if reduced federal funding constituted harm, which it does not, Mr. Halftown has stated under oath that the "overwhelming majority" of Nation revenue derives from his Class II gambling operation. *Declaration of Clint Halftown in Support of Plaintiffs' Order to Show Cause,* at ¶ 12, *Cayuga Nation v. Howard Tanner,* No. 5:14-cv-1317 (N.D.N.Y. May 29, 2015), ECF No. 5-8, filed Oct. 28, 2014, Exhibit HH.

Plaintiffs are likely to prevail on the merits of their APA and due process claims, and little harm

will result from enjoining further reliance on the disputed contracting decision while this Court

considers Plaintiffs' claims. For all the foregoing reasons, Plaintiffs' Motion for Preliminary

Injunction should be granted.

Date:  February 9, 2018                          Respectfully submitted,


By:____*/s/Alexandra C. Page*_____
            Alexandra C. Page, D.C. Bar No. 461765
            BERKEY WILLIAMS LLP
            616 Whittier Street, NW
            Washington, D.C.  20012
            Tel: 202-302-2811
            Fax: 202-330-5293
            E-mail: alex.c.page@gmail.com

            Curtis G. Berkey, D.C. Bar No. 288647
            BERKEY WILLIAMS LLP
            2030 Addison Street, Suite 410
            Berkeley, CA  94704
            Tel: 510-548-7070
            Fax: 510-548-7080
            E-mail: cberkey@berkeywilliams.com

            Joseph J. Heath, N.Y. Bar Roll No. 505660
            *Pro Hac Vice*
            512 Jamesville Avenue
            Syracuse, New York 13210
            Tel: 315-475-2559
            E-mail: jjheath1946@gmail.com

            *Attorneys for Plaintiffs*

# EXHIBIT LIST

A.  *Letter of Bruce W. Maytubby, BIA Eastern Regional Director to Clint Halftown and William Jacobs, December 15, 2016*

B.  *Samuel George v. Eastern Regional Director*, 49 IBIA 164 (2009)

C.  *Decision of Assistant Secretary-Indian Affairs, July 13, 2017*

D.  *Letter of Bruce W. Maytubby, BIA Eastern Regional Director, to Anita Thompson, June 17, 2016*

E.  *Declaration of Brenda Bennet, Nov. 11, 2016*

F.  *Declaration of Chief William Jacobs, June 9, 2014*

G.  *Declaration of Chief Samuel George, June 10, 2014*

H.  *Declaration of Bear Clan Mother Pamela Tallchief, Nov. 13, 2016*

I.  *Letter of Acting Eastern Regional Director Tammie Poitra to Cayuga Nation et al., Feb 20, 2015*

J.  *Letter of Joseph J. Heath to Bruce Maytubby et al., July 1, 2016*

K.  *Memorandum of Law and Facts in Support of Cayuga Nation Council's Recognition as the Lawful Government of the Nation, November 14, 2016*

L.  *Halftown Group Governance Process Document, Letter of Clint Halftown et. al to Cayuga Nation, July 6, 2016*

M.  *Letter from Brenda Bennett et. al to Bruce Maytubby, January 27, 2016*

N.  *Report of James N. Druckman, Ph.D., and Jacob E. Rothschild, M.A., Nov. 25, 2016*

O.  *Affidavit of Brenda Bennett, Sept. 29, 2011*

P.  *Affidavit of Justin Bennett, Sept. 29, 2011*

Q.  *Cayuga Nation v. William Jacobs,* 17 N.Y.S.3d 372 (N.Y. App. Div. 2015); *Cayuga Nation v. William Jacobs,* 17 N.Y.S.3d 353 (N.Y. App. Div. 2015); *Cayuga Nation v. William Jacobs,* 986 N.Y.S.2d 791 (N.Y. Sup. Ct. 2014)

R.  *Letter of Clint Halftown et al. to Cayuga, June 24, 2014*

S.  *Letter of Clint Halftown et al. to Bruce Maytubby et. al, June 14, 2016*

T.  *Letter of Bruce Maytubby to Cayuga Nation Council*, June 8, 2016

U.  *Letter from Joseph Heath to Bruce Maytubby, June 20, 2016*

V.  *Letter of Bruce W. Maytubby to Clint Halftown and William Jacobs, Nov. 1, 2016*

W.  *Delegation of Authority to Take Final Agency Action to Bruce Maytubby, Dec. 15, 2016*

X.  *IBIA Order for Briefing, Jan 23, 2017*

Y.  *Memorandum of Michael Black to Bruce Maytubby Withdrawing Delegation of Authority, Jan. 31, 2017*

Z.  *Letter from Johnna Blackhair, Acting Eastern Regional Director, to Joseph Heath, June 23, 2016*

AA.  *Letter of Lance Purvis, Department of Interior Office of the Solicitor, to Martha Morales, Berkey Williams LLP July 27, 2017*

BB.  *Declaration of Oren Lyons, Nov. 4, 2011*

CC.  *The Cayuga Nation v. Eastern Regional Director*, IBIA 17-025 (Aug. 2, 2017)

DD.  *Cayuga Nation v. Campbell,* No. 51342, 2017 WL 4079004 (N.Y. Sup. Ct. Sept. 8, 2017)

EE.    *Halftown Group's Motion to Lift Stay of Interpleader Action Concern Cayuga Nation* filed in *Ramah Navajo Chapter, et al. v. Jewell,* No. 90-cv-957-JAP/KBM, Aug. 28, 2017

FF.    *Email from Argie Cirillo, Assistant Regional Counsel, Environmental Protection Agency to Joe Heath, September 20, 2017, 11:03 AM ET*

GG.    *Cayuga Indian Nation v. Eastern Regional Director, Bureau of Indian Affairs,* 58 IBIA 171 (2014)

HH.    *Declaration of Clint Halftown in Support of Plaintiffs' Order to Show Cause, at ¶ 12, Cayuga Nation v. Howard Tanner,* No. 5:14-cv-0131-DNH-ATB (N.D. N.Y. Oct. 28, 2014)

II.    *Letter of Halftown Group to Cayuga Citizens, June 2016*