## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CAYUGA NATION, by its Council of Chiefs and Clan Mothers; PAMELA TALLCHIEF; BRENDA BENNETT; SAMUEL GEORGE; WILLIAM JACOBS; AL GEORGE; KARL HILL; MARTIN LAY; and TYLER SENECA, Plaintiffs, v. The Honorable RYAN ZINKE, in his official capacity as Secretary of the Interior; MICHAEL BLACK, in his official capacity as Acting Assistant Secretary – Indian Affairs and in his individual capacity; BRUCE MAYTUBBY, in his official capacity as Eastern Regional Director, Bureau of Indian Affairs; WELDON "BRUCE" LOUDERMILK, in his official capacity as Director, Bureau of Indian Affairs; UNITED STATES DEPARTMENT OF THE INTERIOR; and the BUREAU OF INDIAN AFFAIRS, Defendants, CAYUGA NATION COUNCIL, Defendant-Intervenor. | Civil Action No. 1:17-cv-01923 (CKK) |

## DEFENDANT-INTERVENOR CAYUGA NATION COUNCIL'S
## OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

David W. DeBruin
D.C. Bar No. 337626
JENNER & BLOCK, LLP
1099 New York Avenue, N.W.
Washington, D.C.  20001
(202) 639-6015

*Counsel for Defendant-Intervenor*
Cayuga Nation Council

### <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

BACKGROUND .................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.   THE PRELIMINARY RELIEF THAT PLAINTIFFS HAVE REQUESTED
     CARRIES AN EXTRAORDINARILY HIGH BURDEN. .................................. 6

     A.   Plaintiffs Seek A Mandatory Injunction, A Heavily Disfavored And Rarely
          Granted Form Of Preliminary Relief. ...................................................... 6

     B.   Plaintiffs' Complaint Asserts Claims Under The Administrative Procedure
          Act, Making Preliminary Injunctive Relief Uniquely Disfavored. ......................... 7

II.  PLAINTIFFS HAVE FAILED TO MAKE A CLEAR SHOWING THAT THEIR
     APA CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS ................................... 8

     A.   Plaintiffs Will Fail On Count One Because The BIA Properly Deferred To
          Cayuga Nation Law. ............................................................................. 8

     B.   Plaintiffs' Other Counts Also Fail. ....................................................... 10

III. PLAINTIFFS HAVE FAILED TO MAKE A CLEAR SHOWING THAT THEY
     WILL SUFFER IMMINENT AND IRREPARABLE INJURIES IF THEIR
     REQUEST IS DENIED. .......................................................................... 12

     A.   Plaintiffs' Alleged Non-Economic Harms Are Question-Begging. .................... 12

     B.   Plaintiffs' Request Is Directed At Defendants Who Cannot Forestall
          Plaintiffs' Alleged Harms. .................................................................. 14

IV.  GRANTING PLAINTIFFS' REQUEST WOULD SUBSTANTIALLY INJURE
     THE CAYUGA NATION, ITS CITIZENS, AND THE CAYUGA NATION
     COUNCIL. ........................................................................................... 15

CONCLUSION .................................................................................................................... 16

# TABLE OF AUTHORITIES[*]

CASES

*Abdullah v. Bush*, 945 F. Supp. 2d 64 (D.D.C. 2013), *aff'd sub nom. Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014) .................................................................6

*American Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001).....................................7

*American Meat Institute v. United States Department of Agriculture*, 968 F. Supp. 2d 38 (D.D.C. 2013), *aff'd*, 760 F.3d 18 (D.C. Cir. 2014) ......................................15

*Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106 (D.D.C. 2014) ..............................................................................................................4

*Cayuga Indian Nation v. Eastern Regional Director*, 58 IBIA 171 (2014) ....................................1

*Cayuga Nation v. Jacobs*, 44 Misc. 3d 389 (N.Y. Sup. Ct., Seneca Cty. 2014).............................2

*Cayuga Nation v. Tanner*, 824 F.3d 321 (2d Cir. 2016).................................................................13

*Columbia Hospital For Women Foundation, Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1 (D.D.C. 1997), *judgment aff'd*, 159 F.3d 636 (D.C. Cir. 1998) ..............................................................................................................7

*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004)..........................................14

*Electric Privacy Information Center v. DOJ*, 15 F. Supp. 3d 32 (D.D.C. 2014).............................7

*Emily's List v. FEC*, 362 F. Supp. 2d 43 (D.D.C.), *aff'd*, 170 F. App'x 719 (D.C. Cir. 2005) .................................................................................................7, 8

*George v. Eastern Regional Director*, 49 IBIA 164 (2009) ............................................................1

*Healthbridge Management, LLC v. NLRB*, 672 F. App'x 1 (D.C. Cir. 2016)...............................12

*Katz v. Georgetown University*, 246 F.3d 685 (D.C. Cir. 2001) ....................................................15

*Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221 (DC Cir. 1993).....................7

*Power v. Federal Labor Relations Authority*, 146 F.3d 995 (D.C. Cir. 1998) ......................11, 12

*Ransom v. Babbitt*, 69 F. Supp. 2d 141 (D.D.C. 1999)............................................................5, 10

*Safari Club International v. Jewell*, 47 F. Supp. 3d 29 (D.D.C. 2014) .........................................14

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Shenandoah v. United States Department of Interior*, No. 96-CV-258(RSP/GJD), 1997 WL 214947 (N.D.N.Y. Apr. 14, 1997), *judgment aff'd*, 159 F.3d 708 (2d Cir. 1998) ...................................................................................................................8

*Town of Norwood v. FERC*, 962 F.2d 20 (D.C. Cir. 1992) ...........................................................12

*\*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985).....................................................14

**STATUTES**

28 U.S.C. § 1657(a) ...........................................................................................................................7

**OTHER AUTHORITIES**

25 C.F.R. § 81.7 ...............................................................................................................................13

2 C.F.R. pt. 1500, subpt. E...............................................................................................................14

**BACKGROUND**

The history of this dispute is discussed extensively in Federal Defendants' filing, in the agency decisions under review, and in two previous Interior Board of Indian Appeals decisions. *See George v. Eastern Regional Director*, 49 IBIA 164 (2009), and *Cayuga Indian Nation v. Eastern Regional Director*, 58 IBIA 171 (2014). Rather than repeat that history, the Cayuga Nation Council draws the Court's attention to certain facts of particular significance to the Cayuga Nation.

This case comes before the Court as a result of a decade-long leadership dispute within the Cayuga Nation. In short, members of what has come to be known as the "Jacobs faction" claimed that members of the "Halftown faction" – Clint Halftown and others – had been removed from the Cayuga Nation Council. Compl., Ex. A ("BIA Decision") at 2. The members of the Halftown faction tried to work collaboratively with the Jacobs faction, sending them notices regarding every Nation Council meeting. Decl. of Clint Halftown ("Halftown Decl.") ¶ 5. However, members of the Jacobs faction refused to attend in light of their position that the Halftown faction members had been removed. *Id.* This stalemate has persisted, in the same basic form, since 2005.

The damage to the Nation's citizens has been immense. The Nation, as one of the few Indian nations without land in trust held by the United States (which allows for the full exercise of Indian sovereignty), applied for land to be taken into trust in 2005 – but the leadership dispute has stalled that application. *Id.* ¶¶ 17-18. Likewise, obtaining critical federal grant funding requires a resolution by the Nation's recognized governing body, and a stalemate within that governing body thus can put funding at risk. BIA Decision, at 1-3.

1

Nonetheless, the Halftown faction has pressed forward with economic development initiatives on behalf of the Cayuga Nation, as Mr. Halftown had been authorized to do by a unanimous council resolution in 2002.  Halftown Decl. ¶ 4.  That effort has succeeded, notwithstanding the ongoing leadership dispute.  *Id.* ¶¶ 15-19.  In 2013, for example, the Nation's businesses – thriving, audited, and accountable – produced more than $6.5 million dollars in annual profits for the Nation and its citizens.  *Id.* ¶ 15.

But the Nation's citizens found that this success, too, was not immune from the effects of the ongoing leadership dispute.  In 2014, Jacobs faction supporters forcibly took over Nation properties in violent confrontations that threatened the safety and security of both Cayuga citizens and their non-Indian neighbors.  *Id.* ¶¶ 6-7; *see*, *e.g.*, *Cayuga Nation v. Jacobs*, 44 Misc. 3d 389 (N.Y. Sup. Ct., Seneca Cty. 2014).  Those steps not only undermined the Nation's economic development, but gravely threatened the dissipation of its assets: Since 2014, Plaintiffs in the instant litigation have repeatedly refused to allow their operation of Nation-owned businesses to be audited.  Halftown Decl. ¶ 7.

For the Nation's citizens, it was time to put these controversies to an end.  In 2016, the Halftown faction initiated a "statement of support" process designed to ascertain the views of Cayuga citizens concerning the principles guiding the Nation's government and the identity of the Nation's lawful council.  BIA Decision, at 5.  That process complied with, and indeed was compelled by, the "Great Law of Peace" that both sides acknowledge.  While the Great Law does not contemplate formal elections in the manner conducted by U.S. federal and state governments, it requires that decisions on especially important matters be taken directly to the people for decision.  Halftown Decl. ¶ 9; BIA Decision, at 6; Compl., Ex. B ("ASIA Decision"), at 13.  The Jacobs group was invited to, and did, participate, sending a letter to all citizens urging them to

reject the process.  BIA Decision, at 12; ASIA Decision, at 5.  At the end, more than 60% of adult Cayuga citizens submitted statements affirming the Cayuga Nation Council (the Defendant-Intervenor here) as the Nation's governing body, and agreeing with the statement of governance principles proposed by that Council.  BIA Decision, at 9; ASIA Decision, at 16.

In the decisions under review, the Department of Interior – first, the Bureau of Indian Affairs ("BIA") and then the Assistant Secretary–Indian Affairs ("ASIA") – recognized the statement of support process as a valid resolution of a tribal dispute by a tribal mechanism, after receiving exhaustive briefing from both sides on the lawfulness of that process.  As a result, the Department recognized the Cayuga Nation Council as the Nation's governing body and entered a funding contract with it.  Meanwhile, relying on these decisions, the Cayuga Nation Council has moved forward with multiple initiatives of critical importance, including the land-into-trust application.  Halftown Decl. ¶¶ 18-19.

Plaintiffs have now moved for a preliminary injunction that aims to, in effect, restore the stalemate resolved by the statement of support process.  If Plaintiffs have their way, the federal government will not be able to interact with *any* council as the recognized representative of the Cayuga Nation for the entire pendency of this action.  Federal funds will not be able to flow to the Nation and its citizens.  The Nation's land-into-trust application will not move forward.  And myriad other government-to-government actions will be on hold.  Cayuga citizens themselves will bear the consequences.

## **ARGUMENT**

Plaintiffs seek a preliminary injunction that would overturn the established status quo and prevent the BIA from recognizing the governing body of the Cayuga Nation, in disregard of the views of more than 60% of the Nation's adult citizens.  Such extraordinary relief would undermine the clear and expressed will of those citizens and interfere with tribal sovereignty – all before this

Court has even had a chance to address the merits (or lack thereof) of Plaintiffs' claims.  Thus, the Cayuga Nation Council agrees with the Federal Defendants that Plaintiffs' motion for a preliminary injunction should be denied, and the Council respectfully joins and incorporates Defendants' arguments.  The Council also underscores and briefly amplifies that Plaintiffs' motion should be denied for at least four principal reasons.

First, Plaintiffs ask to upset the status quo – a request that carries an especially high burden, which Plaintiffs cannot meet.  Raising their burden even higher, Plaintiffs ask for a preliminary injunction – essentially, an immediate ruling on the merits – *in an APA action*, where the lack of a need for factfinding eliminates the delay that ordinarily may justify preliminary relief.

Second, Plaintiffs cannot establish a likelihood of success on the merits of their claims.  "So long as the agency decision has some rational basis, the Court is bound to uphold it."  *Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106, 120 (D.D.C. 2014).  Plaintiffs seek to set aside a detailed 2016 decision of the Bureau of Indian Affairs, which was affirmed in a comprehensive, 28-page decision of the ASIA.  These decisions accepted the resolution of a long-standing, internal leadership dispute within the Cayuga Nation by the Cayuga people themselves.  Plaintiffs directly participated in that process.  Yet more than 60% of adult Cayuga citizens rejected Plaintiffs' claims to leadership of the Nation and endorsed the Cayuga Nation Council as the Nation's governing body.  As this Court has held:

> In situations of federal-tribal government interaction where the federal government must decide what tribal entity to recognize as the government, it must do so in harmony with the principles of tribal self-determination. . . .  [I]f the legitimate tribal institutions are no longer functioning or are no longer able to fulfill their duties, the power to make such important determinations for the tribe in question lies with the people of the tribe – not with the federal government.

*Ransom v. Babbitt*, 69 F. Supp. 2d 141, 150 (D.D.C. 1999).  That principle is the same one the federal government recognized and applied here.  Plaintiffs provide no valid reason to set aside the determination of the people of the Cayuga Nation.

Third, Plaintiffs make no showing of irreparable injury sufficient to justify a preliminary injunction.  Plaintiffs claim a burden on their ability to exercise "sovereign governmental authority."  ECF No. 22 at 25.  But that is a right vested in the Nation itself, and the Nation's citizens have found – as confirmed by the Department of Interior – that Plaintiffs *do not* exercise such authority on the Nation's behalf.  Plaintiffs cannot (and do not attempt to) allege any imminent harm that would actually injure *the Nation itself*, such as dissipation of Nation assets or funds.  No harm will befall the Nation itself simply because during the pendency of this litigation, certain initiatives will be pursued on behalf of the Nation by the Cayuga Nation Council rather than by Plaintiffs.

Fourth, the balance of equities and public interest do not favor Plaintiffs because the requested injunction would harm, rather than forestall harm, to the Cayuga Nation.  Against the wishes of the Cayuga people, the requested injunction would sever the Nation's government-to-government relationship with the United States during this litigation's pendency.  The effect would be that *no one* among the Nation's citizens would receive the benefit of the funding and coordination that relations with the federal government provide.  So too, the Nation's ability to move land into trust, as is essential for its sovereignty, would be frozen.   The interests of the Cayuga people should decide the balance of equities in this case, and it is clear where those interests fall.  Indeed, that conclusion is especially clear because Plaintiffs, when they have obtained access to Nation property and funds, have proven themselves to be a threat to those assets.  Plaintiffs forcibly seized certain Nation properties and businesses in 2014, and since that

time they have repeatedly refused to allow audits. Halftown Decl. ¶ 7. In contrast, other businesses operated by the Cayuga Nation Council are subjected annually to independent, third-party audits, to ensure that Nation assets are fully and properly accounted for. *Id.* ¶ 15.

## I.   THE PRELIMINARY RELIEF THAT PLAINTIFFS HAVE REQUESTED CARRIES AN EXTRAORDINARILY HIGH BURDEN.

### A.   Plaintiffs Seek A Mandatory Injunction, A Heavily Disfavored And Rarely Granted Form Of Preliminary Relief.

Federal Defendants correctly point out that Plaintiffs seek to disrupt the status quo and thereby ask for a mandatory injunction, "an even more extraordinary remedy" than the already-extraordinary and already-disfavored prohibitive preliminary injunction. *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013), *aff'd sub nom. Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014) (citing mandatory injunction cases). The Cayuga Nation Council adds that this is a case where Plaintiffs' unexcused delay makes a mandatory injunction uniquely disruptive. Since the campaign of support in 2016, the Nation's recognized governing structure has proven stable, workable, and beneficial for the Nation's citizens. In reliance on the underlying agency decisions, and in deference to the express will of the Nation's citizens, the Council has pressed ahead with critical projects for the Nation and has made significant progress. Halftown Decl. ¶¶ 18-19.

In place of the clarity that the Nation has finally achieved, and that the federal government has recognized, Plaintiffs ask this Court to (by judicial fiat) create a stalemate on matters critical to the Nation's governance. The BIA's recognition determination has allowed the Nation to carry on a consistent and cohesive government-to-government relationship with the United States. Yet Plaintiffs seek to stall that same relationship, preventing the Nation from accessing critical sources of government funds. And even as the Nation's internal government conflict has reached a peaceful resolution, Plaintiffs seek to sow chaotic uncertainty, which in the past has resulted in some citizens taking matters into their own hands by resort to violence. *See id.* ¶ 7.

For these reasons and those set forth below, Plaintiffs cannot satisfy the heavy burden required to prove entitlement to a mandatory injunction.  *See Columbia Hosp. For Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (where injunction "would alter, rather than preserve, the status quo," movant "must meet a higher standard . . . by showing clearly that he or she is entitled to relief." (internal quotation marks omitted)), *judgment aff'd*, 159 F.3d 636 (D.C. Cir. 1998); *see also Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (collecting cases).

### B. Plaintiffs' Complaint Asserts Claims Under The Administrative Procedure Act, Making Preliminary Injunctive Relief Uniquely Disfavored.

In a typical APA case, a request for a preliminary injunction is equivalent to a request for summary judgment, because "[t]he entire case on review is a question of law, and only a question of law." *Marshall Cty. Health Care Auth. V. Shalala*, 988 F.2d 1221, 1225, 1226 (D.C. Cir. 1993). Recognizing this – and knowing that courts are required by statute to expedite actions for preliminary injunctive relief, *see* 28 U.S.C. § 1657(a) – some APA litigants have used a preliminary injunction motion to "jump the queue" and seek resolution of the merits ahead of other cases in this Court's crowded docket.

Both the D.C. Circuit and this Court have recognized that this tactic should be strongly discouraged.  The D.C. Circuit has specifically cautioned against granting preliminary injunctive relief in APA cases.  *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 & n.8 (D.C. Cir. 2001) (noting that "district courts should be careful – in a case such as this – not to do so" and that appellant "introduced a good deal of confusion by seeking an injunction").  Heeding this warning, this Court has determined that "the preliminary injunction stage is not the appropriate time to consider the merits of [a plaintiff's] substantive APA claims." *Emily's List v. FEC*, 362 F. Supp. 2d 43, 53 (D.D.C.), *aff'd*, 170 F. Appx. 719 (D.C. Cir. 2005).  "Although a motion for

preliminary injunction against an agency is not always inappropriate, the better course is to rule on the merits of the substantive issues at a later date, particularly where allegations of irreparable injury are lacking at this stage." *Id.*

In sum, Plaintiffs seek not just a preliminary injunction, but a *mandatory* injunction, in a case raising only APA claims.  Plaintiffs have failed to carry the heavy burden required.

## II.  PLAINTIFFS HAVE FAILED TO MAKE A CLEAR SHOWING THAT THEIR APA CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.  Plaintiffs Will Fail On Count One Because The BIA Properly Deferred To Cayuga Nation Law.

Plaintiffs claim that the decisions below were contrary to federal law because they "imposed upon the citizens of the Cayuga Nation the obligation to accept a plebiscite in order to receive federal funds."  ECF No. 22 at 9.  Although this Court has no need to ultimately interpret Cayuga law, Plaintiffs' characterization is wrong.  It is not true that "the Cayuga Nation has never used" processes akin to the campaign of support.[1]  The Great Law of Peace contains a "guiding principle of invoking the will of the people" – not in the manner of the United States Constitution, with elections every two or four years, but as a way to resolve especially important or intractable issues.  ASIA Decision, at 13; *see* BIA Decision, at 6-7.

> Whenever a specially important matter or a great emergency is presented before the Confederate Council and the nature of the matter affects the entire body of the Five

---

[1] The BIA used the term "plebiscite" – which Plaintiffs repeatedly invoke, *see, e.g.*, ECF No. 22 at 6 – only as a shorthand.  The Cayuga Nation Council conducted a campaign of support.  That term captures the Nation's unique method for ascertaining its citizens' understanding of Cayuga law, which respects the people's ultimate sovereignty while not representing an "election" as understood in the United States.  Relatedly, Plaintiffs' claim that "no evidence exists to show that any Indian nation has *ever* used" a similar process – which they characterize, pejoratively, as "a mail in survey" – is not just irrelevant, but untrue.  ECF No. 22 at 7 (emphasis in original).  In 1993, for instance, the Department recognized a similar process conducted by the Oneida Indian Nation of New York.  *See Shenandoah v. U.S. Dep't of Interior*, No. 96-CV-258(RSP/GJD), 1997 WL 214947, at *1–2 (N.D.N.Y. Apr. 14, 1997), *judgment aff'd*, 159 F.3d 708 (2d Cir. 1998); AR at 000449-75, 000990, 001001-02.

> Nations, threatening their utter ruin, then the Lords of the Confederacy must submit the matter to the decision of their people and the decision of the people shall affect the decision of the Confederate Council. This decision shall be a confirmation of the voice of the people.

BIA Decision, at 6 (quoting Arthur C. Parker, *The Constitution of the Five Nations* 55 (1916)). The BIA was thus right that under the Great Law of Peace, "[t]he adult citizens of the Cayuga Nation are the ultimate 'nonjudicial tribal institution' competent both to identify and to apply Cayuga law." *Id.* at 7-8.

The process that occurred here was consistent with that guiding principle, as the decisions on review concluded. As the BIA recognized, Plaintiffs' view of Cayuga law and custom is sharply contested within the Cayuga Nation and led to a longstanding division. Factions within the Nation had disputed for more than a decade the extent of the Clan Mothers' power under Cayuga law's oral traditions. BIA Decision, at 5, 10. And because of this decade-long dispute, Cayuga Nation governance had broken down. The "2006 Council" (which the BIA recognized on an interim basis in 2015) had not had regular meetings for more than a decade. The Jacobs-faction members of that Council had purported to form their own separate Council, with only their own supporters. Two different Councils had submitted ISDA proposals to the BIA, for federal funds critical "for the benefit of the people of the Cayuga Nation." BIA Decision, at 1. The dispute had led to violence, confrontations, and forcible seizures of Nation property.

Under these circumstances, it was entirely appropriate – and fully consistent with the "guiding principle[s]" of the Great Law of Peace, ASIA Decision, at 13 – for the Halftown group to take the disputed Cayuga governance issues directly to all of the enrolled Cayuga citizens; for the BIA to ensure that the Jacobs group could participate in that process and present to Cayuga citizens their own views of Cayuga governance principles, *as the Jacobs group did*; and for the BIA ultimately to verify and accept the views of more than 60% of adult Cayuga citizens agreeing

upon the composition of the Cayuga Nation Council and endorsing a written statement of Cayuga governance principles specifying that Clan Mothers *lack* exclusive, autocratic authority.

This Court's opinion in *Ransom v. Babbitt*, 69 F. Supp. 2d 141 (D.D.C. 1999), confirms that the decisions on review reached the right result.  There, the St. Regis Mohawk Nation was mired in a similar internal governance dispute, with claims that tribal institutions "were not only invalid, but were also non-functional." *Id*. at 146.  There, too, the disputed governance issues had been taken directly to citizens, who had spoken through multiple referenda. *Id*. at 144-46.  When the BIA refused to recognize the citizens' clear choice, this Court held that BIA action to be inconsistent with principles of Indian sovereignty and self-government and a violation of the APA. This Court emphasized that "[i]n situations of federal-tribal government interaction where the federal government must decide what tribal entity to recognize as the government, it must do so in harmony with the principles of tribal self-determination." *Id*. at 150.  And the Court held:

> [I]f the legitimate tribal institutions are no longer functioning or are no longer able to fulfill their duties, the power to make such important determinations for the tribe in question lies with the people of the tribe – not with the federal government.  In *Harjo* [*v. Kleppe*, 420 F. Supp. 1110 (D.D.C. 1976), *judgment aff'd sub nom. Harjo v. Andrus*, 581 F.2d 949 (D.C. Cir. 1978)], for instance, this Court indicated that "consent for fundamental political decisions may only be obtained from the ultimate source of legislative authority, the people themselves. . . . [A] feasible and appropriate approach would be to consult the members of the tribe directly, by means of a referendum." *Id*. at 1146.

*Ransom*, 69 F. Supp. 2d at 151 (one citation omitted) (second bracket added).  *Ransom* compels the conclusion that the decisions under review did not err by following a similar approach.

### B.   Plaintiffs' Other Counts Also Fail.

Consistent with this Court's order granting intervention, the Cayuga Nation Council will not repeat all the arguments on the merits that the Federal Defendants have addressed.  Instead, the Cayuga Nation Council will merely emphasize three additional points.

*First*, Plaintiffs allege that a new "key" document obtained via a FOIA request proves that Defendant Maytubby pre-judged the merits of whether the campaign of support comported with the Great Law of Peace.  ECF No. 20.   Yet that document – a letter from Defendant Maytubby date-stamped June 8, 2016 – contains no relevant information not already found in the letter from Defendant Maytubby dated June 17, 2016, which was a part of the record before the ASIA.  *See* ECF No. 22 at 19-20.  Those letters only observed what is obviously true: that the statement of support would "be a viable way of *involving* the Cayuga people in a determination of the form and membership of their tribal government."  *Id.* at 20 (emphasis added) (quoting *id.*, Ex. T).  The campaign indisputably did involve the Cayuga people.  But it is a separate question, not addressed in these letters, whether the campaign was consistent with Cayuga law and adequately executed in practice.  Defendant Maytubby and the ASIA approached that question with open minds, as shown by the extensive briefing they received and the carefully reasoned decisions they produced.

*Second*, Plaintiffs failed to preserve their claim that Acting Regional Director Maytubby was required to recuse himself.  As the D.C. Circuit has held, "[c]laims of bias must be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist."  *Power v. Fed. Labor Relations Auth.*, 146 F.3d 995, 1002 (D.C. Cir. 1998) (quotation marks omitted).  The Jacobs group never sought Acting Director Maytubby's recusal or disqualification and never lodged an accusation of bias or prejudgment.  This is so even though, at the time, they were clearly aware of the due process argument they now raise.  *See* AR at 001033.  It is clear, then, that Plaintiffs made a strategic decision not to ask the Regional Director to disqualify himself, perhaps hoping his decision would go their way.  Having made that choice, they must now live with it, and cannot now claim that the Regional Director suffered from a disqualifying bias.  *Power*, 146 F.3d at 1002.

*Third*, Plaintiffs' allegation of a violation of "due process" because the ASIA allegedly had some unspecified participation in the BIA Decision, and then later reviewed it on appeal when he became the Acting ASIA, is meritless for the reasons explained by the Federal Defendants.  It is also, once again, waived – as the ASIA found below.  *See* ECF No. 22 at 17; ASIA Decision, at 9 n.64.  Plaintiffs stated, in a single sentence in a footnote of their opening brief on the appeal to the ASIA, that: "Appellants argued before the IBIA that Acting Assistant Secretary Michael Black's participation in the Regional Director's decision making process should preclude him from adjudicating this appeal, AR Part 11(7), and respectfully preserve that argument here."  AR at 001452 n.1.  But claims of error cannot be raised in footnotes, particularly where Plaintiffs merely referred to briefs filed in an entirely different forum.  *See Town of Norwood v. FERC*, 962 F.2d 20, 25 (D.C. Cir. 1992); *Healthbridge Mgmt., LLC v. NLRB*, 672 F. App'x 1, 1 (D.C. Cir. 2016) (per curiam).  Moreover, Plaintiffs certainly did not request that the ASIA disqualify himself because of his prior involvement.  Once again, Plaintiffs made a tactical decision "to see whether the decision goes in his favor," *Power*, 146 F.3d at 1002 (quotation marks omitted), and therefore waived the claim.

## III.   PLAINTIFFS HAVE FAILED TO MAKE A CLEAR SHOWING THAT THEY WILL SUFFER IMMINENT AND IRREPARABLE INJURIES IF THEIR REQUEST IS DENIED.

### A.   Plaintiffs' Alleged Non-Economic Harms Are Question-Begging.

Plaintiffs argue, at length, that a preliminary injunction is needed because the status quo "prevents the Clan Mothers from exercising the sovereign governmental authority vested in them."  ECF No. 22 at 27.  But this alleged harm presupposes that Plaintiffs have *any right at all* to exercise "the sovereign governmental authority" of the Nation or to "carry out their Cayuga governmental functions."  They have no such right.  But more to the point, whether or not they have any such right is an issue that this Court should never have to confront.  The citizens of the Cayuga Nation

have already forcefully rejected Plaintiffs' claims, in an act of sovereign self-expression that is fully reserved to them and them alone. The only question facing this Court—not now, but at the ultimate merits stage—is whether the BIA acted reasonably in recognizing the Nation's internal resolution of its leadership dispute. The Court should reject Plaintiffs' attempt to relitigate before a court of the *United States*—and via a request for a preliminary injunction, no less—a leadership controversy that needed to be, and was, resolved by the *Cayuga Nation*. Decades of precedent foreclose that attempt. *See, e.g.*, *Cayuga Nation v. Tanner*, 824 F.3d 321, 327 (2d Cir. 2016) ("federal courts lack authority to resolve internal disputes about tribal law").

Plaintiffs separately assert that "[t]he BIA's decision imposing a plebiscite process on the Cayuga Nation inflicts incalculable damage to the Nation's treaty relationship with the United States." ECF No. 22 at 30 (citing the Treaty of Canandaigua of 1794). But again, Plaintiffs' argument rests on a flawed premise. By providing technical assistance to the statement of support process, the BIA did not "impos[e] a plebiscite process," as Plaintiffs allege. *Id.* The BIA routinely assists tribes with governance issues when asked. *See* 25 C.F.R. § 81.7 (explaining "[w]hat technical assistance will the Bureau provide after receiving a request for election").[2] Far from imposing a process on the Nation, the BIA acted deferentially in helping the Nation (*both* of its factions) execute a process consistent with Cayuga oral traditions and the Great Law of Peace.

---

[2] Plaintiffs note that this campaign of support was not a Secretarial election. ECF No. 22 at 14 n.15. But the federal government is not limited to providing technical assistance to those instances where a tribe invokes the provisions of the Indian Reorganization Act. Federal law does not condition tribes' ability to obtain federal assistance on the acceptance of Western norms of democracy. In fact, the very policy of self-determination that Plaintiffs purport to hang their hats on, *see* ECF No. 22 at 35, requires just the opposite.

**B.      Plaintiffs' Request Is Directed At Defendants Who Cannot Forestall Plaintiffs' Alleged Harms.**

There is yet another problem with Plaintiffs' motion.  Plaintiffs' motion is fundamentally misdirected – it is aimed at enjoining parties who cannot forestall the injuries of which Plaintiffs complain.  As of the time the Plaintiffs filed their motion, the only Defendants in this lawsuit were the U.S. Department of Interior, the Bureau of Indian Affairs, and various officials within those two agencies.  Compl. ¶¶ 16-21.  Those Defendants – even if enjoined – are powerless to prevent the New York state courts from adjudicating a case that was filed more than six months ago.  Plaintiffs themselves are free to make whatever arguments they deem appropriate in the New York litigation, and they are doing so.  Likewise, even if enjoined, the federal defendants here are powerless to prevent the EPA (a wholly different federal government agency[3]) from relying on the BIA's decision to release grant money to the Nation.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004) ("We hold that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a 'cause' of the effect.'" (emphasis in original)).  And the federal defendants who are parties to this case have no power (even if enjoined) to prevent a federal court in New Mexico from relying on an already-issued, already-final agency decision to release settlement monies owed to the Nation.

The D.C. Circuit has made clear that a preliminary injunction should not issue against a party who is not causing, and is not in control of, the alleged harms about which a movant complains.  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("[T]he movant must show

---

[3] EPA has its own appeal process for handling disputes regarding denial of grant funding.  *See* 2 C.F.R. Part 1500, Subpart E.  EPA denial of grant money is hardly "imminent" and "certain" if Plaintiffs can challenge such a denial through this appeals process.  If Plaintiffs have failed to make a timely application so as to utilize such procedures, they may not now ask for "extraordinary" relief from this Court to address "harm" that the Plaintiffs have made imminent through their own negligence.  *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 33 (D.D.C. 2014) (observing that irreparable harm "cannot arise from plaintiff's own actions").

that the alleged harm will directly result from the action which the movant seeks to enjoin."); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013) (collecting cases showing that irreparable harm is not established by how "others may respond . . . and react"), *aff'd*, 760 F.3d 18 (D.C. Cir. 2014). That is precisely the circumstance presented by Plaintiffs' motion. At the end of the day, what Plaintiffs *want* is to prevent the BIA's decision from having any effects in the broader world. But what they *seek* is an injunction against parties who simply have no control over such effects.

## IV. GRANTING PLAINTIFFS' REQUEST WOULD SUBSTANTIALLY INJURE THE CAYUGA NATION, ITS CITIZENS, AND THE CAYUGA NATION COUNCIL.

Plaintiffs' requested injunction would create substantial hardships for the Cayuga Nation, its citizens, and the Cayuga Nation Council—harms that decisively weigh against granting Plaintiffs' motion. *See Katz v. Georgetown Univ.*, 246 F.3d 685, 687 (D.C. Cir. 2001) (Plaintiffs must make clear showing that injunction (1) would not substantially injure other interested parties and (2) would further the public interest).

As an initial matter, because this is a dispute about who represents the Nation, all of the alleged irreparable harms claimed by Plaintiffs are shared by the Cayuga Nation Council. Thus, Plaintiffs' claims of interference with the Nation's "authority to choose its own form of government and the manner in which its leaders are selected," ECF No. 22 at 29, would befall the Cayuga Nation Council if an injunction is granted. *See also* Mem. Op. at 6, ECF No. 29 (granting intervention in part because the relief Plaintiffs seek "would undermine Putative Intervenor's current recognition as the government of the Cayuga Nation and their relationship with the federal government"). And here, it is the Cayuga Nation Council that has been identified as the Nation's proper leadership by more than 60% of Nation citizens, in a statement of support process reviewed and confirmed by the Department of Interior. The balance of equities favors maintaining, during

15

the pendency of this litigation, the governing body of the Nation endorsed by more than 60% of its citizens, in a process in which Plaintiffs participated.  Plaintiffs do not dispute those results; they simply contend they should be disregarded.

This is not a case, moreover, where the irreparable harms on each side are in *equipoise* and the preliminary-injunction calculus comes down to likelihood of success.  To the contrary, the harms that will stem from granting a preliminary injunction are much more substantial than any harms Plaintiffs may face were the injunction denied.  A preliminary injunction would impede many projects that are of great importance to the Nation and its citizens, and that remain so regardless of which group is identified as the Nation's lawful government.

The Cayuga Nation is one of the few tribal nations in the country that has no land in trust. Halftown Decl. ¶¶ 16-17.  To try to remedy this situation, the Halftown faction submitted a fee-to-trust application to the Department of Interior in 2005.  *Id.* ¶ 17.  That application still remains pending because, as the BIA Decision recognized, the Department of Interior cannot act on it until this leadership dispute is resolved.  *See* BIA Decision, at 3.  For the Nation's citizens, it is critical that *some* governing body represent them in interactions with the United States, so this initiative and others can move forward.  Against that clear interest, Plaintiffs ask this Court to impede the Nation's fee-to-trust efforts, and in turn harm the Nation's citizens, by preventing the Department of Interior from relying on the underlying agency decisions for purposes such as the trust application.

## CONCLUSION

For the foregoing reasons, Defendant-Intervenor Cayuga Nation Council respectfully requests that the Court deny Plaintiffs' motion for injunction.

Respectfully submitted,

/s/ David W. DeBruin
David W. DeBruin
D.C. Bar No. 337626
JENNER & BLOCK, LLP
1099 New York Avenue, N.W.
Washington, D.C.  20001
(202) 639-6015

*Counsel for Defendant-Intervenor
Cayuga Nation Council*

Date:  February 26, 2018