**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CAYUGA NATION, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-01923 (CKK) |
| | ) | |
| RYAN ZINKE, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A**
**PRELIMINARY INJUNCTION**

On December 15, 2016, the Bureau of Indian Affairs' (BIA's) Eastern Regional Director ("Regional Director") issued an administrative decision ("RD Decision") recognizing a group of citizens of the Cayuga Nation of New York ("Cayuga" or "Nation") led by Clint Halftown ("Halftown Council") as the Nation's proper governing body.  On July 13, 2017, the Office of the Assistant Secretary – Indian Affairs ("AS-IA" or "Assistant Secretary") issued a final agency decision ("AS-IA Decision") affirming the RD's Decision following an administrative appeal from the Halftown Council's rival faction, led by William Jacobs ("Jacobs Council").  For the seven months that have passed since the AS-IA Decision, the United States Department of the Interior ("Department") has carried on its government-to-government relationship with the Nation through the Halftown Council.

Plaintiffs in this case purport to comprise the Nation's government through the leadership of the Jacobs Council.  Plaintiffs characterize the RD and AS-IA Decisions (collectively "Decisions") as illegal Federal usurpation of the Nation's government and sovereignty and challenge those Decisions pursuant to the Administrative Procedure Act ("APA").  Plaintiffs

have now brought the instant Motion for a Preliminary Injunction ("Motion") seeking to enjoin the Decisions pending resolution of this litigation.

Plaintiffs are not entitled to a preliminary injunction.  Plaintiffs failed to bring this APA suit in Federal court until sixty-nine days after final agency action, and then only at the urging of a New York State Court in a separate proceeding.  And only now – 211 days after the AS-IA Decision and 142 days after Plaintiffs filed their Complaint on the merits – have Plaintiffs abruptly filed this Motion, claiming immediate and irreparable harm from the Department's recognition of the Halftown Council.  Plaintiffs' excessive delay demonstrates that there is no need for extraordinary relief to preserve the status quo.  Plaintiffs further claim a likelihood of success on the merits based on their dissatisfaction with the results of the Decisions, not on any remediable legal violation by the Department.  And Plaintiffs cannot demonstrate that the public interest or the balance of equities are in their favor.  This Court should deny Plaintiffs' Motion.

## FACTUAL BACKGROUND

The history of this dispute is discussed extensively in two Interior Board of Indian Appeals ("IBIA") decisions: *Samuel George et al. v. Eastern Regional Director*, 49 IBIA 164 (2009), and *Cayuga Indian Nation v. Eastern Regional Director*.  58 IBIA 171 (2014).  In short, the Nation's leadership split into factions in 2004, sparking civic unrest and over a decade of litigation concerning the proper Cayuga leadership group with whom the United States could interact on a government-to-government basis.

In February 2015, then-Acting Eastern Regional BIA Director Tammie Poitra ("Acting Regional Director") temporarily recognized the Nation's most recent undisputed governmental body ("2006 Council") for the purposes of implementing modifications to the Nation's existing Indian Self-Determination and Education Assistance Act ("ISDA") contract.  *See generally* AR

000790-798.  The Acting Regional Director accordingly declined a request from one of the

Cayuga leadership factions that the Nation's citizenship determine its government through some

form of a popular vote.  *Id.* at 000797.  The Acting Regional Director reasoned that it would be

inappropriate for the BIA to render a decision that went beyond continuing to recognize the last

constituted governing body – the 2006 Council – at that point in time.  *Id.*  However, the Acting

Regional Director emphasized that the BIA's recognition of the 2006 Council was interim in

nature, urged the Nation to adjudicate its dispute internally, and warned that if circumstances did

not improve, the BIA might ultimately be required to make a permanent determination of

Cayuga leadership in the future.  *Id.* at 000796-798.

The Nation failed to resolve its leadership dispute for over a year after the Acting

Regional Director's interim decision.  In the interim, the Halftown Council again discussed with

the BIA the possibility of conducting a "Statement of Support" process ("Initiative") as a means

of definitively ascertaining the Nation's government.  The Halftown Council formally requested

BIA technical assistance for the administration of an Initiative on June 14, 2016.  *See generally*

*id.* at 000828-843.   Under the Initiative, the Halftown Council proposed to ask each adult

Cayuga citizen their views on (1) a governance document describing the operation of the Cayuga

government and the selection and removal process for its leaders; and (2) whether the Halftown

Council was the Nation's governing body.  *Id.* at 000834.  The request for technical assistance

included legal analysis as to why the Initiative was viable under Cayuga law, listed detailed

procedural safeguards for the Initiative, and requested BIA recognition of the Halftown Council

as the Nation's leadership should a majority of the adult Cayuga citizens affirm both of the

proposed questions.  *Id.* at 000834-835.

Three days after receiving the Initiative proposal, the Regional Director contacted Plaintiffs to inform them of the Halftown Council's proposal, stating that "under the circumstances," the Initiative would be "a viable way" of resolving the dispute. *Id.* at 000844-845. However, the Regional Director clarified that the BIA had not definitively decided to recognize the results of an Initiative process. He urged Plaintiffs to either work with the Halftown Council to properly administer the Initiative or else propose an alternative means of determining Cayuga leadership. *Id.* at 000844. Although disputing the validity of an Initiative process generally in subsequent correspondence with the BIA, *see generally id.* at 000846-916, 929-930, 937-938, the Record does not demonstrate that Plaintiffs either collaborated with the Halftown Council on the Initiative or otherwise proposed any other means of resolving the dispute.

The Halftown Council proceeded to conduct the Initiative in July and August of 2016. *Id.* at 000919-928, 932-936. During this process, the BIA continued to meet with and accept correspondence from both parties concerning the Initiative's legitimacy. *Id.* at 000929-930; 0001549 (noting disagreement between parties as to date of Plaintiffs' meeting with the Department). Both Plaintiffs and the Halftown Council also directly appealed to the Cayuga citizens on behalf of their respective positions. *Id.* at 000919-926; 000931. In September 2016, staff from the BIA's Eastern Regional Office evaluated the results of the Initiative and concluded that of 392 adult Cayuga citizens identified on the Nation's membership roll, 237 voted in favor of the Halftown Council on both of the proposed questions. *Id.* at 000953. The Halftown Council presented the results of the Initiative to the Nation's citizens on October 6, 2016. *Id.* at 000980.

In the meantime, however, both Plaintiffs and the Halftown Council had submitted ISDA proposals to the BIA. *Id.* at 000939-944; 000954-959. In order to determine the Nation's proper governing body for the purposes of executing the ISDA contract, the Regional Director requested formal briefing from both Councils on November 1, 2016, concerning (1) the validity of the Initiative as a matter of Cayuga law; (2) concerns about how the Initiative had been conducted on the ground; and (3) Plaintiffs' claim that they constituted the proper Cayuga government under traditional Cayuga law. *Id.* at 000986-987. Both Plaintiffs and the Halftown Council submitted opening and reply briefs on these questions. *Id.* at 000988-1138. On December 15, 2016, the Regional Director issued his Decision recognizing the Halftown Council as the Nation's government, which the Regional Director purported was final for the agency pursuant to a delegation of final agency decision making authority from the Assistant Secretary. *Id.* at 001139-1153.

Plaintiffs could have filed their APA challenge in Federal court – along with a Motion for Preliminary Injunction – in December 2016, after the Regional Director issued his Decision. Instead of bringing such a merits claim, however, Plaintiffs instead challenged the validity of the Assistant Secretary's delegation of final decision-making authority to the RD as a matter of administrative law, and appealed the delegation to the IBIA. *Id.* at 0001291-1302. Concerned about the long turn-around time for the IBIA (*see, e.g.*, *Cayuga Nation*, 58 IBIA at 171 (rendering a decision on a Cayuga Tribal government dispute more than two years after the appeal was filed)), the Assistant Secretary withdrew the final agency delegation and assumed jurisdiction over the appeal pursuant to 25 C.F.R. § 2.20(c) and 43 C.F.R. § 4.332(b) on January 31, 2017. AR at 001305-1308. After receiving additional briefing from the parties, *id.* at 001441-1544, the Assistant Secretary issued his Decision on July 13, 2017 recognizing the

Council as the Nation's government.  *Id.* at 001545-1575.  The BIA accordingly approved the Halftown Council's ISDA application.

After assuming leadership, the Halftown Council initiated a New York State Court proceeding seeking to assert control over certain Cayuga tribal assets and property.  On September 8, 2017, the New York Supreme Court for Seneca County ruled in favor of the Halftown Council but stayed its ruling until September 26, 2017 in order to give Plaintiffs an opportunity to challenge the Decisions in Federal court.  *Cayuga Nation v. Campbell et al*, No. 51342, at 5 (N.Y. Sup. Ct. Sept. 8, 2017).  Plaintiffs subsequently filed their Complaint against the Department and various Federal officials ("Defendants") on September 20, 2017 and brought the instant Motion on February 9, 2018.

## STATUTORY AND REGULATORY BACKGROUND

The current iteration of the dispute stems from the Department's resolution of the Nation's tribal leadership dispute in the context of determining the proper awardee of an ISDA contract.  In 1975, Congress enacted the ISDA, 25 U.S.C. §§ 5301 *et seq*., to bring about "an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by Indian people in the planning, conduct, and administration of those programs and services."  25 U.S.C. § 5302.  Under the ISDA, Indian tribes and tribal organizations may take responsibility for delivering various programs, functions, services, and actions (PFSA), which would otherwise be provided through the Department or the Department of Health and Human Services.  *See generally* 25 U.S.C. § 5321(a)(1).  An ISDA contract is implemented through yearly funding agreements between the relevant Federal agency and the tribal recipient, which specify both parties' obligations with respect to each PFSA.  *See*

*generally Maniilaq Ass'n v. Burwell*, 72 F. Supp. 3d 227, 229–30 (D.D.C. 2014) (providing background on ISDA).

The Department may enter into ISDA contracts with tribes, as well as other tribal organizations.  The Department entered into the ISDA contract at issue as an "Indian tribe." That phrase is defined as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."  25 U.S.C. § 5304(e); *see also Gibson v. Babbitt*, 72 F. Supp. 2d 1356, 1358 (S.D. Fla. 1999), *aff'd*, 223 F.3d 1256 (11th Cir. 2000) (listing the ISDA's definition of "Indian tribe" as "a term of art which Congress has used on innumerable occasions and defined repeatedly to mean federally recognized tribes").  The Department may not accept an ISDA proposal from an entity that is "not the Tribe's recognized governing body." *Cloverdale Rancheria of Pomo Indians of California v. Jewell*, 593 F. App'x 606, 609 (9th Cir. 2014) (unpublished) (citing definitions in 25 U.S.C. § 5304).

Upon receipt of an ISDA proposal, the Department has ninety days to either approve or decline it, seek correction of errors in the application, or seek an extension from the applicant. 25 C.F.R. §§ 900.15-.17.  Absent an extension or correction, an ISDA proposal that the Department does not approve or decline within the ninety-day timeframe is deemed approved as a matter of law.  25 C.F.R. § 900.18.

## STANDARD OF REVIEW

### I.        Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (emphasis added). Typically, this Court requires a movant to make a clear showing that (1) there is a substantial likelihood of success on the merits; (2) it would suffer irreparable injury if the injunction is not granted; (3) an injunction would not substantially injure other interested parties; and (4) the injunction would further the public interest. *See, e.g.*, *Katz v. Georgetown Univ.*, 246 F.3d 685, 687 (D.C. Cir. 2001).

Despite arguing that they merely wish to preserve the pre-Decision status quo, (ECF No. 22 at 36-38), Plaintiffs actually seek to sever the government-to-government relationship between the United States and a recognized tribal leadership group. Injunctions that alter the status quo are "an even more extraordinary remedy" that must be "sparingly exercised." *TK Servs., Inc. v. RWD Consulting, LLC*, 263 F. Supp. 3d 64, 74 n.4 (D.D.C. 2017); *accord Dorfman v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969). A "district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Columbia Hosp. for Women Found. Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979) (emphasis omitted)).

### II.       Administrative Procedure Act

Plaintiffs challenge the AS-IA's Decision pursuant to the APA, 5 U.S.C. §§ 701-706. Section 706(2)(A) of the APA provides that a court may set aside agency action only where it finds the action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2)(A). "Highly deferential, that standard presumes the validity of agency

8

action, requiring [courts] to determine whether the agency has considered the relevant factors and 'articulate[d] a rational connection between the facts found and the choice made.'" *AT&T Corp. v. F.C.C.*, 220 F.3d 607, 616 (D.C. Cir. 2000) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted)).  Courts "may reverse only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment."  *Kisser v. Cisneros,* 14 F.3d 615, 619 (D.C. Cir. 1994); *see also Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 709 (D.C. Cir. 2008) ("All we ask of the agency is a reasonable interpretation.").

## ARGUMENT

### I.  Plaintiffs Are Not Entitled to Injunctive Relief

#### A.  Plaintiffs Have Failed to Demonstrate Irreparable Harm

At the outset, this Motion should be denied because Plaintiffs have failed to demonstrate that an injunction is necessary to foreclose irreparable harm.  The D.C. Circuit "has set a high standard for irreparable injury."  *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 47 (D.D.C. 2013) (citation omitted).  The injury "must be both certain and great; it must be actual and not theoretical."  *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."  *Farris v. Rice*, 453 F. Supp. 2d 76, 80 (D.D.C. 2006) (citing *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n,* 259 F.2d 921, 925 (D.C. Cir. 1958)).  And "failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 545 (D.D.C. 2016) (citation omitted).

In addition, parties seeking an injunction that would disrupt the status quo "must do more than merely raise a serious question about the law." *Columbia Hospital*, 15 F. Supp. 2d at 4. Thus, "the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or serious damage will result from the denial of the injunction." *Id.* at 4-5 (citation and internal quotations omitted).

Plaintiffs have made no such showing. "An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005). For example, the D.C. Circuit has characterized a delay of forty-four days before bringing action for injunctive relief as "inexcusable," and held that such delay "bolstered" the "conclusion that an injunction should not issue," particularly where the party seeking an injunction had knowledge that the allegedly irreparable harm was pending. *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975). Many other decisions of this Court have similarly held that an unexcused delay in filing for injunctive relief weighs strongly against a finding of irreparable harm. *See*, *e.g.*, *AARP v. U.S. Equal Employment Opportunity Comm'n*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) ("The final rules at issue here were promulgated in May 2016, yet AARP waited until the end of October to file this suit, despite knowing that these rules were effective in July and would become applicable on January 1, 2017."); *Davis v. Billington*, 76 F. Supp. 3d 59, 66 n.11 (D.D.C. 2014) (six month delay in seeking injunction); *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (sixty-two day delay); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two month delay).

Plaintiffs have demonstrated a similarly inexcusable pattern of delay in this case. Throughout the administrative process, Plaintiffs consistently claimed that Defendants'

acceptance of an Initiative recognizing the Halftown Council would result in the precise harms Plaintiffs allege are irreparable here: an inability for Plaintiffs to carry out their responsibilities as tribal leadership, violation of tribal self-governance as guaranteed by the Treaty of Canandaigua of 1794, injury to the Nation's governmental and economic affairs, and injury to Plaintiffs' constitutional rights.  (ECF 22 at 25-34); *accord* AR at 000846-884; 000917-918; 001007-1120; 001445-1477; 001529-1544.  This demonstrates Plaintiffs' clear and longstanding acknowledgment as to what they believe to be the irreparable harm to their interests in this case.

The Department recognized the Halftown Council on July 13, 2017.  But Plaintiffs did not file their Complaint (let alone move for a preliminary injunction) until September 20, 2017, over three months after the AS-IA Decision.[1]  Even then, Plaintiffs appeared to be responding to specific urging from a New York State Court.  In that suit, filed by the Halftown Council, the court ordered the Jacobs Council and its associates (Plaintiffs here; defendants there) to vacate certain Cayuga properties and relinquish control of the Nation's personal assets to the Halftown Council absent "an immediate application to the federal court for a stay of the BIA decision." *Cayuga Nation v. Campbell et al*, No. 51342, at 5 (N.Y. Sup. Ct. Sept. 8, 2017).  And although Plaintiffs accordingly filed their Complaint in September 2017, it was not until February 9, 2018

---

[1] While Plaintiffs style their Complaint as a request for declaratory and injunctive relief, ECF 1 at 26-27, Plaintiffs nevertheless did not specifically seek to achieve this injunctive relief until filing their current Motion.  The delay between nominally seeking an injunction and actively moving for an injunction makes Plaintiffs' alleged injury all the less irreparable.  *See, e.g.*, *Contender Partners, LLC v. Azteca Int'l Corp.*, No. CV0802026MMMJTLX, 2008 WL 11334492, at *24 (C.D. Cal. May 19, 2008) (rejecting motion for preliminary injunction based on delay when plaintiff did not file complaint until two months after alleged injury and actual motion for injunctive relief for another month after complaint); *Media Grp., Inc. v. Ontel Prod. Corp.*, No. CIVA300CV2034(JCH), 2001 WL 169776, at *4 (D. Conn. Feb. 14, 2001) ("Because of the delay in bringing the action *and, more significantly, in filing a motion for a preliminary injunction*, [Plaintiff] has failed to demonstrate that it would suffer irreparable harm before permanent relief can be granted.") (emphasis added).

that Plaintiffs filed the instant Motion specifically seeking injunctive relief: 142 days after filing

their Complaint and *211 days after the AS-IA Decision*, and alleging the imminence of the same

harms Plaintiffs raised in briefing nearly two years ago.  Plaintiffs' extreme delay in seeking to

foreclose what they have consistently described as irreparable harms demonstrates the lack of

any imminent injury.

      In addition to Plaintiffs' delay, none of Plaintiffs' alleged harms are both imminent *and*

irreparable.  For example, all such harms either significantly predate this Motion, *see, e.g.* ECF

22 at 31-33 (alleging irreparable injury from actions the Halftown Council took in August and

September 2017), depend upon the eventual outcome of judicial proceedings in separate fora to

which Defendants are not parties, *id.* at 31-32 (discussing harms stemming from the currently-

stayed New York judgment against Plaintiffs and a funding dispute in the District of New

Mexico), or are entirely speculative.  *See, e.g.*, *id.* at 32-33 (claiming imminent harm from what

the Halftown Council "will likely" do and what the New Mexico District Court "may do" absent

an injunction).  Plaintiffs cannot demonstrate that any such harms are "actual or imminent, not

conjectural or hypothetical."  *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (quoting

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)).

      Finally, Plaintiffs claim that their mere allegation of a constitutional violation per se

satisfies the irreparable harm requirement.  (ECF 22 at 33-34).  But Plaintiffs' cited cases do not

support such a rule.  For example, one such decision was qualified on the fact that the moving

party had demonstrated a clear likelihood of success on the merits, which, as discussed *infra*,

Plaintiffs have not. *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009).

Another held that the per se nature of irreparable harm only attaches to certain types of

constitutional deprivations, none of which are listed in Plaintiffs' Complaint.  *Chaplaincy of Full*

*Gospel Churches v. England*, 454 F.3d 290, 301–02 (D.C. Cir. 2006).  Other cases have rejected

a finding of irreparable harm even in the face of allegations of constitutional violations.  *See,*

*e.g.*, *Singh v. McConville*, 187 F. Supp. 3d 152, 162 (D.D.C. 2016).  And in none of Plaintiffs'

cited cases did the moving party delay filing their claim in the same manner as Plaintiffs here.

Taken as a whole, Plaintiffs' claims of constitutional injury, which Plaintiffs have not

demonstrated they will likely establish on the merits, should not per se satisfy this Circuit's

demanding irreparable harm requirement.

But despite insisting for years that recognition of the Halftown Council would constitute

irreparable harm, Plaintiffs failed to challenge the Decisions for several months, and then waited

several more months before actually seeking injunctive relief.  Plaintiffs have not demonstrated

imminent irreparable harm and this Court should deny their Motion.

## B.     Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits

In addition to failing to demonstrate irreparable harm, Plaintiffs have not demonstrated a

likelihood of success on the merits of their claims.  This is because: (1) the Decisions were

consistent with Federal law governing the Department's deference to tribal sovereignty; (2) the

Decisions were predicated on a well-developed administrative record and briefing materials

submitted by both parties; and (3) Plaintiffs' due process claims fail to overcome the

presumption of good faith accorded to Federal agency decision makers.

### i.     The Decisions Did Not Violate Federal Law Concerning Tribal Sovereignty

#### a.   Plaintiffs Have Not Challenged Defendants' Authority to Determine the Nation's Leadership

At the outset, Defendants note that Plaintiffs have not challenged Defendants' general

authority to determine the Nation's leadership.  As this Court has held, "the BIA has a

responsibility to interpret tribal law when necessary to carry out the government-to-government relationship with [a] tribe." *Seminole Nation v. Norton*, 223 F. Supp. 2d 122, 145 n.22 (D.D.C. 2002) (quotations and internal formatting omitted).  Such Federal intervention is necessary in order to avoid "effectively creating a hiatus in tribal government which jeopardize[s] the continuation of necessary day-to-day services on the reservation." *Goodface v. Grassrope*, 708 F.2d 335, 338-39 (8th Cir. 1983); *accord William H. Richards, Sr. et al. v. Acting Pac. Reg'l Dir.*, 45 IBIA 187, 191-92 (2007) ("BIA has the authority and responsibility to identify the duly chosen or elected tribal governing body to facilitate relations between a tribe and federal agencies.") (citations omitted); *Wadena v. Acting Minneapolis Reg'l Dir.*, 30 IBIA 130, 145 (1996) (BIA has the authority to make recognition decisions regarding tribal leadership "when the situation [has] deteriorated to the point that recognition of some government was essential for Federal purposes").

The BIA's involvement with the Nation that led to the issuance of the AS-IA Decision comported with the rule and guidance of *Goodface*.  Having received ISDA proposals from both Plaintiffs and the Halftown Council, the Regional Director deemed it necessary as a matter of law for the BIA to determine which faction was the proper Nation government.  AR at 001546-48; *see also Cloverdale,* 593 Fed. App'x. at 609 (affirming BIA's rejection of an ISDA proposal submitted by a group that was neither the Tribe's governing body nor approved by the Tribe's governing body).  And contrary to Plaintiffs' suggestion, ECF 22 at 2, 35, that the Department intended to recognize the Halftown Council solely for the purpose of administering ISDA contracts, the United States Court of Appeals for the Second Circuit has noted in a previous iteration of this dispute that Federal recognition for ISDA purposes necessarily applies to all Federal purposes.  *Cayuga Nation v. Tanner*, 824 F.3d 321, 329 (2d Cir. 2016) ("The reasoning

that led the BIA to recognize the 2006 Council [on an interim basis for ISDA contracting] would apply with equal force to any situation in which there was a need to recognize one person or group as authorized to act on behalf of the tribe.").   The RD Decision similarly identified numerous other reasons why the BIA's failure to definitively recognize the Nation's leadership would have "effectively created a hiatus" in Cayuga government such that the United States could not carry out its relationship with the Nation.   AR 001141-1142 (including a submitted liquor control ordinance, fee to trust application, related litigation concerning Cayuga gaming, and various policy concerns).

### ii. The Decisions did not illegally force the Nation to choose leadership via plebiscite.

Plaintiffs next argue that the Decisions arbitrarily and capriciously forced the Nation to adopt a mechanism of choosing leaders that was fundamentally inconsistent with Cayuga law. (ECF 22 at 5-8).   Plaintiffs assert that they are likely to succeed in demonstrating that the Decisions therefore violated the APA by "impos[ing] upon the citizens of the Cayuga Nation the obligation to accept a plebiscite in order to receive federal funds" without any rational basis for doing so.   (ECF 22 at 9).

Plaintiffs' argument fails on this point.   Both Decisions explained in detail how the Regional Director considered and weighed the evidence in the record concerning the legitimacy of the Initiative.   *See generally* AR 001144-1146; *id.* at 001556-1560.   For example, the Regional Director rejected Plaintiffs' argument that the Clan Mothers alone may choose tribal leadership, irrespective of the wishes of Cayuga citizens.   Rather, as explained in briefing before both the Regional Director and the Assistant Secretary, the Haudenosaunee Great Law of Peace, the basis of traditional Cayuga law, states that:

15

> Whenever a specially important matter or a great emergency is presented before the Confederate Council and the nature of the matter affects the entire body of the Five Nations, threatening their utter ruin, then the Lords of the Confederacy must submit the matter to the decision of their people and the decision of the people shall affect the decision of the Confederate Council. This decision shall be a confirmation of the voice of the people.

*Id.* at 001144 (quoting ARTHUR C. PARKER, THE CONSTITUTION OF THE FIVE NATIONS 55 (1916)).[2]   The Regional Director interpreted this to mean that governance among the Haudenosaunee tribes (including the Nation) "comports with the principle [that] governments derive their just powers from the consent of the governed." *Id.*  The Regional Director accordingly held that the Initiative, which demonstrated the Nation's citizens' opinion as to whom they consented to be their leadership, was consistent with this tenet of Cayuga law.  The Regional Director reasoned that in light of the Great Law's guiding principle of invoking the will of the people, he could not "conclude that the citizens of each Haudenosaunee Nation have less authority with respect to their own Nation than they have within the overall Confederacy." *Id.* at 001145.   The Assistant Secretary reasonably found that the Record supported the Regional Director's conclusions based on this analysis.  *Id.* at 001556-1560.

     In light of the careful reasoning by both the Regional Director and the Assistant Secretary, Plaintiffs' mere disagreement with the Decisions do not render them arbitrary, capricious, or otherwise unreasonable within the meaning of the APA.  *See, e.g.*, *Daingerfield Island Protective Soc. v. Babbitt*, 823 F. Supp. 950, 954 (D.D.C. 1993) ("We are not called upon to agree or disagree with [the agency's] actions. The APA forbids substituting a court's judgment for that of the agency, and requires us to affirm an agency action if a rational basis exists for the agency decision."); *accord Presinzano v. Hoffman-La Roche, Inc.*, 726 F.2d 105, 110 (3d Cir.

---

[2] As the Regional Director noted, both parties cited the Parker transcript of the Great Law.  RD Decision at 6 n.15.

1984) (disagreement with agency action insufficient "to show that that decision was based on irrelevant factors or that the judgment of the officials was 'clear error'") (citation omitted).  This is particularly true here in light of Federal courts' longstanding deference to the Department in matters concerning the proper representation of Indian tribal governments.  *See, e.g.*, *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938 (D.C. Cir. 2012) (noting that "we owe deference to the judgment of the Executive Branch as to who represents a tribe").

Finally, both Decisions were reasonable in that they complied with the requirement that Federal officials defer to a Tribe's interpretation of its own laws and ability to internally resolve its disputes.  *See, e.g.*, *Anna Thompson et. al. v. E. Area Dir.*, 17 IBIA 39, 50 (1989) (collecting cases).  In accordance with this principle, Defendants reviewed both factions' interpretations of Cayuga law and determined that the Initiative was a valid mechanism for ascertaining Cayuga citizens' understanding of their governmental structure and leaders.  As the Regional Director noted:

> The Jacobs Council argues strenuously that the statement of support process runs counter to long-established, and federally recognized, processes by which the Cayuga Nation selects members of its governing council.  But to reject the principle that a statement of support campaign could be valid would be to hold that the Cayuga Nation's citizens lack the right to choose a government that reflects their choices - that the power of the Cayuga Nation Council to govern its citizens does not derive from the consent of the governed. Nothing in federal or tribal law [as presented via briefing authorizes me to deny to the Nation's citizens their fundamental human right to have a say in their own government.

AR at 001145.

It was accordingly reasonable for the Regional Director to conclude that "a significant majority of the Cayuga citizens have stated their support for the Halftown Council" and that this was a "resolution of a tribal dispute by a tribal mechanism."  *Id.* at 001152; *see also Timbisha*, 678 F.3d at 938 (acknowledging the legitimacy of the tribe "resolv[ing] their *own* leadership

dispute through a valid *internal* tribal process") (emphasis in original).  And as the Assistant

Secretary stated, the Initiative process was solely designed for establishing a government with

which the United States could interact in that moment.  Moving forward, the Assistant Secretary

noted that it was incumbent upon the Nation to determine how it would determine tribal

leadership – whether via Initiative, Clan Mother determination, or otherwise.  AR at 001159.  At

this juncture, Plaintiffs' concerns properly lie with the Nation and its citizens, not Defendants.

Because the Defendants reasonably accepted the result of the Initiative, Plaintiffs have

not demonstrated a likelihood of success as to Count 1 of their Complaint.

### iii.    The Decisions Did Not Reverse Federal Policy or Fail to Explain the Regional Director's Reasoning

Plaintiffs next accuse the Department of violating the APA by failing to offer a reasoned

basis for accepting Cayuga leadership via the Initiative.  Plaintiffs argue that the Nation had

never previously determined its government through a popular vote, and further note that the

Acting Regional Director had declined to authorize such a process in 2015.  (ECF 22 at 10).

Although both the Regional Director and AS-IA Decisions discussed at length why the use of an

Initiative was legitimate here, Plaintiffs insist that "[n]either the BIA nor the Department of the

Interior offered a reasoned basis for this abrupt reversal" of disallowing write-in voting

campaigns.  (ECF 22 at 12).

At the outset, it is well-settled that an agency can change its position without violating the

APA, as long as such a change is explained.  As the Supreme Court has observed, "an agency

must be given ample latitude to 'adapt their rules and policies to the demands of changing

circumstances."  *Motor Vehicle*, 463 U.S. at 42 (citations omitted).  And while an agency must

show that there are good reasons for the new policy, it need not demonstrate that the reasons for

the new policy are better than the reasons for the old one; rather, it suffices that the new policy is

permissible under the law.  *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515-16 (2009).  In such cases, the agency need only proffer a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy.  *Id.*; *accord Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("At bottom, an agency must explain why it chose to do what it did.") (citations and internal quotations omitted).

Defendants satisfied those standards.  Plaintiffs selectively quote the Acting Regional Director's 2015 Memo as representing longstanding Federal acknowledgment that Cayuga law prohibits popular vote.  (ECF 22 at 10-11).  That ignores that in that same Memo, the Acting Regional Director emphasized that the BIA's decision not to make a definitive Cayuga leadership determination (via popular vote or otherwise) was solely because, at that time, the BIA could continue to recognize the 2006 Council on an interim basis.  AR at 000795 (citing *Rosales v. Sacramento Area Dir.*, 32 IBIA 158, 167 (1998) *and Poe v. Pac. Reg'l Dir.*, 43 IBIA 105, 112-13 (2006)).  But, the Acting Regional Director also specified that "this is not to say that those circumstances may not arise at a future time, conceivably when the time comes for the Nation to renew an ISDA contract," and urged the Nation to "resolve this dispute using tribal mechanisms and prevent the need for the BIA to examine Nation law and make a subsequent determination based on the results of that examination."  *Id.* at 000796; *see also Cayuga*, 58 IBIA at 185 (noting that a new ISDA proposal could "serve as justification for a future decision" concerning Cayuga leadership).

As the Acting Regional Director anticipated, competing ISDA proposals subsequently required the BIA to ascertain Cayuga leadership.  The Regional Director explained that he only authorized the use of the Initiative in order to ascertain Cayuga leadership after recognizing that the 2006 Council had dissolved.  Thus, there was no longer a previously-recognized Cayuga

leadership faction with which the BIA could interact on an interim basis.  AR at 001141.  The Regional Director's authorization of the Initiative also occurred after (1) providing notice to Plaintiffs; (2) accepting opposition briefing from Plaintiffs; and (3) affording Plaintiffs several months to make their case to the Cayuga citizens.  *Id.* at 001546-1552 (chronicling Plaintiffs' ongoing interaction with the Regional Director).  And as discussed above, the Regional Director explained his reasoning in a lengthy and detailed Decision document.  As the Assistant Secretary affirmed, the Regional Director provided the prerequisite "reasoned explanation" for the Regional Director's decision to accept the Initiative as consistent with Cayuga law.  *Id.* at 001556-1560.  Neither the RD nor the AS-IA Decision was arbitrary and capricious.

The APA requires more than Plaintiffs' dissatisfaction with Defendants' reasoned rejection of their position.  Here, both the Regional Director and the Assistant Secretary "articulated a rational connection between the facts found and the choice made" in the Decisions.  *City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (internal quotations omitted).  Plaintiffs have failed to demonstrate a likelihood of success on the merits.

### iv.   The Department Rationally Concluded that the Initiative was Valid as Administered in Practice.

Plaintiffs next argue that Defendants violated the APA because the Regional Director allegedly "disregarded each of the multiple deficiencies identified by [Plaintiffs'] two experts in voting and public opinion polling" concerning the administration of the Initiative on the ground.  Plaintiffs further accuse Defendants of "without explanation refus[ing] to consider Plaintiffs' evidence regarding Mr. Halftown's treatment of political opponents."  (ECR 22 at 13-17, 15-

16).[3]  Plaintiffs claim a likelihood of success of demonstrating that the Decision was arbitrary

and capricious for "disregard[ing] multiple flaws" in the Statement of Support process and its

surrounding circumstances as set out in Plaintiffs' expert testimony.  (ECR 22 at 17).

Once again, Plaintiffs mischaracterize the Decision.  Contrary to Plaintiffs' suggestion,

Defendants did not casually disregard Plaintiffs' expert testimony.  Rather, the Defendants

explained in detail why the experts' concerns were unfounded, unpersuasive, or, in several cases,

based on disputed or demonstrably incorrect factual premises.  AR at 001149-1151; 0011569-

1571.[4]  The Regional Director was well within his rights to independently consider and

reasonably reject Plaintiffs' expert testimony.  *See e.g.*, *Ratliff v. Schiber Truck Co.*, 150 F.3d

949, 954 (8th Cir. 1998) ("Appellants argue that Appellee did not rebut the expert opinion of Mr.

Oldham, but the jury was free to accept or reject the expert testimony of Mr. Oldham. Obviously,

the jury rejected Mr. Oldham's opinion that Mr. Baugh was negligent."); *Powers v. Bayliner*

*Marine Corp.*, 83 F.3d 789, 798 (6th Cir. 1996) (court may reject testimony even if formally

uncontradicted).

For these same reasons, Plaintiffs are also incorrect that the Defendants "without

explanation" refused to consider Plaintiffs' allegations of voter intimidation and abuse.  To the

extent Plaintiffs suggest an APA violation from the fact that the Defendants did not directly

address virtually every one of Plaintiffs' declarations or witness statements, ECF 22 at 16-17, the

APA does not require such a line-by-line rebuttal.  Rather, courts "must uphold the [agency's]

---

[3] Count 3 of Plaintiffs' Complaint does not allege that Defendants "refused to consider" Plaintiffs' evidence, as alleged in Plaintiffs' Motion, but rather that the Assistant Secretary violated the APA by affirming the RD Decision even in light of Plaintiffs' evidence.

[4] To the extent that Plaintiffs insinuate that their expert testimony is due particular deference because it was unrebutted by the Halftown Council, *see generally* ECF 22 at 14-16, the Assistant Secretary explained his decision not to accord independent weight to Plaintiffs' expert testimony. AR at 001569 (note180 of the AS-IA Decision).  This Court should do the same.

factual determinations if on the record as a whole, there is such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Sec'y of Labor, Mine Safety & Health Admin. v. Fed. Mine Safety & Health Review Comm'n*, 111 F.3d 913, 918 (D.C. Cir. 1997) (citation and internal quotations omitted). This is true "even though a plausible alternative interpretation of the evidence would support a contrary view." *Dickson v. Nat'l Transp. Safety Bd.*, 639 F.3d 539, 542 (D.C. Cir. 2011) (citation omitted). The Assistant Secretary explained why the RD Decision satisfied this "highly deferential standard," *Mine Safety*, 111 F.3d at 918, *see* AR at 0011569-1571, and thus Plaintiffs are unlikely to succeed on the merits of Count 3 of their Complaint.

### v.      The Regional Director Did Not Violate Plaintiffs' Due Process Rights

Plaintiffs finally claim a due process violation from Defendants' alleged collusion with the Halftown Council, pre-judgment of the Initiative results, withholding of relevant documents, and other charges. (ECF 22 at 17-24). A party alleging unconstitutional bias on the part of a Federal agency "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Accordingly, in "the absence of clear evidence to the contrary, courts should presume that public officers have discharged their official duties properly." *South Dakota v. U.S. Dep't of the Interior*, 401 F. Supp. 2d 1000, 1011 (D.S.D. 2005) (citation omitted).

To overcome this presumption, Plaintiffs must demonstrate that the Regional Director and Assistant Secretary were "not capable of judging a particular controversy fairly on the basis of its own circumstances." *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) (quotations and internal citation omitted). "This standard is met when the challenger demonstrates, for example, that the decision maker's mind is 'irrevocably closed' on a

disputed issue." *Nec Corp. v. United States*, 151 F.3d 1361, 1373 (Fed. Cir. 1998) (quoting *FTC v. Cement Inst.*, 333 U.S. 683, 701 (1948)).  Examples of such a "closed mind" include a decision maker definitively and publicly supporting one side of a dispute, *see, e.g.*, *McClure v. Ind. Sch. Dist. No. 16*, 228 F.3d 1205, 1215-16 (10th Cir. 2000); *Rio Arriba, N.M., Bd. of County Comm'rs v. Acting Sw. Reg'l Dir.*, 38 IBIA 18, 28-29 (2002), publicly disparaging a party to a dispute, *see, e.g.*, *Guo-Le Huang v. Gonzales*, 453 F.3d 142 (2d Cir. 2006); *Cinderella Career & Finishing Sch., Inc. v. FTC*, 425 F.2d 583, 589-90 (D.C. Cir. 1970), or having a pecuniary interest in ruling in favor of a particular party.  *See, e.g.*, *Ward v. Village of Monroeville*, 409 U.S. 57 (1972).

None of Plaintiffs' allegations remotely satisfy these standards.  Plaintiffs primarily argue that Defendants conspired to prejudge the outcome of the dispute in favor of the Halftown Council.  (ECF 22 at 19-21, 23).  But the Administrative Record demonstrates that the Regional Director urged Plaintiffs to consult with the Halftown Council concerning the Initiative; invited Plaintiffs to offer alternative methods for resolving the dispute; received, considered, and included in the Administrative Record multiple legal memoranda and other submissions from Plaintiffs objecting to the Initiative as a matter of law, fact, and policy; and, prior to issuing the Decision, offered Plaintiffs the opportunity to submit opening and response briefs  on the merits of their claims.  *See generally* AR at 001546-1552 (explaining administrative history and citing relevant documents from the Record).  Without objection, the Regional Director accepted briefing and other correspondence from Plaintiffs for weeks after the applicable deadlines.  *See id.* at 000844 (Regional Director asking for Plaintiffs' comments within ten days of June 17, 2016); *id.* at 000846 (Plaintiffs' first substantive response, dated July 1, 2016); *id.* at 00929 (Plaintiffs' second substantive response dated July 8, 2016).  The Assistant Secretary similarly

accepted opening and response briefs during Plaintiffs' appeal and upheld the RD Decision after

reviewing both these briefs and the full Administrative Record before the Regional Director. *Id.*

at 001383; 001445-1477; 001529-1544. Stripped of pretense, Plaintiffs essentially argue that

Defendants spent over a year conducting sham administrative proceedings that had been pre-

judged from the outset as part of a multi-level Federal conspiracy against Plaintiffs. The Record

does not even begin to justify this stunning allegation or overcome the presumption of regularity

accorded to the Defendants' decision.[5]

Nor, as Plaintiffs suggest, was it unlawful for the BIA to have discussed the Initiative

with the Halftown Council, with or without Plaintiffs present. There is nothing untoward about

the BIA exercising its agency responsibility of assisting the resolution of a tribal leadership

dispute. Absent such discussions (which the Record demonstrates the BIA undertook with both

factions; *see* AR at 0001549 (note 38 of the AS-IA Decision), the BIA would be precluded from

offering Tribes any assistance whatsoever resolving disputes. And both the United States

Supreme Court and the IBIA have held that there is no prohibition on ex parte communications

for the purposes of appeals governed by 25 C.F.R. Part 2. *See United States v. Navajo Nation*,

537 U.S. 488, 512-14 (2003) (because the parties had elected to proceed with an appeal before

the Assistant Secretary pursuant to 25 C.F.R. Part 2, rather than before the IBIA pursuant to 43

C.F.R. Part 4, "the regulatory proscription on ex parte contacts applicable in Board proceedings

thus did not govern"); *see also Mary Carol Jenkins, et al., v. W. Reg'l Dir.*, 42 IBIA 106, 110 n.8

---

[5] Plaintiffs make much of the Regional Director's statement that the Initiative "would be a viable way" of resolving the dispute, offering this as proof that the Regional Director had already concluded that the Initiative was unquestionably legitimate under Cayuga law. (ECF 22 at 6, 19-20). That is not the case: as discussed above, the Regional Director explicitly sought alternatives from Plaintiffs and consulted and met with them during the Initiative process, and both the Regional Director and the Assistant Secretary sought briefing on this very issue.

(2006) ("Unlike appeals pending before the Board, see 43 C.F.R. § 4.27 (b), there is no express prohibition against ex parte communications during appeals pending before a Regional Director, although notice and opportunity-to-comment requirements may apply. See 25 C.F.R. § 2.21 (b).").

Plaintiffs next allege that the Department attempted to deny Plaintiffs the ability to present an administrative appeal by delegating the Regional Director the authority to take final agency action, and that the Assistant Secretary improperly assumed jurisdiction over the appeal in order to wrest control from neutral decision makers in the IBIA. (ECF 22 at 21-22). But Plaintiffs ignore the fact that the Department subsequently withdrew the delegation to the Regional Director. AR at 001311-1312. And while ascribing nefarious intent to the Assistant Secretary's assumption of jurisdiction, at no point have Plaintiffs challenged the Federal regulations under which the Assistant Secretary assumed jurisdiction over the appeal. 25 C.F.R. § 2.20(c) and 43 C.F.R. § 4.332(b). *See, e.g.*, *Spadone v. McHugh*, 842 F. Supp. 2d 295, 303 (D.D.C. 2012) (noting that "issues and arguments not made before the relevant . . . administrative agency . . . could not be raised in a judicial tribunal" and that plaintiffs "cannot show a likelihood of success on waived claims") (citation omitted).

Finally, Plaintiffs claim that the Assistant Secretary improperly adjudicated the administrative appeal despite having participated in the drafting of the RD Decision. (ECF 22 at 22-23). Plaintiffs' sole support for this allegation is that then-Acting Assistant Secretary Michael Black was copied by "cc" on the briefing the parties sent to the Regional Director. (*Id.* at 23). This fails to demonstrate a likelihood of success for two reasons. First, despite being one of the many individuals who received a courtesy copy on certain briefing below, *see, e.g.*, AR at 001006 (Mr. Black's courtesy copy on Halftown Council's opening brief before the Regional

Director) *and* 001035 (Mr. Black's courtesy copy on Plaintiffs' opening brief before the Regional Director), Mr. Black avers that at no point did he review those documents, discuss the case with the Regional Director, or otherwise participate in the Regional Director's decision. *See* Declaration of Michael S. Black. Mr. Black further maintained his separation from both the Regional Director and his counsel on this matter during the appellate process. *Id.* Mr. Black's electronic receipt of a courtesy copy of documents in a matter in which he had no personal involvement does not violate due process. Second, "it is well settled that the combination of functions in the same official or agency is not, without more, a violation of due process." *Nat'l Rifle Ass'n of Am. v. U. S. Postal Serv.*, 407 F. Supp. 88, 92 (D.D.C. 1976) (citing *Withrow*, 421 U.S. at 47-48); *accord Riggins v. Goodman*, 572 F.3d 1101, 1113-14 (10th Cir. 2009) ("[I]nvolvement of tribunal members in earlier proceedings in the same case does not overcome the presumption of honesty and integrity.") (quotation omitted). Even accepting arguendo (and contrary to his own testimony) that Mr. Black reviewed the briefing submitted by the Parties to the Regional Director, (the only example of his "participation" listed in Plaintiffs' Motion), Plaintiffs' allegations fail to explain how such review would render Mr. Black's mind "irrevocably closed" towards Plaintiffs' position.[6]

The "mere fact that a decision was reached contrary to a particular party's interest cannot justify a claim of bias, no matter how tenaciously the loser gropes for ways to reverse his misfortune." *Marcus v. Dir., Office of Workers' Comp. Programs, U. S. Dep't of Labor*, 548

---

[6] Plaintiffs' due process argument include multiple references to Defendants' alleged withholding of relevant documents. Defendants interpret these references as additional arguments in support of Plaintiffs' various due process claims, rather than a separate count of a due process violation, and so do not address the Administrative Record or FOIA response in this section. Those will be addressed in Federal Defendants' Response in Opposition to Plaintiffs' Motion to Supplement the Administrative Record and Expedite Discovery.

F.2d 1044, 1051 (D.C. Cir. 1976).  Plaintiffs accordingly cannot couch their general objection to the Decision as a due process violation.  Because Plaintiffs have not demonstrated a likelihood of success on the merits of any of their claims, this Court should deny their Motion.

### C.      Neither the Balance of the Equities Nor the Public Interest Favor Plaintiffs

Having failed to establish either irreparable harm or a likelihood of success on the merits, Plaintiffs' Motion should be denied.  But Plaintiffs have further failed to demonstrate either that an injunction would not substantially injure other interested parties or that an injunction would further the public interest.  "'These factors merge when the Government is the opposing party.'" *Colorado Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220–21 (D.D.C. 2015) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Even in such cases, injunctive relief "may be withheld if contrary to the public interest, even if other factors support such relief, and consideration of the public interest is particularly crucial in a suit seeking to enjoin governmental action being carried out pursuant to a statute intended to serve the public interest."  *AARP*, 226 F. Supp. 3d at 25 (citations omitted).  The ISDA is one such statute.  *See generally* 25 U.S.C. § 5302.

Plaintiffs do not satisfy this standard.  Plaintiffs claim that none of their requested relief "would require the Bureau of Indian Affairs or Department of the Interior to take any affirmative action," (ECF 22 at 37).  Rather, Plaintiffs insist that they seek merely that this Court "return the parties to the status quo that existed before [the Regional Director] issued his decision recognizing the Halftown Group as the government for the Cayuga Nation. . . ." (*Id.*).  Plaintiffs further claim that their alleged injuries are exponentially more grievous than those of the United States, who "would incur no appreciable hardship if an injunction to maintain the status quo ante is issued."

This is untrue.  Plaintiffs do not merely seek to maintain the status quo: rather, they seek to sever the government-to-government relationship between the United States and the Nation as it has existed for nearly a year.  In the interim, the Nation is in the process of making the Federal funding through its ISDA contract as administered by the Halftown Council and the Department available.  Bruce Maytubby Declaration.¶ 6.  As Plaintiffs themselves note, there is a significant Federal and Tribal interest in ensuring that ISDA contracts inure only to a Federally-recognized Tribal government.  (ECF 22 at 35).  Such a requirement is codified in Federal law.  *See* 25 U.S.C. § 5321(a)(1) (requiring Department to enter into a 638 contract if requested by an Indian tribe or tribal organization); 25 U.S.C. § 5304(e), (*l*) (defining "Indian tribe" and "tribal organization" as referring to a Federally-recognized governing body).

Despite disclaiming any intention of jeopardizing the operation of the Nation's ISDA contract, Plaintiffs fail to explain how an order returning the Tribe to a situation in which it lacks a Federally-recognized governing body would not, as a matter of law, require either termination or a suspension the Nation's current ISDA contract.  The Department itself has already recognized the necessity of such a suspension during the administrative appeal process.  AR at 001303-1304 (recouping ISDA funds mistakenly disbursed to Halftown Council during pendency of RD Decision).  And at the very least, Plaintiffs' requested relief would require reevaluation of whatever financial or other relationships the Nation has established over the past seven months on the understanding that the United States has recognized the Halftown Council. *See, e.g.*, Ex. 1  (Letter from Dean M. Seyler, Dir., Indian Health Serv., to Robert Kelly, Jr., Chairman, Nooksack Indian Tribe (Nov. 18, 2016) (requiring that Tribe comply with Department determination of Tribal citizenship and leadership as condition for maintaining eligibility for

ISDA contract).  Plaintiffs' cannot argue that their requested relief would not withhold

significant Federal funding from the Nation's government and its citizens.

Plaintiffs are further incorrect that there are "no pending issues before the Department

related to Cayuga Nation business that cannot await resolution of the Plaintiffs' claims."  (ECF

22 at 37).  The Department is currently in the process of reviewing modifications to the Nation's

Annual ISDA Funding Agreement and a pending liquor ordinance (both submitted by the

Halftown Council) as well as a land into trust application.  Plaintiffs' requested relief would

require that the Department suspend all such consideration during the resolution of this dispute.

Finally, an injunction would not further the public interest.  The Regional Director

reluctantly authorized the Initiative only after a decade of strife associated with the Nation's

disputed leadership.  For the first time in years, the Nation has a non-interim governing body

with which the United States can interact.  Plaintiffs ask this Court to dissolve over seven months

of progress and instead throw the Nation back into a state of perpetual uncertainty.  Returning to

what Plaintiffs consider "the status quo ante" – the days of paralyzed tribal government and the

factions at an impasse – on a preliminary basis and without the benefit of full adjudication of this

case would only sow more discord and chaos for the Cayuga community.  The public interest

would be served by moving expeditiously to a final decision on the merits and the administrative

record, not preliminary injunctive relief pending a later decision.

The Halftown Council has been the Federally-recognized Cayuga governing body for

over seven months, the Administrative Record is well-developed, and the United States is

prepared to defend the Decisions on the merits.  Plaintiffs' inability to demonstrate that either the

equities or the public interest favors the postponement of a timely resolution of this dispute

further require that this Court deny Plaintiffs' Motion.

II.     **Conclusion**

Plaintiffs have failed to make the significant showing necessary for a preliminary

injunction to be entered in this case.  Plaintiffs' have failed to demonstrate that an injunction is

necessary to prevent irreparable injury.  Nor have Plaintiffs demonstrated a likelihood of success

on the merits of their claim that the Decisions were arbitrary and capricious.  Finally, an

injunction will cause significant harm to, and the equities support, both the Nation and the

Defendants.  Defendants request that this Court deny Plaintiffs' Motion.


                              Respectfully Submitted,

                              JESSIE K. LIU
                              D.C. BAR # 472845
                              United States Attorney
                              for the District of Columbia

                              DANIEL F. VAN HORN
                              D.C. BAR # 924092
                              Civil Chief

              By:     /s/_____
                              BENTON G. PETERSON, BAR # 1029849
                              Assistant United States Attorney
                              U.S. Attorney's Office
                              555 4th Street, N.W. - Civil Division
                              Washington, D.C. 20530
                              (202) 252-2534