**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE CAYUGA NATION, *et al.*,　　Plaintiffs,　　　　v.　RYAN ZINKE, *et al.*,　　Defendants,　THE CAYUGA NATION COUNCIL,　　Defendant-Intervenor. | Civil Action No. 17-cv-1923 (CKK) |

**MEMORANDUM OPINION**
(March 27, 2018)

The Cayuga Nation is a federally recognized Indian Nation.  This case deals with

decisions by the Bureau of Indian Affairs ("BIA") and the Assistant Secretary for Indian Affairs

of the Department of the Interior ("DOI") that recognized one faction within the Cayuga

Nation—now referring to itself as the "Cayuga Nation Council," though alternatively referred to

in the administrative record as the "Halftown Group"—as the governing body of the Cayuga

Nation for the purposes of certain contractual relationships between that Nation and the United

States federal government.  These decisions were the product of an adversarial process between

the Cayuga Nation Council and Plaintiffs, a rival faction within the Cayuga Nation who assert

that they represent the Nation's rightful government.  Plaintiffs have filed this lawsuit seeking to

overturn the BIA and DOI decisions.

Now before the Court is Plaintiffs' [22] Motion for Preliminary Injunction.  Upon

consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the

---

[1] The Court's consideration has focused on the following documents:
- Pls.' Mot. for Preliminary Injunction, ECF No. 22 ("Pls.' Mot.");

Court DENIES Plaintiffs' Motion. Plaintiffs have not demonstrated that they are likely to

succeed on their claims, most of which are based on speculation or can be distilled to mere

disagreements with the decisions reached by the agency. Moreover, Plaintiffs' irreparable injury

showing is relatively weak, and the balance of the equities and public interest favor denying

preliminary injunctive relief.

## I. BACKGROUND

This case arises from a long-standing dispute between rival factions within the Cayuga

Nation. Plaintiffs allege that the Cayuga Nation has long been governed by a Council of Chiefs

selected and overseen by "Clan Mothers," whom Plaintiffs purport to represent in this litigation.

Compl., ECF No. 1, ¶¶ 1-2. Plaintiffs assert that "Cayuga Nation leaders are selected pursuant to

the Great Law of Peace, which gives that responsibility of nomination and removal to the women

who serve as Clan Mothers, based on input from the members of their clans." *Id.* ¶ 31.

According to Plaintiffs, this is a "deliberative and consensus-based" process for selecting leaders.

*Id.* ¶ 33. Plaintiffs allege that the United States federal government had previously recognized

this form of governance for the Cayuga Nation, and rejected efforts over the years by a faction

known as the "Halftown Group" to secure support for the use of a mail-in survey[2] to reconfigure

---

- Def. Int.'s Opp'n to Pls.' Mot. for Preliminary Injunction, ECF No. 31 ("Def. Int.'s Opp'n");
- Fed. Defs.' Opp'n to Pls.' Mot. for Preliminary Injunction, ECF No. 32 ("Fed. Defs.' Opp'n"); and
- Pls.' Reply in Support of Mot. for Preliminary Injunction, ECF No. 37 ("Pls.' Reply").

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

[2] The Court understands that there is some dispute as to how to properly refer to the "mail-in survey." That process is alternately referred to in the briefing and record as, among other things, a mail-in survey, a "Statement of Support" campaign, and a "plebiscite." For the sake of consistency and ease of understanding, the Court refers to the disputed process in this Memorandum Opinion as the "mail-in survey," but by doing so makes no substantive judgment about the nature of the process.

the Cayuga Nation's government. *Id.* ¶¶ 34-36.

However, in June 2016, Defendant Bruce W. Maytubby, the Eastern Regional Director of the BIA, revealed to Plaintiffs that the Halftown Group intended to conduct a mail-in survey in order to create a new government for the Cayuga Nation, and that it was Mr. Maytubby's view that the proposed survey "would be a viable way of involving the Cayuga people in a determination of the form and membership of their government." *Id.* ¶¶ 37, 40. Plaintiffs contend that this determination was the result of secret meetings between the BIA and the Halftown Group, from which Plaintiffs were excluded. *Id.* ¶ 38. Plaintiffs objected to the proposed survey, arguing, among other things, that it violated Cayuga law. *Id.* ¶ 42.

On December 15, 2016, Defendant Maytubby issued a decision "(1) recognizing the Halftown Group as the government of the Cayuga Nation *for purposes of entering into a contract under the ISDEAA* [Indian Self-Determination and Education Assistance Act] and declining to recognize Plaintiffs for such purposes; (2) awarding an ISDEAA contract grant to the Halftown Group, on behalf of the Cayuga Nation; and (3) declining to award an ISDEAA contract to [Plaintiffs] on behalf of the Cayuga Nation." *Id.* ¶ 54 (emphasis added). Plaintiffs characterize this decision as a reversal of "longstanding federal policy," and challenge it on a number of substantive and procedural grounds. *Id.* ¶¶ 55-81.

Defendant Maytubby's December 15, 2016 decision indicated that it constituted final agency action, *id.*, Ex. A at 15, and was accompanied by a delegation of authority to Mr. Maytubby to take such action, *id.* ¶ 55. Nonetheless, Plaintiffs did not file a lawsuit challenging this decision when it was issued. Instead, Plaintiffs filed a notice of appeal with the Interior Board of Indian Appeals ("IBIA") arguing that additional administrative review was appropriate because the delegation of authority to Defendant Maytubby to take final agency action was

ineffective. *Id.* ¶¶ 82-83. The IBIA docketed the appeal and requested briefing on the delegation issue. *Id.* ¶¶ 84-85. Shortly thereafter, Defendant Michael Black, the then-Acting Assistant Secretary – Indian Affairs, withdrew the contested delegation to Mr. Maytubby, and himself assumed jurisdiction over Plaintiffs' administrative appeal. *Id.* ¶¶ 86-87. The parties submitted briefs on the merits of the dispute to Defendant Black, who ultimately issued a decision on July 13, 2017, denying Plaintiffs' appeal of Defendant Maytubby's decision. *Id.* ¶¶ 93-95.

On September 20, 2017, Plaintiffs filed this lawsuit, claiming that Defendants had violated the Administrative Procedure Act ("APA") and Plaintiffs' constitutional right to due process. *Id.* ¶¶ 100-65. As relief, Plaintiffs ask that both Mr. Maytubby's decision and Mr. Black's decision be declared unlawful and vacated, that the Court enjoin Defendants from relying on the vacated decisions for any action by the DOI, that the individuals involved in rendering these decisions be enjoined from further adjudicating the questions in this case, that this matter be remanded to the BIA "for government to government consultation and, as appropriate, decision by a neutral decision-maker on recognition and the Plaintiffs' ISDEAA application," and that they be granted costs and attorneys' fees. *Id.* at 26-27.

## II. LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A plaintiff seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392

4

(quoting *Winter*, 555 U.S. at 20) (alteration in original; quotation marks omitted)).  When

seeking such relief, "'the movant has the burden to show that all four factors, taken together,

weigh in favor of the injunction.'"  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014)

(quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).  "The

four factors have typically been evaluated on a 'sliding scale.'"  *Davis*, 571 F.3d at 1291 (citation

omitted).  Under this sliding-scale framework, "[i]f the movant makes an unusually strong

showing on one of the factors, then it does not necessarily have to make as strong a showing on

another factor."  *Id.* at 1291–92.[3]

### III. DISCUSSION

A preliminary injunction is an extraordinary form of relief, not to be granted regularly in

APA cases whenever a party is aggrieved by the decision of a government agency.  This case

does not present the exceptional circumstances that would warrant such an injunction.  Most

importantly, Plaintiffs have not demonstrated a likelihood of success on their substantive claims.

The Court has reviewed the record and concludes, at least at this preliminary stage, that

Plaintiffs' claims are primarily based on speculation, assignations of nefarious intent and mere

disagreements with the determinations reached by agency decisionmakers.  Moreover, Plaintiffs'

attempt to demonstrate that they will suffer irreparable injury in the absence of an emergency

---

[3] The Court notes that it is not clear whether this circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)).  However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112.  In any event, this Court need not resolve the viability of the sliding-scale approach today, as it finds that none of the preliminary injunctive factors favors awarding relief on the pending motion.

injunction is similarly based on speculation. It is also belied by Plaintiffs' considerable delay in seeking such relief—not while exhausting their administrative remedies, but *after* final agency action was taken. Finally, neither the public interest nor the equities favor granting Plaintiffs' motion.

## A. Likelihood of Success on the Merits

First and foremost, the Court is not persuaded that Plaintiffs are likely to prevail on the merits of their claims. The Court cautions that this does not represent a final adjudication of Plaintiffs' claims. Despite the Court's admonition that pursuing a preliminary injunction motion in this APA case was not an efficient use of the parties' or the Court's time and resources, Plaintiffs have insisted on litigating this motion before moving on to a full and final briefing on the merits of their claims. There is a troubling trend in APA cases whereby plaintiffs are routinely filing preliminary injunction motions simply to "jump the queue" and have the Court consider the merits of their claims immediately. There are certainly instances where such motions are necessary and appropriate to prevent an impending injury, but increasingly these "emergency" motions are being filed simply because the plaintiff is aggrieved by an agency decision and wants the Court to focus its attention on its claims immediately, at the expense of the claims of other litigants. This practice is strongly discouraged. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 n.8 (D.C. Cir. 2001) (warning against the use of preliminary injunction motions in APA cases); *Emily's List v. Fed. Election Comm'n*, 362 F. Supp. 2d 43, 53 (D.D.C.), *aff'd*, 170 F. App'x 719 (D.C. Cir. 2005) ("the preliminary injunction stage is not the appropriate time to consider the merits of Plaintiff's substantive APA claims."). The Court addresses the merits of Plaintiffs' claims below, but only in the limited context of determining whether Plaintiffs have satisfied the likelihood of success requirement for a preliminary

injunction.

Plaintiffs assert four different claims in their Complaint and Motion for Preliminary Injunction: "(a) violation of the well-established legal principal that Indian nations retain the exclusive right to govern themselves; (b) failure to provide a reasoned basis for an abrupt reversal in agency policy; (c) no rational connection between the facts about the mail-in survey approved by the BIA and the conclusion that the survey was reliable; and (d) due process violations including prejudgment, collusion with one faction, and failure to provide a neutral decision-maker." Pls.' Mot. at 4. Plaintiffs have not satisfied their burden of demonstrating that they are likely to succeed on any of these claims.

First, Plaintiffs have not demonstrated a likelihood of succeeding on their claim that Defendants acted contrary to law by interfering with the right of the Cayuga Nation to govern itself. In summary form, Plaintiffs argue that Defendants violated the APA by "imposing" a plebiscite requirement on the Cayuga Nation that is contrary to the Nation's traditional manner of choosing its leaders. *Id.* at 4-9. This argument is not supported by the record. Defendants' decision was a narrow one: they did not "impose" a form of governance, or particular leaders, on the Cayuga Nation. *See* AR1558 ("The Regional Director did not 'Mandate' Cayuga government by plebiscite"). The BIA provided technical assistance with a mail-in survey that one faction within the Cayuga Nation wanted to pursue. Defendants were then presented with competing contract proposals, each purportedly on behalf of the Cayuga Nation. These inconsistent proposals forced Defendants to determine which of two rival factions represented the Cayuga Nation's rightful government for the purposes of conducting government-to-government relations with the United States. Failure to have made this determination would have jeopardized the Nation's citizens by leaving them without governmental representation and

7

potentially without United States government funding and programs. *See Goodface v. Grassrope*, 708 F.2d 335, 339 (8th Cir. 1983) ("The BIA, in its responsibility for carrying on government relations with the Tribe, is obligated to recognize and deal with some tribal governing body in the interim before resolution of the election dispute.").

Making this necessary determination was not the equivalent of "imposing" anything on the Cayuga Nation. Although Plaintiffs disagree with Defendants' ultimate decision to recognize the Halftown Group as the Nation's government for the purpose of contracting with the federal government, that decision did not violate the principle of self-governance for Indian Nations—the Cayuga Nation remains free to govern itself however it chooses. If anything, the decision exemplified that principle, because it relied on statements of support by Cayuga Nation citizens about whom they recognized as their government. *See Ransom v. Babbitt*, 69 F. Supp. 2d 141, 150 (D.D.C. 1999) ("In situations of federal-tribal government interaction where the federal government must decide what tribal entity to recognize as the government, it must do so in harmony with the principles of tribal self-determination.").

During the administrative proceedings Plaintiffs argued to the Defendants that this process violated Cayuga law. But others within the Cayuga Nation argued that the process was lawful. Defendants considered the competing arguments about whether the proposed survey process was valid under Cayuga law and reasonably decided that it was valid. Defendants' interpretation of Cayuga law was supported by the Haudenosaunee Great Law of Peace—which both sides appear to acknowledge as a basis of traditional Cayuga law—which states that:

> Whenever a specially important matter or a great emergency is presented before the Confederate Council and the nature of the matter affects the entire body of the Five Nations, threatening their utter ruin, then the Lords of the Confederacy must submit the matter to the decision of their people and the decision of the people shall affect the decision of the Confederate Council. This decision shall

8

be a confirmation of the voice of the people.

AR1557. Defendants made a determination that this passage meant that the power of the

government of the Cayuga Nation derives from the consent of the governed, and that therefore a

survey campaign that asked Cayuga citizens to indicate whom they consented to being governed

by was consistent with Cayuga law. *Id.* This conclusion was certainly reasonable. Plaintiffs

may disagree and have a different interpretation of Cayuga law, but that does not make

Defendants' interpretation arbitrary or capricious, especially considering the deference owed to

the Executive branch in these matters. *See Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935,

938 (D.C. Cir. 2012) ("we owe deference to the judgment of the Executive Branch as to who

represents a tribe"). The Court cannot say that Plaintiffs are likely to succeed on this aspect of

their lawsuit.

Second, Plaintiffs have not established that they are likely to succeed on their claim that

Defendants failed to explain their reasoning for accepting the results of the mail-in survey when

choosing which faction constituted the legitimate government of the Cayuga Nation for the

purpose of contracting with the federal government. This argument is based on the principle that

"[a]n agency acts unreasonably for purposes of the APA when, for example, it departs from its

past precedent without reasonably explaining and justifying the departure." *Indiana Boxcar*

*Corp. v. R.R. Ret. Bd.*, 712 F.3d 590, 591 (D.C. Cir. 2013). Plaintiffs claim that Defendants'

decision constituted an unexplained reversal of past federal policy.

Again, the Court disagrees. Although Defendants had, in the past, declined to recognize

new governments for the Cayuga Nation on the basis of similar survey efforts, they had done so

because they were able at those times to recognize an undisputed 2006 council as the Nation's

government. In those past instances, Defendants warned that their decisions were temporary,

and that if the rival factions within the Cayuga Nation were not able to resolve their disputes

9

internally, Defendants might eventually have to make a new determination of the Nation's leadership. The dispute had not resolved itself over the intervening years. In the decision at issue in this case, Defendants explained that—unlike in the past—they could no longer simply recognize the 2006 council as the government of the Cayuga Nation, because that council had not submitted a contract proposal. Instead, having been presented with proposals from two competing disputed leadership factions, each purporting to represent the Cayuga Nation, Defendants were forced to make a new determination about the Nation's government for purposes of entering into contracts with the Nation and providing it with services and funding. Defendants explained that they chose to recognize the Halftown Group because a majority of Cayuga Nation citizens had indicated their support for that faction through a process that Defendants determined was consistent with Cayuga law and adequately executed. All of this was explained by Defendants in a manner that easily satisfied the APA's requirement that changes to agency policy be explained. *See* AR1546-47, 1551, 1556, 1565-67.

Third, Plaintiffs have not established that they are likely to succeed on their claim that "there is no rational connection between the facts relative to the mail-in survey and the conclusion reached by agency decision-makers that it was a 'viable way of involving the Cayuga people in a determination of the form and membership of their government.'" Pls.' Mot. at 13-14 (quoting Pls.' Mot., Ex. D at 1). Basically, Plaintiffs argue that Defendants ignored expert evidence that Plaintiffs presented that allegedly showed that the mail-in survey was not reliable for a number of reasons, including evidence "regarding Mr. Halftown's treatment of political opponents" (in other words, evidence that Cayuga citizens would not feel free to vote against the Halftown Group because they would fear retribution from Mr. Halftown). *Id.* at 13-17.

The record does not support Plaintiffs' assertion that this evidence was ignored. Instead,

10

the record shows that this evidence was thoroughly considered, but was rejected. AR11569-71. As Defendant Black found, "the Regional Director devoted several pages in the Decision to explaining why he did not believe that the experts' concerns undermined the Initiative as a whole." AR1569. "The Decision was not arbitrary and capricious merely because Appellants believe their experts were correct." AR1570. The Court agrees. Defendants decided that the survey was a reliable way of determining the will of the Cayuga people despite the alleged deficiencies highlighted by Plaintiffs' evidence. Plaintiffs disagree, but that disagreement is not a sufficient basis for this Court to overturn an agency decision under the APA. To the extent Defendants' discussion of this issue did not address every single alleged deficiency in the mail-in survey process, this is not enough to render Defendants' decision as a whole arbitrary or capricious. Again, Defendants' reliance on the survey was narrow. Defendants did not use the survey to force a particular government on the Cayuga Nation, but instead merely considered it in the context of determining which of two rival leadership factions should be recognized for the purposes of entering into a contract with the federal government. Defendants adequately addressed the general argument that the mail-in survey was not reliable for that purpose. They were not required to rebut every single aspect of that argument individually.

Finally, the Court is also not convinced that Plaintiffs have a likelihood of succeeding on their due process claims. Plaintiffs claim that Defendants prejudged the determination of the Cayuga Nation's leadership before Plaintiffs were ever given a chance to be heard on the issue. Pls.' Mot. at 17-21. This claim, like Plaintiffs' others, is belied by the record. Plaintiffs were invited to be involved in the mail-in survey, were asked to provide alternative proposals for resolving the Nation's leadership dispute, and were given considerable opportunity to be heard about the legality and reliability of the campaign during the administrative proceedings below.

11

There is no reason to think that Defendants had predetermined how they would decide these issues before giving Plaintiffs these opportunities to be heard, or that this entire administrative process was a sham.

Plaintiffs put great emphasis on a letter sent by Defendant Maytubby to Plaintiffs at the outset of administrative proceedings that indicated that the mail-in survey would "be a viable way of involving the Cayuga people in a determination of the form and membership of their tribal government." Pls.' Mot. at 19. This letter does not indicate, as Plaintiffs have argued, that Defendants had predetermined to approve the use of the mail-in survey. Instead, it indicates Defendant Maytubby's fairly unremarkable belief that a mail-in survey that asked for the input of the Cayuga Nation's citizens on their choice for government would be one way of involving the Cayuga people in the determination of their government.[4] There is no reason to interpret the remark as showing that Defendants had predetermined the substantive questions regarding the legality of the survey or whether the survey would be fairly executed in practice. The parties would go on to litigate those issues for months afterward. To the extent Plaintiffs claim that Defendants Maytubby or Black prejudged the dispute because they were biased against Plaintiffs, this claim is not supported by the record. Administrative adjudicators are entitled to a presumption of honesty and integrity, *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), and Plaintiffs fall far short of making the type of showing that could overcome that presumption.

---

[4] Plaintiffs' claims of bias, prejudgment and other unfair conduct by Defendants Maytubby and Black may suffer from an additional flaw. In large part, Plaintiffs appear to not have meaningfully raised these arguments below, and may have therefore waived them. "Claims of bias must be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist." *See Power v. Fed. Labor Relations Auth.*, 146 F.3d 995, 1002 (D.C. Cir. 1998) (internal quotation marks and modifications omitted). Without making any final ruling on this point, the Court notes it as another reason why Plaintiffs have not established a likelihood of success in this lawsuit.

Nor have Plaintiffs demonstrated that there was anything wrongful about Defendants'

consultations and communications with the Halftown Group. As Defendant Black noted,

Plaintiffs have not pointed to any legal requirement that the BIA only meet with a tribal

leadership faction if other factions are present as well. *See* AR1564. Indeed, it is difficult to see

how the BIA could fulfill its responsibility to assist Indian Nations with leadership disputes

without such communications. Moreover, *ex parte* communication are not prohibited for the

purposes of appeals—like the administrative appeal in this case—governed by 25 C.F.R. Part 2.

*See United States v. Navajo Nation*, 537 U.S. 488, 513 (2003) (because appeal was taken under

25 C.F.R. 2.20, "the regulatory proscription on *ex parte* contacts applicable in Board proceedings

thus did not govern.").

Plaintiffs also argue that their administrative appeal rights were compromised, but this

argument does not withstand scrutiny. Plaintiffs complain about the delegation of authority to

Defendant Maytubby to take final agency action, but ignore that the delegation was subsequently

withdrawn. Plaintiffs complain about Defendant Black's assumption of jurisdiction over their

appeal after the delegation to Defendant Maytubby was withdrawn, but do not appear to dispute

that his doing so was expressly permitted by regulation. *See* 25 C.F.R. § 2.20(c) (giving the

Assistant Secretary – Indian Affairs the authority to decide to issue a decision in an appeal to the

IBIA).

Finally, Plaintiffs claim that Defendant Black unfairly adjudicated their appeal of the

BIA's decision, despite having been involved in that decision in the first instance. The support

for this argument is threadbare. It appears to be premised on the fact that Defendant Black was

one of the individuals to whom the parties had submitted their briefs related to the underlying

decision. Pls.' Mot. at 23. This fact alone does not demonstrate that Defendant "actively

participated" in the decision, as Plaintiffs claim. *Id.* This absence of any substantial record

support for Plaintiffs' argument that Defendant Black was involved in the underlying decision is

consistent with Defendant Black's declaration, in which he avers that "at no point was I actively

involved in the decision making process preceding the BIA Eastern Regional Director's

December 15, 2016 decision . . . to recognize Clint Halftown and his associates as the proper

leadership of the Nation." Decl. of Michael S. Black, ECF No. 32-1, ¶ 4. Mr. Black further

states that he "neither discussed the details of the Decision with the Eastern Regional Office nor

reviewed any drafts of the decision," nor did he "participate in the consideration, drafting,

editing, or any other review or discussion of the Decision." *Id.* After taking over the appeal of

the decision, Defendant Black "did not consult with the Eastern Region concerning the

Decision." *Id.* at 6. Plaintiffs' assertions to the contrary are pure speculation.

In sum, the Court has reviewed the parties' preliminary injunction briefing and the record

for the purposes of this motion, and finds Plaintiffs' legal claims unpersuasive. Again, this is

only a preliminary assessment of Plaintiffs' claims. At this stage, Plaintiffs have not carried their

significant burden of demonstrating that they are likely to succeed in this lawsuit and are

therefore entitled to the extraordinary relief of a preliminary injunction.[5]

## B. Irreparable Injury

Plaintiffs' weak showing of irreparable injury is another factor that counsels against

issuing a preliminary injunction. To show that a preliminary injunction is warranted, Plaintiffs

---

[5] In a footnote in their Reply brief, Plaintiffs note that they "have discovered certain errors and omissions" in the administrative record that are not subject to their pending Motion to Supplement, and request the opportunity to bring those deficiencies to the attention of the Court if they are unable to resolve them with Defendants in a collaborative fashion. Pls.' Reply at 2 n.3. The parties shall cooperate with each other to resolve or narrow their issues without Court intervention if at all possible. If not, Plaintiffs shall bring these issues to the Court's attention in an expeditious manner, so that the resolution of their claims on the merits is not further delayed.

must demonstrate that there is a likelihood they will suffer irreparable harm in the absence of injunctive relief. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). The D.C. Circuit "has set a high standard for irreparable injury." *Id.* "First, the injury 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (citation omitted). "Second, the injury must be beyond remediation." *Id.*

Plaintiffs assert that in the absence of a preliminary injunction they will suffer various types of irreparable injuries. These include an injury to their ability to carry out their Cayuga Nation governmental functions, an injury to the government-to-government relationship between the Cayuga Nation and the United States through interference with the Nation's mode of governance, injuries from the Halftown Group taking advantage of the administrative decisions challenged in this case in various other forums, and a *per se* irreparable injury caused by the violation of Plaintiffs' constitutional right to due process.

There are several overarching problems that substantially weaken Plaintiffs' irreparable injury showing. First, what the Court views as the main injury asserted in this case—the alleged deprivation of a fair administrative process—can be remedied if Plaintiffs are successful. The Court has the authority to vacate the challenged decisions and order Defendants to reconsider them in a manner consistent with the APA and Plaintiffs' due process rights. This injury is therefore not irreparable.

Second, many of the injuries Plaintiffs claim will befall them are speculative and dependent on the actions of third parties or even other courts. Plaintiffs claim that they will be injured by relief that may or may not be granted by a New York state court, decisions that a

federal district court in New Mexico may make, and by certain activities of the Environmental Protection Agency. Because these injuries depend on actions that may or may not be taken by other courts or non-parties over which this Court does not have control, they are not certain. Similarly, the injunctive relief Plaintiffs seek would not necessarily prevent them from occurring. This disconnect and uncertainty counsel against granting preliminary injunctive relief. *See Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin.").

Third, Plaintiffs have been slow to seek a preliminary injunction, which belies their current claim to need emergency relief. Although the Court agrees with Plaintiffs that this factor is not *dispositive* of the irreparable injury question, it is relevant because "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005). Plaintiffs argue that they should not be punished for availing themselves of administrative processes, but the delay that the Court is concerned with is that which occurred *after* the agency took final action. The final agency action at issue in this case was taken on July 13, 2017. AR1572. Plaintiffs did not file this lawsuit until 69 days later, on September 20, 2017. *See* Compl. It was another 142 days, on February 9, 2018, that Plaintiffs filed the pending Motion for Preliminary Injunction. *See* Pls.' Mot. In other words, Plaintiffs did not seek preliminary injunctive relief from this Court for nearly seven months after the final agency action in this case. This delay weakens Plaintiffs' irreparable injury showing.

Finally, several aspects of Plaintiffs' alleged irreparable injuries depend completely on the Court accepting Plaintiffs' view of the disputed claims in this case. However, as explained above, the Court has made a preliminary assessment that Plaintiffs are unlikely to succeed on

16

those claims. For example, Plaintiffs claim that their ability to exercise "sovereign governmental authority" is burdened in the absence of preliminary injunctive relief. Pls.' Mot. at 27. But to find that this is an injury Plaintiffs would actually suffer, the Court would have to accept Plaintiffs' disputed interpretation of the decisions at issue in this case—*i.e.*, that they imposed a form of governance by plebiscite on the Cayuga Nation. As discussed above, the Court is not convinced at this point that Plaintiffs' interpretation is correct. Defendants do not appear to have imposed anything on the Cayuga Nation, nor do they appear to have prevented Plaintiffs from exercising any governmental authority. Instead, Defendants issued a narrow decision that recognized one of two rival factions within the Cayuga Nation for the purposes of choosing between two competing proposals to contract with the federal government on the Nation's behalf.

Similarly, Plaintiffs claim that they are suffering a *per se* irreparable injury because their due process rights were violated. Putting aside the fact that the cases Plaintiffs cite for this proposition do not deal with alleged deprivations of procedural due process, the Court finds this argument unpersuasive because it has determined that Plaintiffs have not demonstrated a likelihood of success on their due process claims. Finally, Plaintiffs claim damage to their treaty relationship with the United States because the BIA has "impos[ed] a plebiscite process on the Cayuga Nation." Pls.' Mot. at 30. However, as the Court has already explained above, the record does not appear to support this claim. Instead of "imposing" anything on the Cayuga Nation, the BIA appears to have merely provided technical assistance to a group within the Nation that wanted to pursue a mail-in survey, and determined which of two competing factions represented the Cayuga Nation's rightful government for purposes of government-to-government relations with the United States. Nothing about this decision requires the Cayuga Nation to

17

govern itself in any particular manner or deprives the Plaintiff Clan Mothers of their authority.

Taken together, the issues discussed above prevent Plaintiffs from satisfying the "high standard for irreparable injury" that has been set by the D.C. Circuit. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. This failure is an additional reason, in conjunction with Plaintiffs' failure to persuade the Court about the merits of their claims, to deny Plaintiffs' Motion for Preliminary Injunction.

## C. Balance of Equities and Public Interest

Finally, neither the balance of the equities nor the public interest favor granting preliminary injunctive relief in this case. "A party seeking a preliminary injunction must demonstrate both 'that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015) (quoting *Winter*, 555 U.S. at 20) (alteration in original). "These factors merge when the Government is the opposing party." *Id*. (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Plaintiffs claim that the equities are in their favor because they merely seek to maintain the "*status quo*." Pls.' Mot. at 36-37. This is plainly incorrect.[6] Plaintiffs seek to alter the *status quo*. Plaintiffs seek an order that would prevent the enforcement or reliance on the currently-operative decision of Defendants to recognize the Defendant-Intervenor as the government of the Cayuga Nation. During the period Plaintiffs delayed filing for a preliminary injunction after Defendant Black issued his decision, the DOI has been carrying on government-to-government relations with the Cayuga Nation through the Halftown Group. Fed. Defs.' Opp'n at 1. That

---

[6] The parties dispute whether a more demanding standard applies to motions for preliminary injunctions that seek to alter the *status quo*, as opposed to motions that seek to merely maintain the *status quo*. The Court need not decide this point, because Plaintiffs are not entitled to a preliminary injunction under even the traditional preliminary injunction standard.

relationship is the *status quo*. The relief Plaintiffs seek would effectively sever that relationship, and return the parties to a state where there is no recognized government of the Cayuga Nation which the United States can relate to in carrying out its responsibilities to the Cayuga Nation.

The Court understands that, absent this relief, Plaintiffs will continue to suffer what they view as a hardship by not being the recognized government of the Cayuga Nation for the purposes of interacting with the federal government. But if their motion were to be granted, that same harm would simply befall Defendant-Intervenor instead. Apart from this type of harm to the rival leadership factions, the Court is persuaded that severing the relationship between the federal government and the Halftown Group would have tangible negative effects on the Cayuga Nation itself and its people. The requested injunction would jeopardize the Nation's receipt of federal funding, as well as interrupt other Nation business pending before the DOI, such as a modification of a funding agreement for the Cayuga Nation, a pending liquor license, and a land to trust application. The Nation's ability to move land into trust is apparently of particular importance, as it is essential for the Nation's sovereignty. *See* Decl. of Clint Halftown, ECF No. 31-1, ¶¶ 16-18. The equities do not favor, and the public interest would not be furthered by, suspending these pursuits and returning the Cayuga Nation to a state of uncertainty and paralyzed government pending the final outcome of this case.

## IV. CONCLUSION

For the foregoing reasons, the Court will DENY Plaintiffs' Motion for Preliminary Injunction. An appropriate Order accompanies this Memorandum Opinion.

_/s/_

**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE
