## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE CAYUGA NATION, by its Council of Chiefs and Clan Mothers; PAMELA TALLCHIEF; BRENDA BENNETT; SAMUEL GEORGE; WILLIAM JACOBS; AL GEORGE; KARL HILL; MARTIN LAY; and TYLER SENECA, Plaintiffs, v. | ) ) ) ) ) ) ) ) | Civil Action No. 1:17-cv-01923 (CKK) |
| The Honorable RYAN ZINKE, in his official capacity as Secretary of the Interior; MICHAEL BLACK, in his official capacity as Acting Assistant Secretary – Indian Affairs and in his individual capacity; BRUCE MAYTUBBY, in his official capacity as Eastern Regional Director, Bureau of Indian Affairs; WELDON "BRUCE" LOUDERMILK, in his official capacity as Director, Bureau of Indian Affairs; UNITED STATES DEPARTMENT OF THE INTERIOR; and the BUREAU OF INDIAN AFFAIRS, Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| CAYUGA NATION COUNCIL, Defendant-Intervenor. | ) ) ) ) | |

### DEFENDANT-INTERVENOR CAYUGA NATION COUNCIL'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

David W. DeBruin
D.C. Bar No. 337626
Previn Warren
D.C. Bar No. 1022447
Zachary C. Schauf*
D.C. Bar No. 1021638
Leonard R. Powell
D.C. Bar No. 1048832
JENNER & BLOCK, LLP
1099 New York Avenue, N.W.
Washington, D.C. 20001
(202) 639-6015
  *Application pending for admission to the bar of the
   United States District Court for the District of Columbia

*Counsel for Defendant-Intervenor
Cayuga Nation Council*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

      A.      The Cayuga Nation And Its Decade-Plus Leadership Dispute. .............................. 3

      B.      The Department's 2015 Decision. ........................................................................... 6

      C.      The 2016 Campaign Of Support. ............................................................................ 8

      D.      The Decisions Below. ............................................................................................ 11

STANDARD OF REVIEW ............................................................................................. 15

ARGUMENT ................................................................................................................... 15

I.       DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE CLAIM IN
COUNTS I AND II THAT THE DEPARTMENT VIOLATED THE APA BY
ACCEPTING THE CAYUGA PEOPLE'S RESOLUTION OF THE NATION'S
LEADERSHIP DISPUTE. .................................................................................... 15

      A.      Plaintiffs Distort The Standard Of Review. ........................................................... 16

      B.      The Department Had A Rational Basis For Deferring To The Cayuga
People's Resolution Of The Leadership Dispute Through The Statement Of
Support. .................................................................................................................. 17

      C.      Plaintiffs' Miscellaneous Arguments Fail. ............................................................ 22

II.      DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFFS'
MISCELLANEOUS ARBITRARY-AND-CAPRICIOUS CLAIMS IN COUNTS
II AND III. ........................................................................................................... 26

      A.      Defendants Are Entitled To Judgment On Count II's Claim That The
Department Violated The APA By Changing Policy Without Explanation. .......... 26

      B.      Defendants Are Entitled To Judgment On Count III's Claim That The
Department Violated The APA By Declining To Credit Plaintiffs' Survey
Experts. .................................................................................................................. 30

III.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFFS' DUE
PROCESS CLAIMS IN COUNTS IV, V, AND VI. ............................................ 33

      A.      Defendants Are Entitled To Judgment On The Claims Of Prejudgment And
Bias In Counts IV and V. ...................................................................................... 34

1.      Plaintiffs' Due Process Claims Are Waived. ...............................................34

2.      Plaintiffs' Due Process Claims Lack Merit. ...............................................35

B.    Defendants Are Entitled To Judgment On The Claims In Count VI Regarding The Assistant Director's Participation In The Regional Director's Decision. ...............................................................................36

CONCLUSION .......................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

CASES

*Air Transportation Ass'n of America, Inc. v. National Mediation Board*, 663 F.3d
476 (D.C. Cir. 2011) ............................................................................................39

*Alto v. Black*, 738 F.3d 1111 (9th Cir. 2013) ..............................................................16

*Alturas Indian Rancheria v. Pacific Regional Director*, 64 IBIA 236 (2017) ............................23

*American Petroleum Tankers Parent, LLC v. United States*, 952 F. Supp. 2d 252
(D.D.C. 2013) ......................................................................................................39

*Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106 (D.D.C.
2014) ..................................................................................17, 20, 26, 27, 30

*Cayuga Indian Nation v. Eastern Regional Director*, 58 IBIA 171 (2014) ...................................4

*Cayuga Nation v. Jacobs*, 44 Misc. 3d 389 (N.Y. Sup. Ct. Seneca Cty. 2014) ..............................5

*Committee of 100 on the Federal City v. Foxx*, 140 F. Supp. 3d 54 (D.D.C. 2015).....................39

*Consolidated Edison Co. v. Herrington*, 752 F. Supp. 1082 (D.D.C. 1990) ...............................35

*EF International Language School, Inc. v. NLRB*, 673 F. App'x 1 (D.C. Cir.
2017) ..................................................................................................................38

*Elmhurst Care Center v. NLRB*, 303 F. App'x 895 (D.C. Cir. 2008)............................................38

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).........................................27, 28

*Feezor v. Babbitt*, 953 F. Supp. 1 (D.D.C. 1996) ........................................................16

*General Electric Co. v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010)................................................36

*George v. Eastern Regional Director*, 49 IBIA 164 (2009) ................................3, 4, 25

*Gorin v. Osborne*, 756 F.2d 834 (11th Cir. 1985) ........................................................38

*Hassan v. Ashcroft*, 388 F.3d 661 (8th Cir. 2004) ........................................................38

*Healthbridge Management, LLC v. NLRB*, 672 F. App'x 1 (D.C. Cir. 2016)...............................37

*Holy Land Foundation for Relief and Development v. Ashcroft*, 219 F. Supp. 2d 57
(D.D.C. 2002) ......................................................................................................39

*Kadi v Geithner*, 42 F. Supp. 3d 1 (D.D.C. 2016) ........................................................39

*Koretoff v. Vilsack*, 841 F. Supp. 2d 1 (D.D.C. 2012), *aff'd*, 707 F.3d 394 (D.C. Cir. 2013) ................................................................................................................3

*LaRocque v. Aberdeen Area Director*, 29 IBIA 201 (1996)..................................23

*Levine v. National Railroad Passenger Corp.*, 80 F. Supp. 3d 29 (D.D.C. 2015) .......................35

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................38

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)....................................................27

*Office of Foreign Assets Control v. Voices in Wilderness*, 382 F. Supp. 2d 54 (D.D.C. 2005) ................................................................................................39

*Ortwein v. Schwab*, 410 U.S. 656 (1973) ................................................................38

*Picayune Rancheria of the Chukchansi Indians v. Pacific Regional Director*, 62 IBIA 103 (2016)................................................................................................23

*Pinkney v. Robinson*, 913 F. Supp. 25 (D.D.C. 1996) ..............................................38

*Power v. Federal Labor Relations Authority*, 146 F.3d 995 (D.C. Cir. 1998) .......................34, 35

*Radack v. United States Department of Justice*, 402 F. Supp. 2d 99 (D.D.C. 2005) ...................39

*Ransom v. Babbitt*, 69 F. Supp. 2d 141 (D.D.C. 1999)..........................................18, 22

*Runs After v. United States*, 766 F.2d 347 (8th Cir. 1985) ..........................................17

*Shenandoah v. United States Department of Interior*, No. 96-CV-258(RSP/GJD), 1997 WL 214947 (N.D.N.Y. Apr. 14, 1997), *judgment aff'd*, 159 F.3d 708 (2d Cir. 1998) ................................................................................................21

*Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935 (D.C. Cir. 2012) .....................17, 36

*Town of Norwood v. FERC*, 962 F.2d 20 (D.C. Cir. 1992) ..........................................37

*United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO-CLC v. Pension Benefit Guaranty Corp.*, 707 F.3d 319 (D.C. Cir. 2013) ................................................30

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2) ................................................................................................16

25 C.F.R. § 2.20(c)................................................................................................13

25 C.F.R. § 81.5(a)(2) ..........................................................................................36

25 C.F.R. § 900.75 ........................................................................................................36

43 C.F.R. § 4.332(b) ......................................................................................................13

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(d) ......................................................................................................39

## INTRODUCTION

The Court is familiar with the issues in this case through its decision on Plaintiffs' Motion for Preliminary Injunction.  The case concerns whether the decisions of the Department of the Interior ("Department") regarding a leadership dispute within the Cayuga Nation ("Nation") were consistent with the Administrative Procedure Act ("APA").

For more than a decade, a leadership dispute had paralyzed the Nation's government and harmed its people.  The dispute centered on disagreements over Cayuga law and its principles for how members of the Nation's governing body—the Nation Council—may be removed.  Because Cayuga law is unwritten and the Nation lacks courts that can authoritatively construe this unwritten law, the dispute had proved intractable.  The harm to the Nation's people was immense: The dispute hindered the Nation's ability to obtain federal funds that are essential for the Nation's government and the services it provides to its citizens; it stalled the Nation's trust application that is attempting to restore full sovereignty over a piece of the Nation's historic reservation; and it left the Nation vulnerable to local governments that used the leadership dispute as a pretext to trample the Nation's rights.  It even yielded violence, as individuals associated with Plaintiffs seized Nation properties, and local law enforcement—in light of the leadership dispute—refused to intervene.

In 2016, the Cayuga people themselves resolved this dispute.  While Cayuga law does not provide for regular elections in the manner of the United States' government, the Cayuga people remain the ultimate sovereign.  Cayuga law recognizes that in times of great crisis, especially important questions can—indeed, must—be put to the people for resolution.  Here, the Cayuga people did just that.  Via a "statement of support" process, more than 60% of eligible Cayuga citizens endorsed a written statement of the principles guiding the Nation's government and identified the Nation's lawful Council.  They rejected the views of the "Jacobs Council" (Plaintiffs

1

here), and agreed with the understanding of the "Halftown Council" (Defendant-Intervenor here). The Department considered both sides' arguments about Cayuga law and the validity of the statement of support and, after doing so, recognized the results of the statement of support.

In this action, Plaintiffs principally urge this Court to do what all parties agree the Court *cannot* do. Plaintiffs believe the statement of support was unlawful under Cayuga law, and on that basis, they ask this Court to find that the decisions below "were contrary to law." Mem. of Points and Authorities in Support of Plaintiffs' Mot. for Summary Judgment at 5, ECF No. 46 ("Mem."). But those questions of Cayuga law have already been resolved against Plaintiffs—by the Cayuga people, in an open process in which both sides participated. That decision of the Cayuga people was later recognized and accepted by the Department, an agency charged for more than 200 years with the complex task of coordinating relations between the United States and the sovereign Indian nations. Now, the question for this Court is not a question about Cayuga law, but simply whether the Department's decisions complied with the APA's minimum rationality standards. They did: The Department "considered the competing arguments about whether the" statement of support "was valid under Cayuga law and reasonably decided it was valid." Mem. Op. Regarding Order Denying Pls.' Mot. for Prelim. Injunction at 8, ECF No. 42 ("PI Opinion"). While "Plaintiffs may … have a different interpretation, … that does not make [the Department's] interpretation arbitrary or capricious, especially considering the deference owed to the Executive branch." *Id.* at 9.

Plaintiffs' miscellaneous arguments also fail. They disagree with aspects of the Department's reasoning and object to how the statement of support was implemented. But the agency decisions below fully addressed these arguments, and the Department's determinations readily satisfy the APA's deferential standards. Plaintiffs also argue that the Department violated due process by depriving Plaintiffs of a fair and impartial hearing. The record, however, confirms

2

that Plaintiffs got a fair hearing.  They had the chance to present their arguments in opening and reply briefs to two different Department decisionmakers—first, the Regional Director, and second, the Assistant Secretary.  These decisionmakers recognized the results of the statement of support after considering each of Plaintiffs' objections.  Plaintiffs disagree with the Department's decisions, but they received all the process due (and, indeed, much more).

The decisions below fully comport with the applicable standards, and the Court should grant summary judgment to Defendants.

## STATEMENT OF FACTS[1]

### A.  The Cayuga Nation And Its Decade-Plus Leadership Dispute.

The Cayuga Nation is one of the six nations of the Haudenosaunee Confederacy.  *George v. E. Reg'l Dir.*, 49 IBIA 164, 167 (2009).  It adheres to a "traditional government" that historically has relied on "an oral and unwritten" law known as the "Great Law of Peace."  AR-003878; AR-003888.  The Nation's governing body is known as the Cayuga Nation Council and is composed of representatives from the Nation's clans.  *George*, 49 IBIA at 167.  There is no dispute that, as of 2006, the Council consisted of six members including Clint Halftown, Tim Twoguns, and Gary Wheeler, and that Mr. Halftown was the Nation's "federal representative" responsible for carrying out government-to-government relations with the United States.  AR-003217; AR-003221; *George*, 49 IBIA at 193.

---

[1]  Consistent with Local Rule 7(h)(2), this consolidated motion for summary judgment and opposition "include[s] a statement of facts with references to the administrative record."  Also consistent with that rule, Defendant-Intervenor has not included a "separate … statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  Local Rule 7(h)(1); *see* Local Rule 7(h)(2) (noting that this provision of "Paragraph (1) shall not apply to cases in which judicial review is based solely on the administrative record").  Defendant-Intervenor notes that in such cases, a "separately paginated 'Statement of Materials Facts,'" like the one filed by Plaintiffs here, "[i]s improper."  *Koretoff v. Vilsack*, 841 F. Supp. 2d 1, 5 (D.D.C. 2012), *aff'd*, 707 F.3d 394 (D.C. Cir. 2013).

The decisions below emerged from a leadership dispute that developed thereafter and festered for more than a decade.  The details are not relevant, but in short:  A group associated with what is now the "Jacobs Council" (the "Jacobs Group") believed that the Nation's "clan mothers" had absolute authority under Cayuga law to appoint and remove members of the Nation's Council, and that the clan mothers had validly exercised their authority to remove and replace Mr. Halftown, Mr. Twoguns, and Mr. Wheeler.  AR-003217; AR-003572; *see* Mem. 9-13.[2]  A group associated with what is now the "Halftown Council" (the "Halftown Group") disagreed that Cayuga law granted clan mothers this absolute authority or that the clan mothers had validly removed Mr. Halftown, Mr. Twoguns, or Mr. Wheeler.  *Infra* at 23-24 & nn.7-9 (citing record evidence supporting this view).

Given the Nation's lack of written law or a court system, this "true division" proved intractable.  AR-003569; AR-003572; AR-003888.  In a 2006 decision, the BIA declined to endorse claims that Mr. Halftown had been removed, and the Interior Board of Indian Appeals affirmed this decision in 2009.  *George*, 49 IBIA at 164, 180, 193.  Undeterred, the Jacobs Group in 2011 purported to form a new council and persuaded the BIA's then-Regional Director Franklin Keel to accept its views.  *Cayuga Indian Nation v. E. Reg'l Dir.*, 58 IBIA 171, 171 (2014).  The Interior Board of Indian Appeals ("IBIA"), however, first stayed and then vacated that decision without reaching the merits, explaining that the Regional Director should never have issued a decision in the first place.  *Id.* at 186.  The IBIA thus declined to express "any view on the merits of the underlying dispute, the current leadership of the Nation, or the identity or scope of authority of any individual to represent or take action on behalf of the Nation."  *Id.* at 172.

---

[2] The leadership dispute's background is discussed in *George v. Eastern Regional Director*, 49 IBIA 164 (2009), and *Cayuga Indian Nation v. Eastern Regional Director*, 58 IBIA 171 (2014).

The Halftown Group has done its best to move the Nation forward despite the leadership dispute.  It tried to work collaboratively with the Jacobs faction, sending them notices regarding every Nation Council meeting.  AR-002385; AR-002433-36.  The Jacobs Group's members, however, refused to attend in light of their position that the Halftown Group members had been removed.  AR-002385.  Nonetheless, the Halftown Group has kept up its work promoting the Nation's economic development, as Mr. Halftown had been authorized to do by a unanimous council resolution in 2002.  AR-002380-82; AR-002402.  That effort has succeeded, notwithstanding the leadership dispute.  Until recently a landless nation, the Cayuga Nation has reacquired more than 1,300 acres within its historic reservation and built thriving businesses, including convenience stores, gas stations, a gaming facility, a private label water bottling facility, a produce stand, and a working farm, which together employ more than 100 people and produce income that is distributed to Nation citizens every quarter.  AR-002381; AR-003901.

But the leadership dispute's toll has been heavy.  The Nation is one of the few Indian nations without land in trust held by the United States—which allows for the full exercise of Indian sovereignty.  While the Nation applied for land to be taken into trust in 2005, the leadership dispute has stalled that application.  AR-002381; AR-003249.  Likewise, obtaining critical federal grant funding requires a resolution from the Nation's recognized governing body, and a stalemate concerning that governing body thus puts funding at risk.  AR-003249.

Even the Nation's economic successes were not immune from the effects of the leadership dispute. In 2014, Jacobs Group supporters forcibly took over Nation properties in violent confrontations that threatened the safety and security of both Cayuga citizens and non-Indian neighbors.  AR-002390-92; AR-002461-62; AR-002464-94; *see Cayuga Nation v. Jacobs*, 44 Misc. 3d 389 (N.Y. Sup. Ct. Seneca Cty. 2014).  Those steps not only undermined the Nation's

economic development, but threatened the dissipation of its assets:  Since 2014, Plaintiffs have refused to allow their operation of Nation-owned businesses to be audited.  AR-003089-91.

## B.  The Department's 2015 Decision.

In 2015, the Department issued a stopgap decision that left the leadership dispute, and its damaging effects, unresolved.  The BIA received two requests to modify existing contracts with the Nation under the Indian Self-Determination Act ("ISDA," sometimes referred to as the "ISDEAA," with contracts sometimes referred as "638 contracts").  AR-003217.  One request came from the Jacobs Group, which relied on the same claim sketched above—that the Nation's clan mothers have absolute authority to remove clan representatives and had done so as to Mr. Halftown, Mr. Twoguns, and Mr. Wheeler.  *Id.*; AR-002356-73.  The second request came from Mr. Halftown, acting as the "federal representative … for [the] six-member council identified by BIA in 2006."  AR-003217; *see* AR-002152-53.

The Halftown Group set forth, in hundreds of pages of briefing and affidavits, its understanding of Cayuga law that clan mothers do not have the absolute and dictatorial authority claimed by the Jacobs Group and had not validly removed Mr. Halftown, Mr. Twoguns, and Mr. Wheeler.  *See generally* AR-002375-2950.  The Halftown Group supported its understanding with sworn declarations from Nation elders, *infra* at 24 & n.7, and scholarly studies dating back to the 19th century, *infra* at 24 & nn.8-9.  The Halftown Group urged the BIA to accept Mr. Halftown's requested contract modification based principally on this evidence of Cayuga law.  The Halftown Group also presented two alternatives.  First, the Halftown Group asked the BIA to recognize the 2006 Council (with Mr. Halftown as federal representative) as the Nation's "last undisputed" government, based on precedent in which the BIA had followed a similar approach.  AR-002849-62.  The Halftown Group also asked the BIA to accept Mr. Halftown's requested modification

based on a "statement of support" campaign conducted in 2014, in which more than 60% of eligible Cayuga citizens returned statements affirming their understanding that Mr. Halftown, Mr. Twoguns, and Mr. Wheeler had not been removed.  AR-003075; *see* AR-002862-66.

The BIA declined to address the merits of the Nation's leadership dispute at that time. Instead, the BIA decided that it would grant interim recognition to "the last undisputed leadership of the Nation"—the Nation's 2006 Council, with Mr. Halftown as "the Nation's representative for purposes of administering existing ISDA contracts." AR-003217.  The BIA's decision emphasized that "[t]his interim recognition decision is intended to provide additional time to the members of the Nation to resolve this dispute using tribal mechanisms and prevent the need for the BIA to examine Nation law and make a subsequent determination based on the results of that examination." AR-003222.  Consistent with this approach, the BIA declined "under these circumstances" to "verify" the results of the 2014 campaign of support, noting that the legality of the campaign of support under Cayuga law was disputed by the Jacobs Group.  AR-003223.

The BIA stressed that it would not refrain indefinitely from recognizing claims of authority based on disputed propositions of Cayuga law.  While the BIA "believe[d] that current circumstances do not warrant a decision on the merits of Nation law," it emphasized that the need to do so "may … arise at a future time, conceivably when the time comes for the Nation to renew an ISDA contract." AR-003222.  The BIA stated it would not enter a new ISDA contract without a "consensus" Nation Council resolution.  *Id.*  While the Jacobs Group filed an appeal with the IBIA, the IBIA rejected the Jacobs Group's request for a stay and placed the BIA's decision into immediate effect, AR-003235-41; the Jacobs Group then elected not to pursue its appeal.

### C.  The 2016 Campaign Of Support.

By 2016, it was clear that the decade-old dispute over Cayuga law had paralyzed the Nation's government and its relations with the United States.  The 2015 decision had warned that, due to the requirements of the ISDA, the BIA could not enter a new contract with the Nation absent a "consensus" resolution from the Nation's recognized governing body.  AR-003222 & nn.11, 12 (citing 25 U.S.C. § 5321(a)(1) and 25 U.S.C. § 5304(1)).  But there was *no* possibility of such a resolution from the 2006 Nation Council, which had not met in full for a decade, and which would not be meeting given the Jacobs Group's claim that it had formed a new Council with only their members.  AR-003564 & n.6; AR-003882; AR-003897.

The Nation's citizens were therefore at risk of losing valuable federal grant funding—not just ISDA funding, but also funding from the Department of Housing and Urban Development and other agencies.  Indeed, the Nation was forced to suspend certain benefits for its citizens and delay much-needed work supported by federal grant funds.  AR-003249.  Meanwhile, the Nation's land-into-trust application remained stalled.  *Id.*  Local governments argued that the leadership dispute deprived the Nation of standing to protect its rights against preempted local laws.  *Id.*  And local law enforcement officers hesitated to intervene to prosecute individuals who misappropriated or damaged Nation property.  *Id.*

For the Nation's citizens, it was time to put these controversies to an end.  To finally move the Nation forward, the Halftown Group in 2016 initiated a more comprehensive statement of support.  Consistent with the Nation's "'traditional government,'" the statement of support was a "non-electoral solution" that asked "Nation citizens [to] 'memorialize, in writing, their

understanding of Nation law and traditions regarding certain Nation governance matters.'"  AR-003878.  In particular, the statement asked each adult citizen's views on:

- "A governance document that describes the operation of the government of the Cayuga Nation of New York and the selection and removal process for its leaders"; and

- "Whether five named individuals from the Turtle, Heron, Bear, and Wolf Clans who were selected through a traditional clan process are the recognized members of the Cayuga Nation Council."

AR-003878; *see* AR-003340-49 (original statement circulated to Nation citizens).  The process thus was designed to ascertain Cayuga citizens' views about both the identity of the Nation's lawful council, and the going-forward principles guiding the Nation's government.  It thereby aimed not just to resolve the existing dispute, but also—by memorializing these principles in writing—to forestall future disputes.

The Jacobs Group was invited to, and did, participate in the statement of support process.  On June 14, 2016, the Halftown Council wrote to the BIA to request "technical assistance" with the process.  AR-003246.  Just three days later, the BIA sent a letter advising the Jacobs Group of the proposal "to ensure that you … are aware of this initiative."  AR-003262; *see* AR-003879.  The BIA advised the Jacobs Group:

> The Bureau of Indian Affairs has been consulted by Mr. Halftown and his group regarding a way to identify the Cayuga Nation's leadership and confirm or reaffirm the Cayuga Nation's governing structure, and we have agreed that under the current circumstances a "Statement of Support" process would be a viable way of involving the Cayuga people in a determination of the form and membership of their tribal government.  We want this process to be inclusive and to obtain a true sense of what the Cayuga people support.  To that end, we hope that you will provide honest feedback to Mr. Halftown.  If you have an alternative method for obtaining accurate information regarding the will of the Cayuga Nation's citizens, please be forthcoming with a proposal.  Alternatively, if you prefer to communicate your concerns to my office, we will gladly share those concerns with the other parties involved.

AR-003262; *see* AR-003879.

9

The Jacobs Group accepted this invitation and participated directly in the process.  In lengthy letters, they presented their objections to the BIA.  AR-003264-65; AR-003299-3337; AR-003350-51.  They also sent a letter to all Cayuga Nation citizens, expressing "deep concern" regarding the process and urging, "[t]his is not the way of our people."  AR-003352; *see* AR-003880.  The Jacobs Group implored citizens to "REJECT THIS PROCESS OF VOTING BY MAIL, AND SUPPORT THE CAYUGA NATION'S TRADITIONAL SYSTEM OF CONSENSUS DECISION MAKING BY THE CHIEFS AND CLAN MOTHERS."  AR-003352.

Over two months, Cayuga citizens responded.  AR-003567.  The BIA later reviewed the responses.  *Id.*  "BIA employees scrutinized the statements of support and membership roll maintained by the Nation's Secretary and concluded that, of 392 adult Cayuga citizens identified on the membership roll, 237 submitted statements of support for both of the two propositions" put forward by the Halftown Group.  AR-003880; *see* AR-003373-74.  Thus, over 60% of enrolled Cayuga citizens agreed that the written statement of Cayuga governance procedures was consistent with their understanding of Cayuga oral traditions.  And over 60% of enrolled Cayuga citizens also agreed that an identified five-person Council selected through a traditional clan process—the Halftown Council, Intervenor-Defendant here—were the recognized members of the Nation Council.  AR-003891.

Meanwhile, the BIA received two competing proposals to enter new ISDA contracts on behalf of the Nation—one from the Jacobs Council; the other from the Halftown Council.  AR-003654; *see* AR-003367-72; AR-003375-80.  Given the lack of "overlap in the membership of the two councils," AR-003664, the BIA's Regional Director invited both sides to submit opening and response briefs on the following issues:

- "The validity of the Initiative as a matter of Cayuga law";

- "Concerns about how the statement of support process had been conducted on the ground"; and

- "The validity of the Jacobs Council's claim that it was vested with tribal government authority via traditional tribal processes."

AR-003881; *see* AR-003407-08.

### D. The Decisions Below.

In the decisions below, the Regional Director recognized the Halftown Council as the Nation's lawful government, and the Assistant Secretary affirmed that decision.

***Regional Director Decision.*** First, the Regional Director found that he *had* to address the leadership dispute's merits and *could not* repeat the BIA's 2015 approach. The 2015 interim decision had been an "interim recognition [of] … the Nation 2006 Council," but in 2016, "the Nation 2006 Council … did not submit a proposal." AR-003565. So, the 2015 approach was simply off the table. The decision also noted that the 2015 interim decision "was issued to allow the Nation additional time to resolve the intragovernmental dispute," but that "one year and ten months" had now passed, and "it is time to look at the processes the Cayuga Nation has undertaken to resolve this dispute." *Id.* Indeed, issuing "repeated interim recognition decisions that ignore efforts by the Cayuga people to resolve this dispute risks paralyzing the Nation in a state of uncertainty and is inconsistent with BIA's 'responsibility for carrying on government relations with the Tribe.'" *Id.* (quoting *Goodface v. Grassrope*, 708 F.2d 335, 339 (8th Cir. 1983)). The decision also identified five other reasons that a recognition decision was necessary: (1) resolution of a Cayuga Nation trust application; (2) Nation eligibility for other federal programs involving roads, housing, and health services; (3) resolution of a Nation liquor control ordinance; (4) pending litigation, where the leadership dispute had been raised as an issue; and (5) the fact that "there have been some instances of unrest and even violence." AR-003565-66.

Second, the Regional Director addressed the leadership dispute's merits.  The Regional Director did not accept the statement of support simply because "over 60% of … citizens" had endorsed it, AR-003571; rather, he scrutinized it in light of all the objections raised by the Jacobs Group over multiple rounds of briefing.  The Regional Director noted the "well-settled tenet of Indian law that the Federal government should encourage and defer to tribal resolutions of tribal disputes."  AR-003569 (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 63 (1978)).  While that principle often means "defer[ing] to decisions of tribal courts," the Cayuga Nation "has no tribal judiciary," and "'[n]onjudicial tribal institutions have also been recognized as competent law-applying bodies.'"  *Id.* (quoting *Santa Clara Pueblo*, 436 U.S. at 65-66).  "The adult citizens of the Cayuga Nation," the Regional Director observed, "remain the ultimate 'nonjudicial tribal institution' competent both to identify and to apply Cayuga law."  *Id.*  Rejecting the outcome of "a question … put to the entire tribal membership for resolution" would raise the specter of "intrusion into a tribe's exercise of sovereignty."  AR-003569-70.

Even so, the Regional Director carefully considered the Jacobs Group's argument that Cayuga law required the BIA to disregard the views of the Cayuga people.  The Regional Director recognized that Cayuga law "rejects the kinds of elections that are fundamental to the governing system of the United States."  AR-003568.  But the Regional Director explained that the statement of support was not that kind of election; rather, it was an "alternate way to ascertain the will of the people."  *Id.*  And while the Great Law is unwritten, a transcript of the Great Law published in 1916, and discussed in greater detail below, affirms that certain "specially important matter[s]" or "great emergenc[ies]" must be "submit[ted] … to the people."  AR-003568.  Hence, the Regional Director declined to find that "the Cayuga Nation's citizens lack the right to choose a government that reflects their choices – that the power of the Cayuga Nation Council to govern its citizens does

not derive from consent of the governed." AR-003569. The Regional Director thus determined that the "statement of support process is valid in principle." AR-003570. The Regional Director also acknowledged the Jacobs Group's arguments that the statement of support was inconsistent with their view of Cayuga law as according absolute power to the clan mothers. The decision "conclude[d] there is a true division" on this question of Cayuga law, and that "[i]n the face of this division, we have determined that the results of the Statement of Support campaign should be respected." AR-003572.

Having accepted the statement of support process as valid in principle and consistent with Cayuga law, the Regional Director then considered at length each of several other objections raised by the Jacobs Group to the process's execution. AR-003570-76. The decision rejected each of those objections, for reasons discussed in greater detail below.

The Regional Director concluded that, "based on a complete review of all the information in the record regarding this dispute, I have determined that the statement of support campaign carried out during the summer of 2016 was a valid resolution of an intratribal dispute by a tribal mechanism." AR-003563-64. He recognized the "Halftown Council" as the Nation's governing body, and awarded a new ISDA contract to the Nation based on that Council's resolution. *Id.*

***Assistant Secretary Decision***. The Jacobs Group had a further opportunity to raise its objections with the Department. The Jacobs Group appealed to the IBIA, and the Assistant Secretary–Indian Affairs—who sits above the IBIA—opted to assume jurisdiction over the appeal, as the governing regulations permit. 25 C.F.R. § 2.20(c); 43 C.F.R. § 4.332(b); *see* AR-003366; AR-003770. The Jacobs Group raised myriad objections in their opening and reply briefs.

In a thorough, 28-page single-spaced decision, the Assistant Secretary rejected the objections raised by the Jacobs Group and affirmed the decision of the BIA. AR-003876-3903.

The decision addressed each argument made by the Jacobs Group, and the Assistant Secretary explained in detail why he rejected each argument.  *Id.*

As to the Jacobs Group's central challenge to the statement of support process, the Assistant Director agreed with and expanded on the Regional Director's analysis.  Like the Regional Director, the Assistant Secretary began with the "foundational tenet of Federal Indian law that the Federal Government should encourage and defer to tribal resolutions of internal disputes," whether those resolutions happen via "a formal judiciary or … by other means."  AR-003886 (citing *Santa Clara Pueblo*, 436 U.S. at 65-66).  "Once the dispute is resolved through internal tribal mechanisms, the BIA must recognize the tribal leadership embraced by the tribe itself."  *Id.* (quoting *Attorney's Process & Investigation Servs. v. Sac & Fox Tribe*, 609 F.3d 927, 943 (8th Cir. 2010)).  The Assistant Secretary found the Jacobs Group's claim that the Regional Director had "'declined to review Cayuga law on … the validity of the statement of support'" to be "inaccurate."  AR-003888.  The Regional Director *had* looked to Cayuga law, including a provision from the 1916 Parker transcript of the "Haudenosaunee Great Law of Peace, the basis of Cayuga law."  AR-003888.  Like the Regional Director, the Assistant Director found a "true division" on central questions of Cayuga law, and held that under these circumstances, it was "valid" to "'determine[] that the results of the Statement of Support campaign should be respected.'"  AR-003889 (quoting AR-003572).

The Assistant Secretary also rejected the Jacobs Group's arguments that the Regional Director had "forc[ed] the Cayuga Nation to govern via election, plebiscite, or some other mechanism of majority rule."  *Id.*  The Assistant Secretary observed that the Regional Director had not forced the Cayuga Nation to do anything at all.  Rather, he "found that under these specific circumstances, Cayuga law permits the use of" the statement of support "in order to ascertain the

peoples' understanding of their governmental structure and leaders." AR-003889. "The Regional Director made clear … that it is now the Nation's right, and responsibility, to determine how its governance will operate moving forward." AR-003890. Indeed, "[n]othing in the Decision … suggests that in less tumultuous circumstances, BIA would not decline a request to certify an Initiative (much like it did in 2015)." *Id.* *This* statement of support, however, the Assistant Secretary could not "consider … as anything other than resolution of a tribal dispute by a tribal mechanism." AR-003890-91. Like the Regional Director, the Assistant Secretary "consider[ed] [him]self obligated to recognize the result of that tribal process." *Id.*

## STANDARD OF REVIEW

The Halftown Council incorporates by reference the Standard of Review set forth in the brief of Defendants Ryan Zinke and other Department of Interior officials ("Federal Defendants").

## ARGUMENT

I.  **DEFENDANTS ARE ENTITLED TO JUDGMENT ON THE CLAIM IN COUNTS I AND II THAT THE DEPARTMENT VIOLATED THE APA BY ACCEPTING THE CAYUGA PEOPLE'S RESOLUTION OF THE NATION'S LEADERSHIP DISPUTE.**

Via the statement of support, the Cayuga people resolved a leadership dispute that had persisted for 13 years, accepting the Halftown Council's interpretation of Cayuga law and rejecting that of Plaintiffs. AR-003891. The Department deferred to the Cayuga people's resolution, considering and rejecting each of Plaintiffs' arguments that this process violated Cayuga law. *Id.* The Department's careful decisions readily pass muster under the APA's deferential standard, and Plaintiffs' objections "distill[] to mere disagreements." PI Opinion 2. Defendants thus are entitled

to judgment on Plaintiffs' challenges to the lawfulness of the Department's decisions in Count I, as well as the similar claims presented in Count II.[3]

A.      **Plaintiffs Distort The Standard Of Review.**

Plaintiffs believe the Department's determination "violated Cayuga law," and imply that because "[q]uestions of law are reviewed de novo under the APA," this Court should review, *de novo*, the Great Law of Peace.  Mem. 4-5 (quotation marks omitted); *see id.* at 8 ("decision should be vacated" "because Cayuga law does not … allow[]" the statement of support); *cf.* 5 U.S.C. § 706(2) (court may set aside agency action "not in accordance with law").  Page after page thus elaborates Plaintiffs' view of Cayuga law, in hopes the Court will adopt it.

Plaintiffs badly distort the standard of review.  The law is clear that while courts "have adjudicated APA causes of action in cases concerning Indian affairs," they must be "careful … to limit the scope of federal jurisdiction to the propriety of the BIA's action under the APA, not the soundness of the BIA's decision under tribal law."  *Alto v. Black*, 738 F.3d 1111, 1139 n.9 (9th Cir. 2013).  Hence, decisions in this District are "mindful of the difference" between "reviewing BIA's actions under APA standards" and "going beyond judicial review to reach the merits of the tribal … dispute."  *Feezor v. Babbitt*, 953 F. Supp. 1, 4 (D.D.C. 1996).  This Court's duty thus is only to confirm that the Department's decisions about Cayuga law comply with the minimum rationality standard that the APA applies to *all* agency decisions—that there be "some rational

---

[3] Some of the allegations in Plaintiffs' Count II appear to challenge the Department's decision to recognize the results of the statement of support process as consistent with Cayuga law.  *See* Compl. ¶ 112 (alleging Department violated the APA because it did not "consider[] core provisions of Cayuga law relevant to this matter"); *id.* ¶ 123 (alleging generally that decisions "were not based on consideration of relevant factors, failed to provide reasoned explanation, and showed clear errors of judgment").  This section also addresses those allegations.  Other Count II allegations raise the distinct claim that the Department unlawfully departed from its prior position. *See, e.g.*, *id.* ¶ 121.  Those allegations are discussed in the next section.

basis" to support what the agency has done. *Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106, 120 (D.D.C. 2014). If so, this Court "is bound to uphold it." *Id.* That limited review also respects the weighty deference due to the Executive Branch in matters of tribal law and recognition. *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938 (D.C. Cir. 2012) (courts "owe deference to the judgment of the Executive Branch as to who represents a tribe"); *see Runs After v. United States*, 766 F.2d 347, 352 (8th Cir. 1985) (deferring to BIA due to its "special expertise and extensive experience in dealing with Indian affairs"). The Court should not entertain Plaintiffs' attempts to dodge this deferential standard.

### B.    The Department Had A Rational Basis For Deferring To The Cayuga People's Resolution Of The Leadership Dispute Through The Statement Of Support.

Judged under the proper deferential standard, the Department's decisions easily pass muster. There is no dispute that the Department was obligated to determine the Nation's proper leadership under Cayuga law: It was "presented with competing contract proposals, each purportedly on behalf of the Cayuga Nation," which "forced [the Department] to determine which … represented the Cayuga Nation's rightful government." PI Opinion 7; *see* AR-003564; AR-003886-87. Likewise, there is no dispute that the underlying questions of Cayuga law—such as whether clan mothers' authority is limited or dictatorial, and how clan representatives can be removed—had reached deadlock. The Department noted the Cayuga people's "true division" on those issues, AR-003572; AR-003888-89, and Plaintiffs do not challenge that finding as unsupported by substantial evidence. So, the only question is whether the Department had "some rational basis," *Bimini*, 994 F. Supp. At 120, for resolving that division in the manner it did and "respect[ing] the fact that 60% of eligible citizens" endorsed the Halftown Council's understanding. AR-003891.

The answer is yes.  The Department properly recognized that even when it must address the merits of a tribal leadership dispute, principles of self-determination require it to—as much as possible—"defer to tribal resolutions of internal disputes."  AR-003886.  Thus, if "a dispute is resolved through internal tribal mechanisms, the BIA must recognize the tribal leadership embraced by the tribe itself."  *Id.* (quoting *Attorney's Process & Investigation Servs. v. Sac & Fox Tribe*, 609 F.3d 927, 943 (8th Cir. 2010)).  Sometimes that means deferring to tribal courts.  *Id.* But the Department explained that the same deference principle applies "whether the tribe has a formal judiciary or"—like the Cayuga Nation—"resolves disputes by other means."  *Id.* (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65-66 (1978)).  And the Department found that here, the Nation's leadership dispute had been resolved by "the ultimate nonjudicial tribal institution competent both to identify and to apply Cayuga law"—the Cayuga people themselves via the statement of support process.  AR-003569 (quotation marks omitted); *see Ransom v. Babbitt*, 69 F. Supp. 2d 141, 146 (D.D.C. 1999) (identifying the "members of the Tribe" as "the ultimate non-judicial tribal forum").  The Department ensured that Plaintiffs had the chance for "full participation in the Initiative process and an opportunity to voice their concerns," and in fact, Plaintiffs participated in the process by dispatching letters urging the Nation's people to reject the statement of support.  AR-003880; AR-003898.  But instead, "60% of eligible citizens" "affirmatively support[ed] the Halftown Council's interpretation of Cayuga law" and its understanding of the "composition of the Council."  AR-00003891.

The Department also considered and reasonably rejected Plaintiffs' argument that the statement of support process was inconsistent with Cayuga law.  Plaintiffs argued below, as they argue now, that the statement of support was unlawful because the Cayuga Nation does not "govern via election."  AR-003889; *see* Mem. 11-12.  The Department addressed this argument,

18

recognizing that Cayuga law does not rely on "the kinds of elections that are fundamental to the governing system of the United States."  AR-003568.  But the Department reasonably concluded that the statement of support was not that kind of election; rather, it was an exceptional process designed to resolve a dispute that had proved intractable and destructive to the Nation for more than a decade.  AR-003888; AR-003568-69.[4]  And while it is true that the statement of support's lawfulness for that limited purpose was one of the many Cayuga law questions disputed below, the Department reasonably recognized that the Cayuga people had addressed that very question via the process itself.  While Plaintiffs expressly urged the Nation's citizens to "REJECT THIS PROCESS" on the ground that it violated Cayuga law, AR-003352, more than 60% of eligible citizens rejected that view and endorsed the statement of support.

The Department also reasonably found that relying on the statement of support was consistent with Cayuga law based on the 1916 Parker transcript of the Great Law.  AR-003888. The Department reasonably looked to this transcript not in the manner of a U.S. Code section meant to authorize the statement of support via its plain text—after all, the Great Law is *un*written—but as articulating a "guiding principle of invoking the will of the people" to resolve especially important and intractable questions.  AR-003888.  The 1916 Parker transcript of the Great Law provides:

> Whenever a specially important matter or a great emergency is presented before the Confederate Council and the nature of the matter affects the entire body of the Five Nations, threatening their utter ruin, then the Lords of the Confederacy must submit the matter to the decision of their people and the decision of the people shall affect

---

[4] It is thus beside the point that, as Plaintiffs observe, the Cayuga Nation does not generally use elections to select Council members or majority rule to decide issues on the Council.  Mem. 11-12, 22-23.  In particular, the Nation's exceptional use of the statement of support is fully consistent with Clint Halftown's 1997 statement that the Nation does not use "pure majority rule" as a routine governing mechanism.  Mem. 12 (quoting AR-003276-77).

the decision of the Confederate Council. This decision shall be a confirmation of the voice of the people.

*Id.*

The Department reasonably rejected Plaintiffs' claim that this passage is irrelevant because it expressly discusses only the "the Confederate Council" of the Haudenosaunee, not individual nations.  Mem. 20.  To begin, Plaintiffs are wrong to imply that the Department was bound to judge this passage by the standards of modern "[]textual legal argument" and hold the statement of support unlawful unless authorized by the "specific" "language" of Parker's transcript.  Mem. 20.  The Great Law did not emerge from, and is not today, a textualist legal tradition.  If it were, the Great Law would be written down.  The Department correctly declined Plaintiffs' invitation to view Parker's transcript through a Western textualist lens and, instead, reasonably looked to this passage for the broader principles of self-government it reflects.  AR-003887.

The Department also correctly credited a second provision of the Great Law reproduced in the Parker transcript, which expressly states that individual nations follow *the same* "laws and rules [as] the council of the Confederacy."  AR-003419; AR-003522.  The Department endorsed this as evidence that "th[e] specific passage" concerning "specially important matter[s]" "was applicable to both the Confederate Council and to each member nation of the Council."  AR-003888 & n.96 (citing AR-003521-23 (Halftown Council's brief before Regional Director reproducing the second Parker provision); AR-003838-39 n.7 (Halftown Council's brief before Assistant Secretary reproducing, in footnote 7, the same provision)).[5]  The Department thus had "some rational basis," *Bimini*, 994 F. Supp. at 120, for looking to the Cayuga people as "the

---

[5] Plaintiffs are therefore wrong that the Assistant Secretary agreed with the Halftown Council's interpretation "solely because one side had made that argument."  Mem. 20.  The Assistant Secretary cited record evidence concerning Cayuga law.

ultimate nonjudicial tribal institution competent both to identify and to apply Cayuga law," and substantial record evidence supports its decision.  AR-003569 (quotation marks omitted).[6]

Plaintiffs assert that no "other Indian nation ha[s] ever used such a process."  Mem.12. That claim is not just irrelevant—novelty is no basis for reversal under the APA—but untrue, as Plaintiffs admit in a footnote.   Mem. 12 n.4.   In 1987 and 1993, for instance, the Department recognized a similar process conducted by the Oneida Indian Nation of New York, which follows its own version of the Great Law. *See Shenandoah v. U.S. Dep't of Interior*, No. 96-CV-258(RSP/GJD), 1997 WL 214947, at *1–2 (N.D.N.Y. Apr. 14, 1997), *judgment aff'd*, 159 F.3d 708 (2d Cir. 1998); *see* AR-002720-25; AR-002733-59; AR-003422-23.  While Plaintiffs point to supposed differences in that statement of support's implementation, that does not help Plaintiffs' argument that such a process is *categorically* unlawful under the Great Law.

Plaintiffs thus badly miss the mark with their claim that the Department "violated … the Nation's right to self-governance," Mem. 5, as this Court has recognized.   "If anything, the decision exemplified that principle, because it relied on statements of support by Cayuga Nation citizens about whom they recognized as their government."  PI Opinion 8.  The Department's

---

[6] The substantial record evidence supporting this conclusion includes not just the Parker transcript, but myriad scholarly sources.  *See, e.g.*, AR-003838 (Halftown Council brief to Assistant Secretary citing such sources); *see* AR-002554 (Bruce E. Johansen & Barry Pritzker, *Encyclopedia of American Indian History* at 746 (2007)) ("Public opinion is of great importance in the League of the Iroquois.  Iroquois can have a direct say in the formulation of government policy even if the sachems choose to ignore the will of the people.  The Great Law of Peace provides that the people can propose their own laws even when leaders fail to do so.  The Great Law states that if the necessity arises to change the law, the case shall be considered and, if the new beam seems beneficial, the change, if adopted, shall be called, 'Added to the Rafters.'  This provision resembles those for popular initiative in several states of the United States, as well as the mechanism by which the federal and many state constitutions may be amended."); AR-002589 (Henry R. Schoolcraft, *Notes on the Iroquois* 84 (1846)) (the "popular will" was the "controlling influence" that "annulled, confirmed, originated, or set aside all other power"); AR-002598 (Bruce E. Johansen, *Encyclopedia of Native American Legal Tradition* 160 (1998)) ("[a]ll authority spr[ings] from the people of the ... clans").

resolution also accords with this Court's decision in *Ransom v. Babbitt*, 69 F. Supp. 2d 141 (D.D.C.

1999).  There, the St. Regis Mohawk Nation was mired in a similar internal governance dispute,

with claims that tribal institutions "were not only invalid, but were also non-functional."  *Id*. at

146.  There, too, the disputed governance issues had been taken directly to citizens, who had

spoken through multiple referenda.  *Id*. at 143-46.  When the BIA refused to recognize the citizens'

choice, this Court ruled that the BIA action was inconsistent with principles of Indian sovereignty

and self-government and a violation of the APA.  This Court emphasized that, "[i]n situations of

federal-tribal government interaction where the federal government must decide what tribal entity

to recognize as the government, it must do so in harmony with the principles of tribal self-

determination."  *Id*. at 150.  The Court further explained:

> [I]f the legitimate tribal institutions are no longer functioning or are no longer able
> to fulfill their duties, the power to make such important determinations for the tribe
> in question lies with the people of the tribe – not with the federal government.  In
> *Harjo* [*v. Kleppe*, 420 F. Supp. 1110 (D.D.C. 1976), *judgment aff'd sub nom. Harjo
> v. Andrus*, 581 F.2d 949 (D.C. Cir. 1978)], for instance, this Court indicated that
> "consent for fundamental political decisions may only be obtained from the
> ultimate source of legislative authority, the people themselves. . . . [A] feasible and
> appropriate approach would be to consult the members of the tribe directly, by
> means of a referendum." *Id*. at 1146.

*Ransom*, 69 F. Supp. 2d at 151 (one citation omitted) (second bracket added).  *Ransom* confirms

that the decisions under review reasonably followed a similar approach.

### C.       Plaintiffs' Miscellaneous Arguments Fail.

Plaintiffs complain that the Department violated the APA on the ground that the Assistant

Secretary did not review the Regional Director's analysis of Cayuga law *de novo* and that, had he

done so, he would have held in Plaintiffs' favor.  Mem. 6.  They are wrong again.  Questions of

Cayuga law are not the type of legal question that generally receives *de novo* review, whether from

this Court or in the Department's internal administrative review.  *Supra* at 16-17.  Indeed, that is

clear from the Interior Board of Indian Appeals ("IBIA") decision cited by Plaintiffs, which states

that "unless … tribal law *clearly dictate*[*s*] a particular outcome, we will afford BIA latitude to exercise discretion." *Picayune Rancheria of the Chukchansi Indians v. Pac. Reg'l Dir.*, 62 IBIA 103, 114 (2016) (emphasis added). That is language of deference, not *de novo* review. *Id.*; *see Alturas Indian Rancheria v. Pac. Reg'l Dir.*, 64 IBIA 236, 241 (2017) (same standard); *LaRocque v. Aberdeen Area Director*, 29 IBIA 201, 204 (1996) (affirming Area Director's "reasonable interpretation" of tribal law). Even if the Assistant Secretary's standard differed from the IBIA's, Plaintiffs do not identify any law entitling them to *de novo* review within the Department; they rely only on irrelevant law concerning appellate courts' review of district courts' decisions. Mem. 7. All that matters is that the Department—the Regional Director and the Assistant Secretary—considered Plaintiffs' arguments about Cayuga law and reasonably rejected them.

Thus, it is now beside the point that Plaintiffs continue to claim that clan mothers "[h]ave [s]ole [a]uthority to [a]ppoint and [r]emove [c]ouncil [m]embers." Mem. 9; *see id.* at 9-17. What matters, and all that matters, is that Plaintiffs' view was *contested* within the Nation, which the Department reasonably found to have yielded a "true division." AR-003572; AR-003888. The Halftown Council, over the years, has put forth substantial evidence showing that, under Nation law, clan mothers *lack* the dictatorial authority assigned to them by Plaintiffs. As the 1916 Parker transcript puts it, the Great Law "vests *the people* with the right to correct their erring" leaders. AR-002633 (emphasis added). Moreover, the Halftown Council presented sworn statements from

Cayuga Nation elders,[7] and scholarly studies dating to the 19th century,[8] showing that—in short—clan mothers "did not possess, and so did not exercise, arbitrary or absolute power,"[9] and that instead, clan representatives can be removed only after three warnings delivered by the men or women of the clan, and only based on the consensus of clan members at a clan meeting properly called for that purpose.  AR-003345; *see* AR-003839-40 & n.8 (Halftown Council's brief before the Assistant Secretary collecting authority for this proposition, including both "[d]eclarations from Cayuga Nation leaders and elders" and "secondary sources"); *see also* AR-002829-41, AR-002850-58, AR-002965-75 (Halftown Group's 2014 briefs collecting such authority).   The Halftown Council's evidence showed that none of these requirements had been met as to Mr. Halftown, Mr. Twoguns, or Mr. Wheeler.  The Department reasonably relied on the statement of support to resolve the division within the Nation on these questions.

Finally, in a clumsy effort at distraction, Plaintiffs spend pages enumerating allegations of "heavy-handed and arbitrary treatment … by the Halftown group with respect to employment and housing" seven years ago.  Mem. 13.  This mudslinging is irrelevant to Plaintiffs' APA challenge to the Department's decisions in 2016; Plaintiffs do not claim otherwise.  But their allegations are

---

[7] *See, e.g.*, AR-002385-88 (Declaration of Clint Halftown); AR-002513-14 (Declaration of Timothy Twoguns); AR-002518 (Declaration of Gary Wheeler); AR-2522-24 (Declaration of Sharon LeRoy); AR-002527-28 (Declaration of Irene Jimerson); AR-002530 (Declaration of Carol Printup); AR-002533 (Declaration of Donna Proulx); AR-002536 (Declaration of Frances Sasala); AR-002542 (Declaration of Burt Parker); AR-002714-15 (1992 interview with Chief Jacob Thomas).

[8] *See, e.g.*, AR-002554 (Bruce E. Johansen & Barry Pritzker, *Encyclopedia of American Indian History* at 746 (2007)); AR-002655-56 (A.A. Goldenweister, *On Iroquois Work*, in *Summary Report of the Geological Survey, 1912* 468-69 (1913)); AR-002681 (Lewis H. Morgan, *Ancient Society* 74 (2000)).

[9] AR-002607 (J.N.B. Hewitt, Status of Woman in Iroquois Polity Before 1784, *in Annual Report of the Board of Regents of the Smithsonian Institution*, 1932 479 (1933)).

also false.  No firings were "retaliatory."  *Id.*  A few employees were terminated because they engaged in gross mismanagement and even self-dealing—for example, spending Nation funds without authorization, misrepresenting the nature of transactions to the Nation's comptroller, and then structuring other transactions to conceal the unauthorized transactions.[10]  The Nation commenced eviction proceedings because a few people were unlawfully residing in Nation-owned housing, and the Nation, like any other landlord, sometimes has no choice but to take such steps.[11] And while Plaintiffs allude to their allegations of financial irregularities, Mem. 13, the fact is that the Nation's finances have been audited by a respected and independent accounting firm every year since 2005, in addition to further forensic audits.[12]  Indeed, the BIA and IBIA have previously rejected similar allegations.[13]  Plaintiffs' account of this ancient history, moreover, is highly selective.  If the Halftown Council wished to respond in kind, it would point to a 2011 incident where individuals associated with Plaintiffs drove a pickup truck through the front window of the

---

[10]  AR-000273-74 (Affidavit of C. Daniel Shulman, Esq.); AR-000275-78 (Affidavit of B.J. Radford); AR-000298 (letter from Daniel J. French); AR-000402-04 (letter from Daniel J. French); AR-000414-17 (Affidavit of B.J. Radford); AR-000812 (Appellants' Response to Interested Parties' Motion To Have BIA Eastern Regional Director's Decision Put Into Immediate Effect); AR-000879-81, AR-000885-86 (Affidavit of Clint Halftown).

[11]  AR-000299 (letter from Daniel J. French); AR-000812-13 (Appellants' Response To Interested Parties' Motion To Have BIA Eastern Regional Director's Decision Put Into Immediate Effect); AR-00886 (Affidavit of Clint Halftown).

[12]  AR-000298 (letter from Daniel J. French); AR-000814-15 (Appellants' Response to Interested Parties' Motion To Have BIA Eastern Regional Director's Decision Put Into Immediate Effect); AR-000881-84 (Affidavit of Clint Halftown); AR-0000956-57 (audit engagement letter); AR-000958-60 (forensic audit).

[13]  *See George*, 49 IBIA at 181, 190 & n.23 ("The six arguments supporting Appellants' claims of improper use of funds were presented to the Regional Director, and BIA properly investigated the accusations and responded to them.  BIA investigated; a private accounting firm conducted an audit; the firm provided results of the audit; and the Regional Director concluded that a Corrective Action Plan was in place.  Appellants repeat here the averments proffered to the Regional Director, failing entirely to acknowledge his responses or demonstrate that conclusions based on the private audits were wrong.").

Nation's headquarters and stole Nation files and computers.[14]   The point, however, is that Plaintiffs' stale claims are irrelevant to this case.

## II.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFFS' MISCELLANEOUS ARBITRARY-AND-CAPRICIOUS CLAIMS IN COUNTS II AND III.

Plaintiffs raise two additional arbitrary-and-capricious arguments.  In Count II, they claim that the Department violated the APA by changing policy without explanation.  Compl. ¶ 121.  In Count III, they challenge the BIA's weighing of the evidence, claiming that the Department should have credited the purported survey "experts" they submitted.  Compl. ¶ 129.  But it is undisputed that the Department addressed both of these arguments, and it provided "some rational basis" for rejecting Plaintiffs' claims.  *Bimini*, 994 F. Supp. at 120.  Defendants are entitled to judgment.

### A.   Defendants Are Entitled To Judgment On Count II's Claim That The Department Violated The APA By Changing Policy Without Explanation.

Plaintiffs observe that the Department had previously declined to verify a prior statement of support.  Mem. 22-23.  In particular, the 2015 decision had, "on an interim basis recognize[d] the Nation 2006 Council as the last undisputed leadership of the Nation, with Clint Halftown as the Nation's representative for purposes of administering existing ISDA contracts," and "decline[d] to verify the results" of a statement of support "under these circumstances."  AR-003217; AR-003223.  Based on that 2015 decision, Plaintiffs contend that the Department "fail[ed] to provide a reasoned explanation for its change in policy."  Mem. 21.  But as this Court found, the Department "easily satisfied the APA's requirement that changes … be explained."  PI Opinion 10.

---

[14] AR-000802-04, AR-000811-812 (Appellants' Response To Interested Parties' Motion To Have BIA Eastern Regional Director's Decision Put Into Immediate Effect); AR-000939-40 (Syracuse.com article); AR-000942-44 (photographic evidence).

The key to assessing Plaintiffs' argument is the governing standard.  Agencies "do not establish rules of conduct to last forever," and they "must be given ample latitude to adapt their rules and policies."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (quotation marks omitted).  Hence, an agency generally needs only satisfy two requirements.  It must "display awareness that it is changing position."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  And it must show "that there are good reasons for the new policy," *id.*—in the sense that an agency must support any policy, changed or not, with "some rational basis."  *Bimini*, 994 F. Supp. at 120.  The agency need not, however, "demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *Fox*, 556 U.S. at 515.

The Department easily satisfied those requirements.  First, the Regional Director and the Assistant Secretary both devoted entire sections to addressing the 2015 interim decision and why that decision "d[id] not prohibit BIA from accepting" the statement of support.  AR-003575; *see* AR-003896.  The Department thus "display[ed] awareness" it was doing something different.  *Fox*, 556 U.S. at 515.  Second, the Department had "good reasons" for its approach in the decisions below, *id.*, and "some rational basis," *Bimini*, 994 F. Supp. at 120.  The Department had a statutory obligation to deal with *some* Cayuga government (as is undisputed), and it reasonably decided that accepting the statement of support was the approach most consistent with principles of self-government and Cayuga law (for the reasons explained above, *supra* at 17-22).

To be sure, there is one exception requiring more explanation for agency changes of policy: if the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests."  *Fox*, 556 U.S. at 515.  But Plaintiffs do not identify any "factual findings" (much less "reliance interests") that drove the 2015

interim decision's choice to decline to verify the campaign of support.  Properly read, the 2015 decision rested on a policy judgment that granting interim recognition to the 2006 Council was, "under these circumstances," better than verifying the campaign of support.  AR-003223.  That is the type of judgment that an agency is free to change simply by "display[ing] awareness that it *is* changing position" and establishing that the new policy is permissible.  *Fox*, 556 U.S. at 515.

Regardless, the Department—going above and beyond—also explained why the key "circumstances" had changed and required a new approach.  For one thing, the 2015 decision had determined that the Department *could* continue to recognize the 2006 Council, AR-003575; AR-003897, and the decisions below explained that the Department *no longer* could do so.  No ISDA application had been submitted on behalf of the 2006 Council; instead, the Department received proposals from two councils with "no overlap."  AR-003564.  The Department thus had no choice but to make a decision "on the merits," AR-003887, and it reasonably determined that the statement of support process was the appropriate way to do so.  *Supra* at 17-22.  Indeed, the 2015 decision previewed this outcome, explaining that while "current circumstances do not warrant a decision on the merits of Nation law," that "is not to say that those circumstances may not arise at a future time, conceivably when the time comes for the Nation to renew an ISDA contract."  AR-003222.

Plaintiffs quibble that the Department should not have recognized the 2006 Council in 2015—because "the 2006 Council did not submit an ISDEAA proposal in 2015."  Mem. 23.  Plaintiffs' premise is false: Clint Halftown was the federal representative of the 2006 Council "for purposes of administering existing ISDA contracts," AR-003217, and Mr. Halftown had submitted a contract proposal and urged the Department to recognize him as the last undisputed federal representative of the Nation's last undisputed council.  AR-002152-53; *see* AR-002849-

62. In 2016, however, there was no application that could be construed as made on the 2006 Council's behalf. AR-003370 (Halftown Council application); AR-003375 (Jacobs Council application). And even if Plaintiffs' premise were true, it would not matter. The upshot of Plaintiffs' argument is that the BIA erred in 2015 by construing the application submitted by Mr. Halftown as made on behalf of the 2006 Council. But the 2015 decision is not before this Court. What matters *here* is that the Department reasonably determined in 2016 that it could not recognize the 2006 Council in awarding a new ISDA contract. Whether the Department erred in 2015—after Plaintiffs dropped their appeal of that decision, *supra* at 7—is, today, beside the point.[15]

Plaintiffs quarrel over two additional reasons offered by the Department for accepting the statement of support—that "'one year and ten months' had passed … without any internal resolution," and that this period had seen "worsening disputes." AR-003897 (quoting AR-003565). Plaintiffs' arguments fail. Plaintiffs may believe that "passage of twenty-two months" was insufficient to justify change. But that is the type of policy judgment vested in the Department. *See Fox*, 556 U.S. at 515. And contra Plaintiffs, the record supports the Department's view that this period witnessed worsening disputes—not limited to *violence*, as Plaintiffs imply, but all the disruption and disputes that have accompanied the Nation's internal conflict. AR-003249 (letter identifying such disruption); AR-003565-66 (Regional Director's decision discussing such disruption). In any event, Plaintiffs cannot dispute the more fundamental point: When no

---

[15] The 2015 interim decision also stated that it declined to verify the campaign of support because the Department was at that time unsure of the "applicable authority" to do so and the legality of the campaign of support under Nation law. AR-003223. But that, too, changed. As the Regional Director explained, the "decision to accept the results of the 2016 statement of support campaign was not made suddenly"; the Department reached that decision only "after offering [Plaintiffs] full participation in the Initiative process and an opportunity to voice their concerns through formal legal briefing." AR-003575-76; AR-003898. Based on this full process, the Department resolved the legal questions about the statement of support that had been left open in 2015. *Supra* at 10-15, 17-22.

application was submitted in 2016 that could be construed as on behalf of the 2006 Council, the Department *had to* change course.  There was no "unexplained reversal of past federal policy."  PI Opinion 9.

**B.**   **Defendants Are Entitled To Judgment On Count III's Claim That The Department Violated The APA By Declining To Credit Plaintiffs' Survey Experts.**

In Count III, Plaintiffs allege that the Department acted arbitrarily and capriciously by declining to credit the views of two survey "experts" they proffered, who purported to assess the statement of support against the standards for public opinion surveys in published academic work, and who found it "flaw[ed]."  Compl. ¶ 126.  The Department, Plaintiffs claim, "failed to consider the flaws explicated by this expert evidence," and thus violated the APA.  Mem. 25.

This claim withers in the face of the decisions below, together with the standard of review.  The Department *did* consider, at length, Plaintiffs' arguments based on their survey experts—and when an agency does so, "weighing the evidence is not the court's function."  *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. Pension Ben. Guar. Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013).  The Department offered "some rational basis," *Bimini*, 994 F. Supp. at 120, for declining to credit Plaintiffs' experts.  Under the APA, that is all that matters, and Defendants are entitled to judgment.

To begin, the Assistant Secretary addressed Plaintiffs' argument that their survey expert report was the "only expert evidence submitted to" the Department.  Mem. 25.  That was because the expert report was included in a *reply brief*, which meant that "the opposing parties did not have an opportunity to respond."  AR-003900.  Hence, the Assistant Secretary rejected Plaintiffs' "insinuat[ion] that the Expert Report is due particular deference because it is unrebutted."  *Id.*

Likewise, the decisions below explained in detail why the Department concluded that Plaintiffs' experts did not provide an adequate basis to reject the statements signed by more than

60% of enrolled Cayuga citizens.  The Regional Director acknowledged the core critique Plaintiffs

raised below, which they again press here—that certain "language used in the statement of support

documents is not neutral."  AR-003573.  But in light of the record as a whole, the Regional Director

noted the "absence of any evidence that the biased language actually affected any person's

response."  *Id.*  And the Regional Director declined to credit Plaintiffs' premise that standards of

public opinion surveys were appropriate for measuring the Nation's statement of support:  "[T]here

are differences between the public at large and a tribal body politic comprising no more than 500

people, with a network of communal knowledge and personal relationships, and I am not dissuaded

that such a political group could form an opinion relative to their own governance notwithstanding

the potential effect of biased language."  *Id.*  He continued:

> Similarly, asking members of the public at large which of several options best
> reflects his or her opinion on a matter is meaningfully unlike asking the Cayuga
> citizens, 'do you support these five men to be your council?'  The fact that a 'yes'
> response had to be indicated by sending in a signed statement of support, whereas
> a 'no' was indicated by *not* sending in a statement of support, further differentiates
> the statement of support process from a standard public opinion survey.  To
> characterize the statement of support campaign as intended to make a
> "measurement of the attitudes" of the Cayuga citizens suggests a nuanced goal that
> was plainly not the intent.

*Id.* (emphasis in original).  The Nation's citizens, the Regional Director observed, had been

"immersed in this tribal government imbroglio for years," and they "know the players and the

stakes."  AR-003574.  Finally, the Regional Director noted that Cayuga citizens had also received

a separate mailing from Plaintiffs "urging the citizens to rejected the Halftown Council."  *Id.*  This

mailing—notably, ignored by Plaintiffs' "experts"—further undermined claims that the statement

of support's language skewed its results.  Thus, the Regional Director concluded "[i]n light of the

circumstances as a whole," he could not "agree that the statement of support process confused the

Cayuga citizens and left them susceptible to manipulation by biased language."  *Id.*

The Assistant Secretary *also* considered Plaintiffs' experts, and affirmed the Regional Director's determination.  He explained that "there was no evidence" that any bias in the language of the mailing "would have confused or otherwise misled Cayuga voters given their small numbers, network of communal knowledge, and deep familiarity with the dispute between the Jacobs and Halftown Councils."  AR-003900.  The Court should not entertain Plaintiffs' invitation to reweigh evidence that the Department has already weighed—twice.

The Department also considered, and reasonably rejected, Plaintiffs' claims of vote buying presented in their expert report.  What Plaintiffs characterize as "distribution of cash to SOS respondents … from [a] candidate," Mem. 28-29, was—in reality—the regularly scheduled distribution of proceeds from the Nation's enterprises by the Nation's government to the Nation's citizens.  As the Assistant Secretary observed, distribution checks are mailed to Cayuga citizens once a quarter, on the fifteenth of the month, and the check preceding the statement of support mailing followed the regular schedule.  AR-003901.  Moreover, the Department observed that "92 percent of Nation citizens had cashed or deposited their distribution check by June 30, 2016," a week before the statement of support materials were mailed out—rebutting Plaintiffs' suggestion that "at least some citizens received cash payments at the same time as campaign of support materials."  *Id.*  The Department thus concluded that "it is speculation at best to assume that voters would have felt beholden to support the Initiative simply because they had recently received a pre-planned distribution."  AR-003902.  Once again, reweighing this conclusion is outside the APA's limited scope of review.

The Department's careful consideration of Plaintiffs' objections extended to the claims that the statement of support relied on a supposedly "secret voter roll."  Mem. 28.  The Assistant Secretary explained that "even if [Plaintiffs] were unable to independently verify the roll's

accuracy," the Department itself had "scrutinized the statements of support, and the membership roll maintained by the Nation's Secretary." AR-003899. Indeed, the Department had "rejected" some "[a]dditional statements of support [that] were submitted" that Department officials determined should not be counted "for various reasons." *Id.* The Assistant Secretary also considered in detail Plaintiffs' claims—referenced in passing in their Motion—concerning the "number of [Nation] citizens," Mem. 28, and explained why it rejected them. AR-003898-99.

With their final argument, Plaintiffs' descend into irony, claiming that the Department was bound to reject the statement of support because it differed from ballots used in "federal, state and local elections," and "federally-supported tribal elections." Mem. 27 n.9. As Plaintiffs elsewhere stress, *see, e.g.*, Mem. 11, the Cayuga Nation does not generally rely on elections. Hence, the statement of support was not *supposed* to parrot Western electoral practices. Rather, it was intended—in full accordance with *Cayuga* law and traditions and the Great Law of Peace—to ascertain the will of the people during a moment of crisis for the Nation. Understanding and respecting this distinction, the Department reasonably concluded that it should "trust the Cayuga citizens to have understood the choice presented by the process." AR-003574.

## III.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFFS' DUE PROCESS CLAIMS IN COUNTS IV, V, AND VI.

Plaintiffs had chance after chance to present their objections to the statement of support, which they did in briefing and argument prior to and during the statement of support process, and in hundreds of pages of further briefing in the subsequent adjudicative proceedings before the Regional Director and the Assistant Secretary. The Regional Director and Assistant Secretary, in turn, addressed Plaintiffs' arguments in detailed decisions. Indeed, while Plaintiffs object to aspects of the Department's reasoning, they do not cite a *single* objection to the statement of support that went unaddressed. Nonetheless, in Counts IV and V, Plaintiffs allege that they did

not receive due process because they supposedly were "unconstitutionally deprived … of a neutral decisionmaker" by virtue of a statement made by the Regional Director in a June 2016 letter or because the Department "agreed to provide … technical assistance" "[p]rior to requesting or receiving briefing on the issue."  Compl. ¶¶ 134-35 (Count IV); *see* Compl. ¶ 149 (similar, in Count V).  Plaintiffs also allege, in Count VI, that the Department violated due process because the Assistant Secretary supposedly "participated in" the Regional Director's decision. Compl. ¶ 158.  These claims fail, and Defendants are entitled to judgment.  As this Court previously found:  "There is no reason to think that Defendants had predetermined how they would decide these issues before giving Plaintiffs [their] opportunities to be heard, or that this entire administrative process was a sham."  PI Opinion 12.

### A. Defendants Are Entitled To Judgment On The Claims Of Prejudgment And Bias In Counts IV and V.

#### 1. Plaintiffs' Due Process Claims Are Waived.

Defendants are entitled to judgment, first, because Plaintiffs failed to properly preserve the objections in Counts IV and V.  The remedy for alleged prejudgment or bias is disqualification, and as the D.C. Circuit has held, "[c]laims of bias must be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist."  *Power v. Fed. Labor Relations Auth.*, 146 F.3d 995, 1002 (D.C. Cir. 1998) (quotation marks omitted).  Here, Plaintiffs *did* raise, in their November 2016 briefing to the Regional Director, his supposed prejudgment, but they did *not* seek his disqualification.  Rather, they simply asked the Regional Director to "clarify that [his letter] was not intended to express an opinion on the validity of Mr. Halftown's election campaign, and that the issue will be decided according to neutral principles," and they said that doing so would "avoid due process concerns."  AR-003454.  The Regional Director's decision *did* rely on neutral principles, despite Plaintiffs' disagreement with the result, and their

34

statement is inadequate to preserve a claim that the Regional Director should insteapd have *disqualified* himself.  *Cf.* PI Opinion 12 n.4 (noting potential waiver).  As the Court of Appeals emphasized:  "It will not do for a claimant to suppress his misgivings [regarding bias] while waiting anxiously to see whether the decision goes in his favor."  *Power*, 146 F.3d at 1002 (quotation marks omitted).

### 2.    Plaintiffs' Due Process Claims Lack Merit.

The Halftown Council incorporates by reference the Federal Defendants' arguments for why, on the merits, the administrative record refutes Plaintiffs' claims of prejudgment or bias based on, for example, the "letter sent by Defendant Maytubby to Plaintiffs at the outset of administrative proceedings," PI Opinion 12, and the fact that the Department communicated with the Halftown Group, or "provid[ed] … technical support" to the statement of support, Mem. 31.  The Halftown Council notes the following additional points:

First, in places, Plaintiffs imply that providing technical assistance to the Halftown Council was not just evidence of supposed bias, but that doing so *itself* violated due process, and that Plaintiffs had a due process right to "full briefing opportunities" before the Department expended "federal funds" on the statement of support.  Mem. 31.  For many reasons, this argument fails.  First, it is waived:  Below, they did not argue that due process entitled them to a paper hearing before the statement of support commenced.  Their Complaint did not do so either.  Second, Plaintiffs lack standing, which requires "injury in fact—an invasion of a legally protected interest." *Levine v. Nat'l R.R. Passenger Corp.*, 80 F. Supp. 3d 29, 36 (D.D.C. 2015) (quotation marks omitted).  Plaintiffs have no legally protected interest in how the Department chooses to expend money from its budget, or allocate the time of its employees.  *See, e.g.*, *Consol. Edison Co. v. Herrington*, 752 F. Supp. 1082, 1086 (D.D.C. 1990) (plaintiff "lack[ed] standing to challenge … distribution of funds to third parties" (quotation marks omitted)).  Third, and relatedly, Plaintiffs'

due process claim fails because they have no "protected interest in 'liberty' or 'property'" regarding the Department's decision to allocate its financial or human resources to the statement of support—instead of, say, efforts on behalf of the Oneida Indian Nation or the Saint Regis Mohawk Tribe. *See Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'" (quotation marks omitted)).

Second, Plaintiffs also cram into their due process argument the claim that the "provision of … technical assistance" to the statement of support was not authorized by 25 C.F.R. § 81.5(a)(2) or 25 C.F.R. § 900.7.  Mem. 36.  The Court should not entertain this argument because Plaintiffs did not raise it either below or in their Complaint, which alleged only a due process violation—not that technical assistance to the statement of support was unauthorized by statute or regulation. *Cf.* Compl. ¶¶ 130-50.  Regardless, Plaintiffs are wrong.  Their premise is that if the Department's technical assistance was not authorized by these two specific regulations, then it was not authorized *at all*.  But the Department's authority is not so crabbed.  The Secretary of Interior has "the power to manage 'all Indian affairs and ... all matters arising out of Indian relations.'" *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938 (D.C. Cir. 2012) (emphasis and omissions in original) (quoting *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1267 (D.C. Cir. 2008) (in turn quoting 25 U.S.C. § 2))).  Plaintiffs cite nothing that would limit the Department from exercising this broad authority to assist tribes in resolving leadership disputes.

### B.   Defendants Are Entitled To Judgment On The Claims In Count VI Regarding The Assistant Director's Participation In The Regional Director's Decision.

In Count VI, Plaintiffs allege a violation of "due process" because the Assistant Secretary allegedly had some unspecified participation in the BIA Decision, and then later reviewed it on appeal when he became the Assistant Secretary.  Compl. ¶¶ 158, 165.  Plaintiffs have not moved

for summary judgment on Count VI.  But this Count, too, can and should be resolved on summary

judgment, and Defendant-Intervenor has moved for summary judgment on all counts, including

Count VI.  The then-Assistant Secretary has affirmatively, and without contradiction, refuted

Plaintiffs' claims—explaining that "at no point was I actively involved in the decision making

process preceding the BIA Eastern Regional Director's December 15, 2016 decision … to

recognize Clint Halftown and his associates as the proper leadership of the nation," and that he

"neither discussed the details of the Decision with the Eastern Regional Office nor reviewed any

drafts of the decision" nor "participate[d] in the consideration, drafting, editing, or any other

review or discussion of the Decision."   Decl. of Michael S. Black, ECF No. 32-1, ¶ 4.  This Court

is free to rely on that declaration in granting summary judgment, as explained below, but it need

not do so.  For three independent reasons, Defendants are entitled to judgment.

*First*, Plaintiffs failed to preserve this argument.  Plaintiffs chose not to raise this claim in

their brief on appeal to the ASIA.  Rather, in a single sentence in a footnote of their opening brief,

Plaintiffs stated:  "Appellants argued before the IBIA that Acting Assistant Secretary Michael

Black's participation in the Regional Director's decision making process should preclude him from

adjudicating this appeal, AR Part 11(7), and respectfully preserve that argument here."   AR-

003783 n.1.  The Assistant Secretary, however, found that this footnote "did not preserve this

argument for the purposes of this appeal."  AR-003884 n.64.  That conclusion was reasonable, and

indeed, is consistent with the D.C. Circuit's rule that claims of error cannot be raised in footnotes,

particularly footnotes that merely reference briefs filed in a different forum.  *See Town of Norwood*

*v. FERC*, 962 F.2d 20, 25 (D.C. Cir. 1992) ("Mere reference to an argument presented elsewhere

… is not sufficient to raise it.");  *Healthbridge Mgmt., LLC v. NLRB*, 672 F. App'x 1, 1 (D.C. Cir.

2016) ("Petitioners' arguments … are forfeited because they were only briefly mentioned in a

footnote in their brief to the Board, which was insufficient to preserve the issue on appeal."). Reviewing courts routinely affirm agency decisions deeming certain arguments not properly preserved.  *See, e.g.*, *EF Int'l Language Sch., Inc. v. NLRB*, 673 Fed. App'x 1, 3 (D.C. Cir. 2017); *Elmhurst Care Ctr. v. NLRB*, 303 Fed. App'x 895, 897 (D.C. Cir. 2008).

*Second*, even had Plaintiffs preserved their argument, Plaintiffs—again—do not have the due process right that they assert.  Plaintiffs' Count VI rests on the premise that due process entitled them not just to a hearing before the Department, but to a *second* administrative hearing from a decisionmaker that was fully independent from the first.  No such right exists.  *Gorin v. Osborne*, 756 F.2d 834, 838 (11th Cir. 1985) ("due process does not require … any appellate review of administrative rulings"); *Hassan v. Ashcroft*, 388 F.3d 661, 669 (8th Cir. 2004) ("[D]ue process does not require administrative appellate review…."); *cf. Ortwein v. Schwab*, 410 U.S. 656, 659 (1973).[16]

*Third*, even if Plaintiffs had the due process right they assert, there is no evidence it was violated.  "To survive summary judgment, the nonmoving party must offer more than mere allegations."  *Pinkney v. Robinson*, 913 F. Supp. 25, 30 (D.D.C. 1996).  And here, there is an "absence of any substantial record support" for Plaintiffs' claim that the Assistant Secretary participated in the Regional Director's decision.  PI Opinion 14.  The *only* support Plaintiffs have offered for their claim is that he was, among many others, cc'd on the briefs.  *See* Plaintiffs' Mot.

---

[16] The Complaint cites *Morrissey v. Brewer*, 408 U.S. 471 (1972), but it is off point.  When a parole officer finds a parole violation and recommends revoking parole, the officer has been "directly involved" in the case and so "cannot always have complete objectivity in evaluating" it. *Id.* at 486.  Due process thus requires "an independent decisionmaker to examine the initial decision" before the parolee loses his liberty.  *Id.*  But here, the Regional Director *was* an "independent decisionmaker," and Plaintiffs' due process rights do not rise to the same level as the liberty interests in *Morrissey*.  They were fully vindicated by the chance Plaintiffs received to present their case to the Department and then seek review under the APA.

for Preliminary Injunction at 23, ECF No. 22.  This is no support at all.  As the Court observed, that fact "alone does not demonstrate," or even suggest, "that Defendant 'actively participated' in the decision."   PI Opinion 13-14.   The Black Declaration, moreover, affirmatively refutes Plaintiffs' theory.  Courts routinely rely on such agency declarations at the summary judgment stage.  *See, e.g.*, *Am. Petroleum Tankers Parent, LLC v. United States*, 952 F. Supp. 2d 252, 274 (D.D.C. 2013); *Radack v. U.S. Dep't of Justice*, 402 F. Supp. 2d 99, 107 & n.9 (D.D.C. 2005); *Office of Foreign Assets Control v. Voices in Wilderness*, 382 F. Supp. 2d 54, 62-63 (D.D.C. 2005).

Nor can Plaintiffs stave off summary judgment by claiming that they seek discovery on this issue.  *Cf.* Fed. R. Civ. P. 56(d) (nonmovant may seek deferral of a summary judgment motion by showing that "for specified reasons, it cannot present facts essential to justify its opposition").  That is because, under the governing standard, Plaintiffs are not entitled to discovery.  "Discovery is generally not available in cases reviewing agency action."  *Comm. of 100 on the Fed. City v. Foxx*, 140 F. Supp. 3d 54, 59 (D.D.C. 2015).  Only if there is a "strong showing of bad faith or improper behavior" may discovery be had.  *Id.* (quoting *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487-88 (D.C. Cir. 2011)); *see Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2016).  A litigant thus must make this strong showing *before* discovery will proceed; if "nothing in the record supports" the allegation of bad faith, the litigant cannot invade the agency's records based on the claim that it will find such evidence.  *Kadi*, 42 F. Supp. 3d at 10; *see Radack*, 402 F. Supp. 2d at 107 n.9; *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 65-66 (D.D.C. 2002).  The D.C. Circuit strictly enforces this limit:  Even where record evidence supported "'the impression' of prejudgment," the D.C. Circuit affirmed that the district court had properly denied discovery under the stringent standard that applies.  *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011).  Under these standards, Plaintiffs fall

far short:  As this Court observed, there is no "substantial record support" for Plaintiffs' claims. PI Opinion 14.

Because Plaintiffs lack record support for their claim and are not entitled to discovery, entry of summary judgment against the Plaintiffs on Count VI is appropriate.

## **CONCLUSION**

For the foregoing reasons, and the additional reasons offered by the Federal Defendants, Defendant-Intervenor Cayuga Nation Council respectfully requests that Defendants' motions for summary judgment on all counts should be granted and that Plaintiffs' motion for summary judgment should be denied.

Respectfully submitted,

/s/ David W. DeBruin
David W. DeBruin
D.C. Bar No. 337626
Previn Warren
D.C. Bar No. 1022447
Zachary C. Schauf*
D.C. Bar No. 1021638
Leonard R. Powell
D.C. Bar No. 1048832
JENNER & BLOCK, LLP
1099 New York Avenue, N.W.
Washington, D.C.  20001
(202) 639-6015
  *Application pending for admission to the bar of the
   United States District Court for the District of Columbia

*Counsel for Defendant-Intervenor
Cayuga Nation Council*

Date:  July 10, 2018