**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE CAYUGA NATION, *et al.*, <br> Plaintiff <br><br> v. <br><br> DAVID BERNHARDT, *et al.*,[1] <br> Defendants, <br><br> THE CAYUGA NATION COUNCIL, <br> Defendant-Intervenor. | Civil Action No. 17-1923 (CKK) |

**Memorandum Opinion**
(March 11, 2019)

The Cayuga Nation is a federally recognized Indian Nation. This case deals with decisions by the Bureau of Indian Affairs ("BIA") and the Assistant Secretary for Indian Affairs of the Department of the Interior ("DOI") that recognized one faction within the Cayuga Nation, Defendant-Intervenor—now referring to itself as the "Cayuga Nation Council," though alternatively referred to in the administrative record as the "Halftown Group"—as the governing body of the Cayuga Nation for the purposes of certain contractual relationships between that Nation and the United States federal government. These decisions were the product of an adversarial process between Defendant-Intervenor and Plaintiffs, a rival faction within the Cayuga Nation who assert that they represent the Nation's rightful government. Plaintiffs have filed this lawsuit seeking to overturn the BIA and DOI decisions.

Now before the Court are Plaintiffs' [59] Motion for Summary Judgment, Defendants' [51] Cross-Motion for Summary Judgment, and Defendant-Intervenor's [50] Cross-Motion for

---

[1] Pursuant to Fed. R. Civ. P. 25(d), David Bernhardt is substituted in his official capacity as Acting United States Secretary of the Interior.

Summary Judgment.[2] Upon consideration of the pleadings,[3] the relevant legal authorities, and the record as a whole, the Court DENIES Plaintiffs' Motion for Summary Judgment and GRANTS both Defendants' and Defendant-Intervenor's Cross-Motions for Summary Judgment. The Court concludes that Plaintiffs have failed to establish that Defendants violated the Administrative Procedure Act ("APA") in making decisions recognizing Defendant-Intervenor as the governing body of the Cayuga Nation for purposes of certain contractual relationships between the Nation and the United States federal government. The Court further concludes that Plaintiffs failed to establish that Defendants violated Plaintiffs' due process rights in making these decisions.

---

[2] Plaintiffs initially filed their Motion for Summary Judgment at ECF No. 47. However, that motion was not filed in the proper format as it included a Statement of Material Facts. *See* July 30, 2018 Minute Order. Plaintiffs refiled their Reformatted Motion for Summary Judgment at ECF No. 59. That is the Motion under consideration by the Court. Similarly, at ECF No. 63, Defendant-Intervenor filed a renewed Cross-Motion for Summary Judgment in response to Plaintiff's Reformatted Motion. And, Plaintiffs filed a revised Reply to Defendant-Intervenor's Motion at ECF No. 68.

[3] The Court's consideration has focused on the following documents:

- Pls.' Reformatted Mot. for Summary Judgment, ECF No. [59] ("Pls.' Mot.");
- Defs.' Mot. for Summary Judgment, ECF No. [51] ("Defs.' Mot.");
- Def.-Int. Cayuga Nation Council's Mem. of Law in Opp'n to Pls.' Reformatted Mot. for Summary Judgment and in Support of Defs.' Mot. for Summary Judgment, ECF No. [63] ("Def.-Int.'s Mot.");
- Pls.' Mem. of Points and Authorities in Reply to Federal Defs.' Opp'n to Pls.' Mot. for Summary Judgment and in Opp'n to Federal Defs.' Cross-Mot. for Summary Judgment, ECF No. [55] ("Pls.' Reply to Defs.");
- Pls.' Revised Mem. of Points and Authorities in Reply to Def.-Int.'s Opp'n to Pls.' Mot. for Summary Judgment and in Opp'n to Def.-Int.'s Mot. for Summary Judgment, ECF No. [68] ("Pls.' Reply to Def.-Int.");
- Mem. of Points and Authorities in Reply to Pls.' Opp'n to Federal Defs.' Cross-Mot. for Summary Judgment, ECF No. [64] ("Defs.' Reply");
- Def.-Int. Cayuga Nation Council's Reply Mem. of Law in Support of Defs.' Mot. for Summary Judgment, ECF No. [65] ("Def.-Int. Reply").

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

# I. BACKGROUND

Plaintiffs' action seeks vacatur of the BIA and the DOI decisions recognizing Defendant-Intervenor as the governing body of the Cayuga Nation for purposes of certain contractual relationships between the Nation and the federal government. Plaintiffs argue that these decisions violated the APA as well as the Due Process clause of the Constitution.

The Cayuga Nation is one of the six nations of the Haudenosaunee Confederacy. It adheres to a traditional government that has historically relied on an oral, unwritten law referred to as the "Great Law of Peace." AR-003878; AR-0038888. The governing body of the Cayuga Nation is the Cayuga Nation Council. In 2006, the Council was comprised of six members including Clint Halftown, Tim Twoguns, and Gary Wheeler. Mr. Halftown served as the Nation's "federal representative" in carrying out the Nation's relations with the United States federal government. AR-003217.

Beginning in the early 2000s, the Council began having internal problems. In addition to these internal problems, Plaintiffs also allege that Cayuga citizens reported negative treatment by Mr. Halftown and his associates. *See, e.g.*, AR-000100-09; AR-000301-48; AR-000147.

These problems eventually led to a split in the Cayuga Nation Council. The "clan mothers" removed Mr. Halftown, Mr. Twoguns, and Mr. Wheeler from their positions on the Nation Council. AR-000163-70. Plaintiffs' group contends that these changes were valid as the clan mothers had absolute authority under Cayuga law to appoint and remove members of the Nation Council. AR-003217; AR-003572. Defendant-Intervenor's group disagrees that Cayuga law grants the clan mothers this sort of absolute authority and denies that the clan mothers validly removed Mr. Halftown, Mr. Twoguns, and Mr. Wheeler from the Nation Council.

In a 2006 decision concerning the rightful make-up of the Nation Council, the BIA declined to recognize that Mr. Halftown had been removed from the Nation Council or that he was no longer the "federal representative" for the Nation. *See generally George v. E. Regional Dir., Bureau of Indian Affairs*, 49 IBIA 164 (2009) (affirming the BIA's decision).

In 2011, the clan mothers again attempted to remove Mr. Halftown, Mr. Twoguns, and Mr. Wheeler from the Nation Council and to install new representatives. Following these changes to the composition of the Nation Council, the clan mothers and the new Nation Council notified the BIA of the changes to the Nation Council. AR-00100-09. Following briefing from both sides, in August 2011, the BIA recognized Plaintiffs' new Nation Council, rejecting the claims of Defendant-Intervenor. AR-002130-31. But, the Interior Board of Indian Appeals ("IBIA") stayed and then vacated that decision without reaching the merits, explaining that the BIA should never have issued a decision on the leadership dispute. AR-002126-42; *See generally Cayuga Nation v. E. Regional Dir., Bureau of Indian Affairs*, 58 IBIA 171 (2014).

In 2015, the Cayuga Nation's leadership dispute came to a head. The BIA received two requests to modify existing federal-tribal contracts under the Indian Self-Determination Act ("ISDEAA"). AR-003217. One request came from Plaintiffs' group; the BIA determined that the other request came from Mr. Halftown acting as the federal representative for the last Nation Council which had been formally recognized by the BIA in 2006. *Id.*

In response to these competing requests, the BIA declined to address the merits of the Nation's leadership dispute. Instead, the BIA continued to recognize the last undisputed government of the Cayuga Nation which had been identified by the BIA in 2006. The BIA concluded that the 2006 Nation Council, with Mr. Halftown acting as federal representative, had the authority to draw funds from the Nation's ISDEAA contract. AR-003216-24. In recognizing

the 2006 Nation Council for purposes of deciding the 2015 ISDEAA request, the BIA emphasized that "[t]his interim recognition decision is intended to provide additional time to the members of the Nation to resolve this dispute using tribal mechanisms and prevent the need for the BIA to examine Nation law and make a subsequent determination based on the results of that determination." AR-003222.

The BIA's reluctance to examine Nation law and to recognize one faction as the Nation's rightful leadership was in line with past BIA decisions. In 2005, the BIA had rejected an electoral process proposed by members of Defendant-Intervenor's group to determine the leadership of the Cayuga Nation. AR-000053-54. In 2012, the BIA again rejected a similar electoral process proposed by members of that group. AR-003411 n.3. And, the BIA rejected a 2014 request from members of Defendant-Intervenor's group asking the BIA to verify the results of a campaign of support. AR-003075; AR-003223.

But, in its 2015 decision, the BIA cautioned that it could not forever refrain from recognizing a new Nation Council. The BIA explained that while "current circumstances [did] not warrant a decision on the merits of Nation law," the need to make such a decision "may … arise at a future time, conceivably when the time comes for the Nation to renew an [ISDEAA] contract." AR-003222. The BIA stated that it would not enter a new ISDEAA contract absent a "consensus" Nation Council resolution. *Id.*

However, there was little chance for a consensus resolution from the 2006 Nation Council given that the council had not met for a decade, excluding federally-supervised mediation meetings. Moreover, Plaintiffs' group claimed that it had formed a new, valid Nation Council without any members from Defendant-Intervenor's group. AR-003564, AR-003882;

AR-003897. This lack of a consensus Nation Council risked federal grant money, funding from other United States agencies, the Nation's pending land trust application, and more. AR-003249.

In response to this stand-still, in 2016, Defendant-Intervenor initiated a new "statement of support" ("SOS"), asking the Nation's members to "memorialize in writing, their understanding of Nation law and traditions regarding certain Nation governance matters." AR-003878 (internal quotation marks omitted). The SOS's first proposition dealt with "the process by which the Nation is governed and its leaders are selected," and the second proposition dealt with "the identity of those individuals who are the authorized clan representatives on the Nation Council." AR-003340-49.

In preparation for their planned SOS, in the summer 2016, Defendant-Intervenor wrote to the BIA and requested "technical assistance" with the SOS. AR-003246-54. Three days later, the BIA sent a letter to Plaintiffs advising them of Defendant-Intervenor's proposal. AR-003262-63. Specifically, the letter stated:

> The Bureau of Indian Affairs has been consulted by Mr. Halftown and his group regarding a way to identify the Cayuga Nation's leadership and confirm or reaffirm the Cayuga Nation's governing structure, and we have agreed that under the current circumstances a "Statement of Support" process would be a viable way of involving the Cayuga people in a determination of the form and membership of their tribal government. We want this process to be inclusive and to obtain a true sense of what the Cayuga people support. To that end, we hope that you will provide honest feedback to Mr. Halftown. If you have an alternative method for obtaining accurate information regarding the will of the Cayuga Nation's citizens, please be forthcoming with a proposal. Alternatively, if you prefer to communicate your concerns to my office, we will gladly share those concerns with the other parties involved.

AR-003262. The BIA requested a response from Plaintiffs within 10 days of the receipt of the letter. *Id.* Plaintiffs requested an extension of time to respond and were granted an extension. But, the BIA warned Plaintiffs that "it is important that your comments be provided as soon as

possible because the campaign described in my letter and in the letter you received from the group led by Mr. Halftown is going to be getting underway." AR-003266.

In response, Plaintiffs presented to the BIA their objections to the SOS campaign. AR-003264-65; AR-003299-337; AR-003350-51. Plaintiffs also sent a letter to the Cayuga Nation citizens expressing their determination that the use of the SOS "is not the way of our people." AR-003352. The letter asked the Nation's citizens to "reject this process of voting by mail, and support the Cayuga Nation's traditional system of consensus decision making by the chiefs and clan mothers." *Id.* (capitalization omitted).

During a two-month process, citizens of the Cayuga Nation received and responded to Defendant-Intervenor's SOS materials. AR-3567. The results of the SOS were confirmed by the BIA which found that "of 392 adult Cayuga citizens identified on the membership roll, 237 submitted statements of support for both of the two propositions." AR-003880. Accordingly, over 60% of the Cayuga Nation indicated through the SOS that the Defendant-Intervenor comprised the lawful Nation Council.

While the SOS campaign was proceeding, the BIA again received two competing proposals to enter a new ISDEAA contract on behalf of the Cayuga Nation. AR-003367-70; AR-003374-80. One proposal came from Plaintiffs' group, the other from Defendant-Intervenor's group. Facing competing contract requests with no overlap in Nation Council membership, the BIA's Regional Director, Bruce Maytubby, asked both sides to submit an opening and a response brief on (1) "the validity of the [SOS] as a matter of Cayuga law," (2) "[c]oncerns about how the [SOS] process had been conducted on the ground," and (3) "[t]he validity of the [Plaintiffs'] claim that it was vested with tribal government authority via traditional tribal processes." AR-003881.

Following the parties' briefing, Regional Director Maytubby determined that he could no longer take the interim approach of 2015 and recognize the 2006 Nation Council. In 2016, Mr. Halftown had submitted a contract proposal on behalf of a new Nation Council, not in his capacity as the 2006 Nation Council's federal representative. AR-03565. Accordingly, for many reasons, Regional Director Maytubby determined that "it [was] time to look at the processes the Cayuga Nation has undertaken to resolve this dispute." *Id.* In addressing the merits of the leadership dispute, Regional Director Maytubby considered the arguments of both parties as well as Cayuga law to conclude that "the results of the [SOS] campaign should be respected." AR-003572. Having recognized the validity of the SOS campaign, Regional Director Maytubby considered other objections from Plaintiffs including objections to the format and content of the SOS. AR-003570-76. "[B]ased on a complete review of all the information in the record regarding this dispute," Regional Director Maytubby "determined that the [SOS] campaign carried out during the summer of 2016 was a valid resolution of an intratribal dispute by a tribal mechanism." AR-003563-64. Accordingly, Regional Director Maytubby recognized Defendant-Intervenor as the Nation's governing body for purposes of the ISDEAA contract. *Id.*

Plaintiffs appealed the decision of Regional Director Maytubby, and Assistant Secretary of Indian Affairs, Michael Black, assumed jurisdiction over the appeal. AR-003666-67. Plaintiffs raised numerous objections to Regional Director Maytubby's decision in their appellate opening and response briefs. But, ultimately, Assistant Secretary Black rejected Plaintiffs' objections and affirmed the decision of Regional Director Maytubby. AR-003876-903.

Following Assistant Secretary Black's denial of their appeal, Plaintiffs brought suit in this Court on September 20, 2017. On February 9, 2018, Plaintiffs moved for a Preliminary Injunction enjoining Defendants from enforcing or relying on the BIA's decision and the

appellate affirmation of that decision. *See generally* Pls.' Mot. for Prelim. Injunc., ECF No. 22.

On March 27, 2018, the Court denied Plaintiffs' Motion, finding that "Plaintiffs have not

demonstrated that they are likely to succeed on their claims, most of which are based on

speculation or can be distilled to mere disagreements with the decisions reached by the agency."

March 27, 2018 Mem. Opinion, ECF No. 42, 2. Prior to denying Plaintiffs' motion for a

preliminary injunction, the Court had allowed the Halftown group or the Cayuga Nation Council

to intervene in the case. *See generally* Feb. 23, 2018 Order, ECF No. 28. All parties have moved

for summary judgment, and those motions are currently before the Court.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  However, "when a party seeks

review of agency action under the APA [before a district court], the district judge sits as an

appellate tribunal.  The 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v.*

*Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Accordingly, "the standard set forth in Rule

56[ ] does not apply because of the limited role of a court in reviewing the administrative record.

. . . Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency

action is supported by the administrative record and is otherwise consistent with the APA

standard of review."  *S.E. Conference v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

The APA "sets forth the full extent of judicial authority to review executive agency

action for procedural correctness."  *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556

U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings,

and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). "This is a 'narrow' standard of review as courts defer to the agency's expertise." *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). However, an agency is still required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted). "Moreover, an agency cannot 'fail[ ] to consider an important aspect of the problem' or 'offer[ ] an explanation for its decision that runs counter to the evidence' before it." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

## III. DISCUSSION

In their Complaint, Plaintiffs bring six claims for relief. In Count 1, Plaintiffs argue that Defendants violated the APA by acting contrary to law in determining that the SOS was a valid mechanism for selecting the membership of the Cayuga Nation Council. Compl., ECF No. 1, ¶¶ 100-12. In Count 2, Plaintiffs contend that Defendants violated the APA by failing to provide a reasoned explanation for departing from prior policy and approving the SOS as a lawful method of selecting members for the Cayuga Nation Council. *Id.* at ¶¶ 113-23. In Count 3, Plaintiffs allege that Defendants violated the APA by ignoring and minimizing evidence showing that the results of the SOS were unreliable. *Id.* at ¶¶ 124-29. In Counts 4 and 5, Plaintiffs claim that Defendants violated the APA as well as Constitutional due process by failing to provide Plaintiffs with a neutral decision maker. *Id.* at ¶¶ 130-50. Finally, in Count 6, Plaintiffs contend that Defendants violated due process by allowing Assistant Secretary Black to participate in both

Regional Director Maytubby's December 2016 decision and the appeal of that decision. *Id.* at ¶¶ 151-65.

Plaintiffs move for summary judgment as to all counts in their Complaint, except for Count 6. Defendants and Defendant-Intervenor move for summary judgment as to all counts, including Count 6. For the reasons given below, the Court concludes that Plaintiffs have failed to establish that Defendants violated the APA or due process in issuing Regional Director Maytubby's original decision or Assistant Secretary Black's appellate decision.

### A. Count 1- APA Violation Based on Determination that the SOS was a Valid Mechanism for Selecting Tribal Leadership

First, Plaintiffs contend that Defendants violated federal and Cayuga Nation law by supporting and accepting the results of the SOS campaign. Plaintiffs have two primary arguments as to why Defendants' determination that the SOS was a valid mechanism for selecting Nation leadership was contrary to law. First, Plaintiffs argue that Assistant Secretary Black failed to review Regional Director Maytubby's legal conclusion de novo as was required by law. Second, Plaintiffs argue that Cayuga Nation law did not support the use of the SOS. The Court is not persuaded by either of Plaintiffs' arguments.

As an initial matter, Plaintiffs contend that Assistant Secretary Black was required to use de novo review on questions of Cayuga Nation law when reviewing Regional Director Maytubby's decision. But, instead of using de novo review, Plaintiffs argue that Assistant Secretary Black impermissibly deferred to Regional Director Maytubby's analysis of Cayuga law.

The Court concludes that Assistant Secretary Black was not required to use de novo review over Regional Director Maytubby's analysis of Cayuga Nation law. In support of their argument that de novo review was required, Plaintiffs cite to opinions setting forth the general

proposition that the IBIA "reviews legal issues, and the sufficiency of the evidence to support a decision, *de novo*." *Picayune Rancheria of the Chukchansi Indians v. Pac. Regional Dir., Bureau of Indian Affairs*, 62 IBIA 103, 114 (2016); *see also Maniilaq Ass'n v. Burwell*, 72 F. Supp. 3d 227, 234 (D.D.C. 2014) ("Questions of law are reviewed *de novo* under the APA as in ordinary cases.").

But, these cases are not persuasive. First, this appeal was decided by the Assistant Secretary, not by the IBIA; and Plaintiffs present no evidence that the Assistant Secretary would be required to exercise the same standard of review as the IBIA. Second, while it is generally true that the IBIA reviews questions of law de novo, that is not the case with Indian law. Instead, "unless … tribal law clearly dictate[s] a particular outcome, [the IBIA] will afford BIA latitude to exercise discretion in determining with whom it will deal in carrying on the government-to-government relationship with the Tribe." *Picayune Rancheria*, 62 IBIA at 114; *see also LaRocque v. Aberdeen Area Dir., Bureau of Indian Affairs*, 29 IBIA 201, 204 (1996) (deferring to BIA's "reasonable interpretation" of tribal law).

Perhaps recognizing that caselaw does not support their position, Plaintiffs also cite a comment in Assistant Director Black's appellate decision stating that "issues of law and challenges to the sufficiency of the evidence are reviewed de novo." AR-003883. Plaintiffs argue that Assistant Secretary Black should be bound by this statement. But, here, Assistant Director Black is restating only the general standard of review. His statement was completely silent as to the standard of review for Indian law, and his statement in no way implies that the Assistant Secretary was binding himself to ignore precedent and to review Regional Director Maytubby's conclusions of Indian law de novo.

But, even if Assistant Secretary Black was required to exercise de novo review, Plaintiffs have not shown that he failed to do so. Plaintiffs contend that Assistant Secretary Black merely reviewed Regional Director Maytubby's consideration of Cayuga Nation law and deemed it "reasonable." AR-003888. But, in his opinion, Assistant Secretary Black specifically stated that he "receiv[ed] and consider[ed] briefing from both Councils that set out their views on Cayuga law." AR-0038889. And, considering the parties' arguments on Cayuga law, Assistant Secretary Black determined that respecting the results of the SOS was "valid." *Id*. The Court has no reason to doubt Assistant Secretary Black's statement that he considered the parties' arguments on Cayuga law. And, Plaintiffs cite nothing indicating that Assistant Secretary Black was required to do more than review the objections to Regional Director Maytubby's analysis, analyze those objections as they relate to Cayuga Nation law, and, in each instance, determine that Regional Director Maytubby's determinations were valid.

In a final attempt, Plaintiffs argue that Assistant Secretary Black could not have properly considered Cayuga law in issuing his judgment because Defendants omitted certain evidence of Cayuga law from the February 2018 Administrative Record. Plaintiffs allege that the February 2018 Administrative Record did not contain certain documents on Cayuga law that Plaintiffs had provided to Regional Director Maytubby and to Assistant Secretary Black. Despite these omissions from the Administrative Record, in his Declaration, Assistant Director Black declared: "the Administrative Record that was filed in this case on February 21, 2018 was the entirety of the Administrative Record that was before me and which I consulted during my consideration of Mr. Jacobs' administrative appeal of the Decision." Declaration of Michael S. Black, ECF No. 32-1, ¶ 7. Plaintiffs argue that this statement, along with the omissions from the February 2018

Administrative Record, prove that Assistant Secretary Black failed to review key evidence and did not conduct a de novo review of Cayuga Nation law.

But, Plaintiffs allege only the existence of an expanded Administrative Record. The Court does not find Defendants' voluntary revision of the Administrative Record to be evidence that Assistant Secretary Black failed to conduct a de novo review because he did not consider the omitted documents. In supplementing the February 2018 Administrative Record, Defendants explained that the Administrative Record contained "inadvertent errors." Defendants then supplemented the Administrative Record with the omitted documents prior to this Court's decision on the merits. April 17, 2018 Joint Status Report and Proposed Schedule, ECF No. 44, 2. Plaintiffs provide no evidence that the omitted documents were anything but an "inadvertent error." And, Plaintiffs provide no evidence that Assistant Secretary Black actually failed to consider the documents which were omitted from the first Administrative Record but included in the voluntarily-supplemented revised Administrative Record.

According to Plaintiffs, the majority of the documents "missing from the initial [Administrative Record] filed by Federal Defendants were nearly all the documents in the Interior Board of Indian Appeals Administrative Record for *Cayuga Nation v. Eastern Reg'l Dir.*, 58 IBIA 171 (2014)." Pls.' Reply to Defs., ECF No. 55, 3. While these documents may have been omitted from the initial Administrative Record, Assistant Secretary Black did consider the IBIA's 2014 decision in *Cayuga Nation*, explaining in the "Factual Background" section of his decision that the case provided an extensive "history of this dispute." AR-003877. Moreover, Plaintiffs fail to point to any document which was omitted from the February 2018 Administrative Record and was cited to or relied upon by Plaintiffs in their briefing to Assistant

Secretary Black, which belies the importance Plaintiffs now attempt to attribute to these omitted documents.

Plaintiffs provide no evidence that Assistant Secretary Black actually failed to consider the documents which were omitted from the original Administrative Record by "inadvertent error." Moreover, in his decision, Assistant Secretary Black cited the IBIA's decision in *Cayuga Nation*, demonstrating a familiarity with the subject matter of the majority of omitted documents. Accordingly, the Court concludes that the mere existence of a supplemented Administrative Record is not evidence that Assistant Secretary Black failed to conduct a de novo review of Cayuga law.

In summary, the Court determines that Assistant Secretary Black was not required to conduct a de novo review of Cayuga law. But, even if he had been so required, Assistant Secretary Black conducted an independent review of the parties' arguments concerning Cayuga law and concluded that Regional Director Maytubby's determinations were valid. The standard of review used by Assistant Secretary Black was not contrary to law.[4]

Turning now to Plaintiffs' second argument, the Court concludes that it was reasonable for Defendants to conclude that Cayuga law supported the use of the SOS to determine the membership of the Nation Council. As an initial matter, the Court notes that its review of Defendants' determination of Cayuga law is constrained by the APA. The Court's role is to determine whether or not Defendants' decision to recognize Defendant-Intervenor as the rightful Nation Council has "some rational basis." *CS-360, LLC v. U.S. Dep't of Veteran Affairs*, 846 F.

---

[4] Plaintiffs argue that Assistant Secretary Black's interpretation of Cayuga law violated the APA as being contrary to law. This is a legal issue. This Court will independently review that legal issue. Accordingly, even if Assistant Secretary Black had used an incorrect standard of review, "[a]ny arguable taint that may remain will therefore be cured" by this Court's review. *Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth.*, 685 F.2d 547, 575 (D.C. Cir. 1982).

Supp. 2d 171, 185 (D.D.C. 2012). As such, the Court is mindful of "going beyond judicial review to reach the merits of the tribal … dispute." *Feezor v. Babbitt*, 953 F. Supp. 1, 4 (D.D.C. 1996); *see also Alto v. Black*, 738 F.3d 1111, 1139 n.9 (9th Cir. 2013) (explaining that courts must be "careful … to limit the scope of federal jurisdiction to the propriety of the BIA's action under the APA, not the soundness of the BIA's decision under tribal law"). The constraints on the Court's review are especially important in this case as courts "owe deference to the judgment of the Executive Branch as to who represents a tribe." *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938 (D.C. Cir. 2012); *see also Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 369 (D.D.C. 2018) (giving BIA deference on interpretation of Indian law).

Plaintiffs have three arguments as to why Defendants violated the APA in concluding that Cayuga law supported the use of the SOS. First, Plaintiffs argue that, under Cayuga law, the clan mothers had sole authority to appoint and remove council members. Second, Plaintiffs claim that they had already constituted a lawful Nation Council, so the use of the SOS was unnecessary. Third, Plaintiffs contend that Defendants misinterpreted the Great Law of Peace. The Court concludes that none of Plaintiffs' arguments establish that it was unreasonable or contrary to law for Defendants to recognize Defendant-Intervenor as the rightful Nation Council for purposes of federal contracting.

First, Plaintiffs contend that under Cayuga law, the clan mothers had the sole authority to appoint and remove Council members. According to Plaintiffs, the SOS was contrary to Cayuga law because it attempted to overtake the role that was lawfully administered by the clan mothers.

Defendants considered, and reasonably rejected, this argument. Defendants acknowledged Plaintiffs' position that the use of the SOS was impermissible within the Nation's traditional clan-based framework. AR-003888. But, Defendants also acknowledged that there

was a division between Plaintiffs and Defendant-Intervenor as to "the requirements of Cayuga Nation law with respect to how Council members are chosen and under what circumstances they can be removed from the Nation Council." *Id.* (internal quotation marks omitted). Given this true division, Defendants elected to respect the results of the SOS, which demonstrated that the Nation's citizens supported the use of an SOS to resolve the leadership dispute. AR-003888-89.

In reaching this conclusion, Defendants acknowledged that the use of voting was not the Cayuga Nation's traditional method of governing. However, Defendants concluded that "under these specific circumstances, Cayuga law permit[ed] the use of a plebiscite in order to ascertain the peoples' understanding of their government structure and leaders." AR-003889. Under different circumstances, Defendants noted that the "BIA [may] decline a request to certify an Initiative (much like it did in 2015)." AR-003890.

Defendants' acceptance of the use of the SOS, despite the clan mothers traditional authority, was buttressed by the fact that Plaintiffs had urged Cayuga citizens not to participate in the SOS, and instead to "support the Cayuga Nation's traditional system of consensus decision making by the chiefs and clan mothers." AR-003352. Despite Plaintiffs' pleas, "60% of eligible citizens nevertheless agreed that [the use of the SOS] was permissible under Cayuga law and sided with [Defendant-Intervenor]." AR-003891. The Cayuga people had determined that Nation law permitted the use of an SOS despite Plaintiffs' urging that the citizens reject the process and defer to the traditional authority of the clan mothers. Under these circumstances, the Court concludes that it was reasonable for Defendants to support the results of the SOS.

Next, Plaintiffs argue that it was wrong for Defendants to accept the results of the SOS because a lawful Cayuga Nation Council was already formed and was made up of members from Plaintiffs' group. As the Cayuga Nation did not lack a functioning government, Plaintiffs

contend that there was no need to use a SOS to "establish a baseline tribal government through which BIA could perpetuate its government-to-government relationship with the Nation." AR-003890.

Plaintiffs oversimply the issue. Plaintiffs fail to acknowledge that, despite urging from both factions, the BIA had not recognized a Cayuga Nation Council since 2006. While Plaintiffs contend that their faction constituted the *true* Nation Council, the BIA had never recognized Plaintiffs' government. And, Defendant-Intervenor had also formed a separate allegedly *true* Nation Council by means of an SOS that was supported by 60% of the Cayuga citizenry. Facing competing claims of legitimacy, it was reasonable for Defendants to defer to the will of the Cayuga people. "In situations of federal-tribal government interaction where the federal government must decide what tribal entity to recognize as the government, it must do so in harmony with the principles of tribal self-determination." *Ransom v. Babbitt*, 69 F. Supp. 2d 141, 150 (D.D.C. 1999).

Finally, Plaintiffs argue that Defendants misconstrued the Cayuga Nation's traditional, unwritten law, the "Great Law of Peace." Under the Great Law, "[w]henever a specially important matter or a great emergency is presented before the Confederate Council and the nature of the matter affects the entire body of the Five Nations, threatening their utter ruin, then the Lords of the Confederacy must submit the matter to the decision of their people and the decision of the people shall affect the decision of the Confederate Council. This decision shall be a confirmation of the voice of the people." AR-003568. The Court notes that this statement of Cayuga law derives from the 1916 Parker transcript of the Great Law. *Id*. However, Cayuga law is traditional and unwritten. AR-003887 n.90. Accordingly, Defendants did to treat the Great Law as one might treat a United States statute. Instead, Defendants determined that, at its

foundation, the Great Law suggests that the Cayuga Nation's government derives its powers from the consent of those that are governed. AR-003888. Accordingly, Defendants extrapolated that the SOS, which allowed the governed to take part in the constituting of tribal leadership, was consistent with Cayuga law. The Court concludes that this determination was reasonable.

Plaintiffs argue that the Great Law did not justify the use of the SOS because the Great Law applies to the Confederate Council as a whole, not to the individual Nation Councils. Defendants considered Plaintiffs' argument and explained that, given "the Great Law's guiding principle of invoking the will of the people," it would make little sense "that the citizens of each Haudenosaunee nation have less authority with respect to their own Nation than they have within the overall Confederacy." AR-003888 (internal quotation marks omitted). In determining that Cayuga law supported the use of the SOS, Defendants also considered a second provision of the Great Law stating that individual nations follow the same "laws and rules [as] the council of the Confederacy." AR-003419; AR-003522. Based on these considerations, the Court concludes that Defendants' determination that Cayuga law supported the use of the SOS was reasonable.

In summary, Plaintiffs have failed to sustain their burden of proving that Defendants violated the APA and acted contrary to law in determining that the SOS was a valid mechanism for selecting members of the Cayuga Nation Council. Assistant Secretary Black used the proper standard of review in affirming Regional Director Maytubby's decision. And, given the particular circumstances facing the Nation, Defendants' determination that the SOS was a valid mechanism for selecting members of the Cayuga Nation Council was not contrary to Cayuga law. Accordingly, the Court DENIES Plaintiffs' Motion for Summary Judgment on Count 1 and GRANTS both Defendants' and Defendant-Intervenor's Cross-Motions for Summary Judgment on this Count.

### B. Count 2- APA Violation Based on Defendants' Change in Position

Next, Plaintiffs argue that Defendants acted arbitrarily and capriciously in violation of the APA when they failed to provide a reasoned explanation for the change in policy regarding their support for Defendant-Intervenor's 2016 SOS campaign. Plaintiffs argue that, prior to 2016, Defendants had regularly rejected requests to support elections and mail-in surveys to determine the composition of the Cayuga Nation Council. For example, in 1997, the BIA recognized that the Cayuga Nation does not use an electoral system. AR-003276-77. In 2005, the BIA rejected an electoral process proposed by Defendant-Intervenor. AR-000053-54. In 2012, the BIA rejected a prior SOS campaign proposed by Defendant-Intervenor. AR-003411 n.3. And again, the BIA rejected a 2014 effort to use a mail-in survey to determine the make-up of the Cayuga Nation Council. AR-003075; AR-003223. According to Plaintiffs, these decisions were predicated upon the BIA's recognition that the Cayuga Nation does not govern through elections and voting. Instead, leaders are appointed by clan mothers. Plaintiffs argue that Defendants' radical departure from this position in 2016 was not adequately explained.

Agencies are not bound by their prior policies for all time; instead, agencies are permitted to change their policies. *Mary V. Harris Found. v. Fed. Commc'n Comm'n*, 776 F.3d 21, 24 (D.C. Cir. 2015). When an agency changes its policy, that agency must generally meet two requirements. First, the agency must "display awareness that it is changing position." *Id.* (quoting *Fed. Commc'n Comm'n v. Fox Television Station, Inc.*, 556 U.S. 502, 515 (2009)). Second, the agency must establish that there are good reasons for the new policy. *Id.* However, the Court is not required to agree that the new policy is better than the old; it is sufficient that the agency "*believes*" the new policy to be better. *Id.* (emphasis in original). Here, the Court finds

that Defendants have established both an awareness of a change of position and good reasons for the change in position.

First, the Court finds that Defendants displayed an awareness that their 2016 decision represented a change in position. In his appellate opinion, Assistant Secretary Black devoted an entire section to why "[t]he Regional Director did not arbitrarily reverse a longstanding agency position." AR-003896. Assistant Secretary Black acknowledged that in 2015, the BIA had declined to resolve the leadership dispute via a SOS, and that the BIA was now changing positions by allowing a SOS to resolve the leadership dispute. *Id.*

Plaintiffs seem to concede that Defendants recognized that their decision represented a change in policy. Plaintiffs argument focuses on the notion that Defendants' proffered explanations for that change were unreasonable.

One of the reasons Defendants provided for their change in policy was that, in 2015, the 2006 Nation Council had submitted an ISDEAA contract application, whereas in 2016, the 2006 Nation Council had not submitted such a request. Lacking a request from the last formally-recognized Cayuga Nation Council, Defendants decided that it was time to recognize, through the SOS process, a new Cayuga Nation Council for purposes of federal contracting. AR-003897.

Plaintiffs argue that this premise is false and that the 2006 Nation Council had not submitted an ISDEAA proposal in 2015. Plaintiffs are incorrect. Mr. Halftown was the federal representative for the 2006 Nation Council. AR-003217. In 2015, the BIA concluded that Mr. Halftown had submitted an ISDEAA proposal which asked Defendants to recognize him as the last undisputed federal representative of the Nation's Council. *Id*. The accuracy of the BIA's 2015 determination that Mr. Halftown had submitted an ISDEAA proposal in his status as the 2006 federal representative is not at issue in this lawsuit. The only relevant factor is that in 2015

the BIA determined that at least one of two competing applications was submitted by the 2006 Nation Council, which was the last formally recognized Nation Council. *Id.* (explaining the application from Defendant-Intervenor's group "seek[s] recognition of Mr. Halftown as federal representative … for a six-member Nation council identified by the BIA in 2006").

In contrast, in 2016, Plaintiffs and Defendant-Intervenor each submitted dueling ISDEAA proposals with no overlap in Council membership. Accordingly, there was no application that Defendants could construe as having been made on behalf of the 2006 Nation Council. Lacking the option to the enter into an ISDEAA contract with the 2006 Nation Council, the Court finds it reasonable that Defendants decided to reverse policy and acknowledge a new Nation Council for purposes of federal contracting. AR-003897.

Defendants explain that another reason for their change in policy was that additional time had passed and no progress had been made in resolving the Nation's leadership dispute. Given the need for a recognized Nation Council for contracting and other purposes, Defendants determined that it was time to resolve the dispute. This need to resolve the Cayuga leadership dispute was noted even in the 2015 interim decision recognizing the 2006 Nation Council. There, the BIA acknowledged that circumstances could arise at a future time which would necessitate the resolution of the tribal leadership question. The BIA specifically stated that such circumstances could arise when it was time for the Nation to renew its ISDEAA contract. AR-003222. In 2016, Defendants faced the circumstances warned of in the 2015 interim decision. It was time to renew the ISDEAA contract and the Cayuga Nation had not made progress in resolving its leadership dispute. Accordingly, Defendants determined that a policy change was necessary.

Plaintiffs allege that the only changed circumstances that Defendants present are the passage of time and contested allegations of worsening disputes. Plaintiffs further argue that these changed circumstances are inadequate to justify Defendants' policy change. The Court disagrees.

Whether or not the passage of one year and ten months was sufficient to justify a change in policy is the type of judgment best left to agencies. Additionally, there is evidence in the record of worsening disputes related to the unresolved leadership issues. AR-003249. Moreover, Plaintiffs minimize the largest changed circumstance facing Defendants. Unlike in previous years, in 2016, there were two competing ISDEAA proposals from two factions both presenting themselves as the rightful Cayuga Nation Council. It was reasonable for Defendants to conclude that the Cayuga leadership dispute had arisen to a level requiring intervention.

In summary, the Court concludes that Defendants did not violate the APA by failing to adequately explain their change in policy relating to the use of a SOS campaign to select members for the Nation Council. Defendants acknowledged that they were making a change in policy and provided a reasonable explanation for that change. For these reasons, the Court DENIES Plaintiffs' Motion for Summary Judgment on Count 2 and GRANTS both Defendants' and Defendant-Intervenor's Cross-Motions for Summary Judgment on this Count.

### C.  Count 3- APA Violation Based on Failure to Acknowledge Survey Unreliability

Third, Plaintiffs contend that Defendants' determination that the SOS reliably demonstrated the will of the Cayuga citizenry violated the APA as it was not supported by record evidence. According to Plaintiffs, the only expert evidence submitted to Defendants on the reliability of the SOS campaign was submitted by Plaintiffs. Plaintiffs' Expert Report concluded that the SOS campaign was "plagued by problems of biased language, confounding financial

influences, insufficient response categories, acquiescence and social desirability biases, compound questions, and a potential lack of representativeness" suggesting "a deeply flawed method of assessment from which no information may be confidently gathered." AR-003559. Plaintiffs contend that Defendants failed to adequately explain why they found the SOS to be a reliable indicator of the Cayuga Nation's will despite these flaws. According to Plaintiffs, Defendants committed a clear error of judgment in supporting the outcome of the SOS in spite of the flaws identified by the Expert Report.

As an initial matter, Assistant Secretary Black acknowledged that Plaintiffs' expert evidence was the only expert evidence regarding the reliability of the SOS. But, he also noted that Plaintiffs had attached their Expert Report to their response brief submitted to Regional Director Maytubby, which under the briefing schedule provided Defendant-Intervenor with no opportunity to respond. Even though the Expert Report was submitted in a final response brief, Assistant Secretary Black still considered the expert evidence, but he did not grant the Expert Report greater weight based on the fact it was unrebutted, stating that he "decline[d] to afford independent weight to the Report in light of its unrebutted status." AR-003900 n.180. The Court finds that Defendants' decision on this matter was reasonable.

Plaintiffs also contend that Defendants erred by improperly placing the burden on Plaintiffs to "disprove" the validity and accuracy of the SOS campaign. AR-003575. But, reading Defendants' decisions as a whole, the Court finds that Defendants did not place an improper burden on Plaintiffs. Defendants considered Plaintiffs' expert testimony "[i]n light of the circumstances as a whole" and concluded that "despite the flaws pointed out by the [Plaintiffs'] Expert Report, in the end" the Cayuga citizens "understood the choice presented by the process."

AR-003574. In examining Defendants' decisions, the Court concludes that no improper burden was placed on Plaintiffs.

The Court now turns to the reasonableness of Defendants' determination that the SOS was a reliable indicator of the will of the Cayuga citizenry despite Plaintiffs' expert evidence concerning its flaws. When reviewing an APA claim, a court must determine whether the agency's conclusions "are supported by substantial evidence in the in the record as a whole." *Az. Pub. Serv. Co. v. U.S.*, 742 F.2d 644, 649 (D.C. Cir. 1984). However, the court "is not empowered to substitute its judgment for that of the agency." *Id.* (internal quotation marks omitted). Instead, the court is constrained to "ensur[ing] that the agency has engaged in the reasoned decisionmaking essential to informed and evenhanded implementation of public policy." *Id.* Accordingly, the question now before the Court is whether or not there "is 'such relevant evidence as a reasonable mind might accept as adequate to support'" Defendants' determination that the SOS campaign reliably evidenced the will of the Cayuga Nation. *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union, AFL-COI-CLC v. Pension Benefit Guar. Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013) (quoting *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620 (1966)). In answering this question, the Court concludes that Defendants reasonably determined that Plaintiffs' Expert Report did not undermine the results of the SOS. AR-003900.

Defendants acknowledged that while "certain language in the [SOS] was biased towards [Defendant-Intervenor], [] there was no evidence that this would have confused or otherwise misled Cayuga voters given their small numbers, network of communal knowledge, and deep familiarity with the dispute between [Plaintiffs and Defendant-Intervenor]." *Id.* The Court finds that this determination was reasonable. The Cayuga Nation had been entrenched in this

leadership dispute for over a decade. Given the duration of the dispute and the fact that the Nation was comprised of less than 500 people, it was reasonable for Defendants to assume that the members of the Nation would have "know[n] the players and the stakes." AR-003574. Additionally, the members of the Nation did not receive only the allegedly flawed SOS materials. The members also received a mailing from Plaintiffs urging them not to participate in the SOS and to reject Defendant-Intervenor's leadership claims. AR-003340-49. Given the circumstances as a whole, it was reasonable for Defendants to conclude that the members of the Cayuga Nation would not have been confused or manipulated by the language in the SOS.

Defendants also considered Plaintiffs' expert evidence explaining how the SOS campaign did not comply with the usual standards for public opinion surveys. Defendants determined that the SOS was fundamentally different than public opinion surveys and was not required to meet those standards. Defendants explained that "there are differences between the public at large and a tribal body politic comprising no more than 500 people with a network of communal knowledge and personal relationships, and I am not dissuaded that such a political group could form an opinion relative to their own governance notwithstanding the potential effect of biased language." AR-003573; AR-003900. In addition to the differences between the public at large and the Cayuga Nation, Defendants also noted that the SOS campaign was unlike other public opinion surveys because Cayuga citizens were specifically asked if they supported Defendant-Intervenor as the true Nation Council, they were not asked "which of several options best reflects [their] opinion on a matter" as is the case in most public opinion surveys. AR-003573. Moreover, unlike in most public opinion surveys, in order to indicate a "yes" members of the Nation had to mail in a signed statement, whereas to indicate a "no" they only had to do nothing. *Id.* The Court

concludes that Defendants provided a reasonable explanation as to why the SOS campaign could not be judged by the usual standards for public opinion surveys.

Defendants also addressed Plaintiffs allegations that the SOS was not reliable because Defendant-Intervenor purchased votes. Plaintiffs provided expert evidence that at least 92% of Cayuga citizens received and cashed checks from Defendant-Intervenor within three weeks of the distribution of SOS materials. But, Plaintiffs' evidence was countered by Defendant-Intervenor's evidence showing that Defendant-Intervenor mailed distribution checks to the citizenry quarterly, on the fifteenth days of March, June, September, and December. AR-003901. Defendants concluded that nothing in the record suggested that the June 2016 distribution "deviated from this schedule in form or function, or that the timing of the Initiative process bore any relation to the timing of the June distribution." *Id.* Defendants further concluded that "it is speculation at best to assume that voters would have felt beholden to support the [SOS] simply because they had recently received a pre-planned distribution."AR-003902. The Court finds that Defendants addressed Plaintiffs' concerns about purchasing votes, and that Defendants' explanation resolving Plaintiffs' concerns was reasonable.

Defendants likewise considered Plaintiffs allegations that the SOS was unreliable because its results were premised on a disputed voter role that was not shared with Plaintiffs. In determining whether or not a majority of the Cayuga nation approved the SOS, Defendants did not rely on membership estimates from Plaintiffs or Defendant-Intervenor. Instead, Defendants relied on the official membership roll. AR-003899. This determination was reasonable because both parties offered differing citizenship estimates which contradicted estimates that they had previously provided. Moreover, Defendants carefully scrutinized the membership roll as it related to the SOS campaign. *Id.* Plaintiffs fail to cite any evidence showing that, in light of

conflicting and contradictory citizenship reports, Defendants decision to rely on the membership roll maintained by the Nation's secretary was unreasonable.

In their Motion for Summary Judgment, Plaintiffs essentially ask this Court to substitute its judgment for that of Defendants and to conclude that the Expert Report proved that the SOS was not reliable. But, as has already been explained, it is not the role of this Court to weigh the evidence anew. *United Steel*, 707 F.3d at 325. Instead, this Court must determine only whether or not Defendants were reasonable in finding that the SOS campaign was reliable despite the expert evidence submitted by Plaintiffs. And, for the reasons explained above, the Court concludes that the Defendants adequately considered Plaintiffs' Expert Report and reasonably determined that the SOS was reliable despite that report.

The Court concludes that Defendants did not violate the APA by failing to adequately account for Plaintiffs' expert evidence in finding the SOS to be a reliable indicator of the will of the Cayuga people. Defendants acknowledged Plaintiffs' expert evidence and provided a reasonable explanation as to why the SOS was reliable in spite of that evidence. For these reasons, the Court DENIES Plaintiffs' Motion for Summary Judgment on Count 3 and GRANTS both Defendants' and Defendant-Intervenor's Cross-Motions for Summary Judgment on this Count.

### D. Counts 4 and 5- APA and Due Process Violations Based on Biased Decision Maker

Counts 4 and 5 of Plaintiffs' Complaint both involve the allegation that Defendants deprived Plaintiffs of a neutral decision maker in violation of the APA and Constitutional due process. In these counts, Plaintiffs allege that Defendants did not provide Plaintiffs with a neutral decision maker because "[p]rior to requesting or receiving briefing on the issue, Defendant Maytubby determined that a sui generis mail-in survey campaign designed by one faction of the

Nation's recognized government would be a viable way of involving the Cayuga people in the determination of the form and membership of their government." Compl., ECF No. 1, ¶ 134 (internal quotation marks omitted). Plaintiffs similarly fault Defendants for providing technical assistance for the SOS campaign prior to receiving briefing on the issue and for meeting with and assisting Defendant-Intervenor to the exclusion of Plaintiffs. Based primarily on these actions, Plaintiffs allege that they were deprived a neutral decision maker in violation of the APA and Constitutional due process. *Id.* at ¶¶ 130-150.

As an initial matter, the Court expresses its skepticism that Plaintiffs properly preserved their objections raised in Counts 4 and 5. "[C]laims of bias must be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist." *Village of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 73 (D.C. Cir. 2006) (internal quotation marks omitted). This requirement prevents parties from sitting on potential claims of disqualification and raising those claims only in the case of an unfavorable outcome. Here, Plaintiffs did not timely raise a request for Regional Director Maytubby's disqualification on account of bias.

In their November 2016 briefing to Regional Director Maytubby, Plaintiffs stated that "[t]o avoid due process concerns, Acting Director Maytubby should clarify that his letter [stating that the SOS was "viable"] was not intended to express an opinion on the validity of Mr. Halftown's election campaign, and that the issue will be decided according to neutral principles of federal and administrative law, giving appropriate deference to Cayuga law as the dispositive factor." AR-003454. Nowhere in their briefing did Plaintiffs actually ask Regional Director Maytubby to recuse himself on account of bias.

Arguing that they did timely raise this issue, Plaintiffs cite a July 2016 letter from Plaintiffs' counsel to Defendants asking that the BIA "rule on the request that the Director recuse

himself due to past illegal and ex parte meetings over the past six months with [Defendant-Intervenor]." AR-003300. But, Plaintiffs cite nothing in the Administrative Record establishing that they had ever actually made a request that Regional Director Maytubby recuse himself. Moreover, this July 2016 letter was sent before the SOS campaign had even begun, and there is no evidence that, when it was time for Regional Director Maytubby to rule on the leadership dispute, Plaintiffs asserted or reasserted such a request. In fact, Plaintiffs' later comment in their November 2016 briefing that Regional Director Maytubby could "avoid due process concerns" by "clarify[ing] that his letter [] was not intended to express an opinion on the validity of Mr. Halftown's election campaign" seems to walk-back any alleged prior request that Regional Director Maytubby recuse himself. AR-003454. Accordingly, the Court finds that Plaintiffs did not timely raise a request that Regional Director Maytubby recuse himself on account of bias.

Despite the fact that Plaintiffs failed to timely raise this claim, the Court will explain why, even if Plaintiffs had timely raised their claim, it would fail. The parties dispute whether or not Plaintiffs are required to show that they have an interest protected by due process in order to be entitled to a neutral decision maker. But, because Plaintiffs fail to show that they were deprived of a neutral decision maker, the Court need not resolve this issue at this time. Instead, for purposes of this Memorandum Opinion, the Court will assume that Plaintiffs were not required to show that they were deprived of an interest protected by the due process clause in order to be entitled to a neutral decision maker.

Plaintiffs contend that Defendants violated the APA and due process by depriving them of a neutral decision maker. Absent clear evidence, courts presume that public officers have discharged their official duties properly. *U.S. v. Studevent*, 116 F.3d 1559, 1563 (D.C. Cir. 1997) (citing *U.S. v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)). Accordingly, when a party alleges

that a decision maker was unconstitutionally biased, that party "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). A "party cannot overcome this presumption with a mere showing that an official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute." *Nuclear Info. and Res. Serv. v. Nuclear Regulatory Comm'n*, 509 F.3d 562, 571 (D.C. Cir. 2007) (internal quotation marks omitted). More is required. Instead, a party establishes that a decision maker is biased if the decision maker is not "capable of judging a particular controversy fairly on the basis of its own circumstances." *Id.* (internal quotation marks omitted).

Here, Plaintiffs have failed to present any evidence which would overcome the presumption that Defendants properly discharged their official duties in rendering their decisions. Plaintiffs have three primary arguments as to why Defendants were unconstitutionally biased. First, Plaintiffs allege that Regional Director Maytubby concluded that the SOS would be "a viable" way of involving the Cayuga people in determining their form of government prior briefing from Plaintiffs. Second, Plaintiffs contend that Defendants devoted resources to supporting the SOS absent Plaintiffs' input. Third, Plaintiffs allege that Defendants met secretly with Defendant-Intervenor and did not permit Plaintiffs to fully participate in the SOS campaign or its lead-up. The Court will address each argument in turn.

First, Plaintiffs contend that they were deprived of a neutral decision maker because, lacking briefing from Plaintiffs, Regional Director Maytubby concluded that the SOS would be "a viable" way of involving the Cayuga people in determining their form of government. Here, Plaintiffs are referring to a letter sent by Regional Director Maytubby to a representative of Plaintiffs' group stating that "under the circumstances a [SOS] would be a viable way of

involving the Cayuga people in a determination of the form and membership of their tribal government." AR-003262. Plaintiffs contend that the use of the word "viable" shows that Defendants had predetermined that they would recognize tribal leadership on the basis of the SOS regardless of Plaintiffs' comments or objections. But, the Court finds that the record does not substantiate this claim.

As an initial matter, the Court notes that Plaintiffs' focus on Regional Director Maytubby's decision is misplaced as it is not the final agency action subject to judicial review by this Court. *See* March 27, 2018 Memorandum Opinion, ECF No. 40, 12. Instead, the final agency decision now on review was made by Assistant Secretary Black. And, any alleged bias on the part of Regional Director Maytubby would have been cured by Assistant Secretary Black's final review. Regardless of this fact, the Court will consider Plaintiffs' argument on this point.

Reading Regional Director Maytubby's statements in context, he considered the SOS to be one way of potentially resolving the leadership dispute. The letter does not establish that Regional Director Maytubby had already conclusively determined that the BIA would support the results of the SOS. In his letter, Regional Director Maytubby stated that "[w]e want this process to be inclusive and to obtain a true sense of what the Cayuga people support." AR-003262. Regional Director Maytubby asked Plaintiffs to provide feedback to Mr. Halftown, or alternatively to provide feedback to the BIA, on issues pertaining to the SOS campaign. *Id.* He also asked Plaintiffs to provide any "alternative method for obtaining accurate information regarding the will of the Cayuga Nation's citizens." *Id.* Regional Director Maytubby would not have requested feedback and alternative solutions from Plaintiffs if he had already made a conclusive determination.

Plaintiffs further contend that they submitted objections and alternatives to Regional Director Maytubby, but they were ignored. AR-003299-337. However, the Administrative Record refutes Plaintiffs' allegation. Plaintiffs' objections to the SOS and comments on alternative resolutions were included in the Administrative Record, showing that Defendants had considered them in reaching a decision. *See Pac. Shores Subdivision*, 448 F. Supp. 2d at 5 (explaining that the Administrative Record is entitled to a presumption of regularity).

The Court does not accept that the use of a single word—"viable"—establishes that Regional Director Maytubby had predetermined his eventual decision to support the results of the SOS. In order to accept Plaintiffs' argument, the Court would be required to ignore the remaining portions of Regional Director Maytubby's letter asking Plaintiffs for input and alternative solutions. Moreover, in order to accept Plaintiffs' argument, the Court would be required to ignore Regional Director Maytubby's later request for briefing from Plaintiffs on "[t]he validity of the [SOS] as a matter of Cayuga law" and on "[c]oncerns about how the [SOS] process had been conducted on the ground." AR-003881. If Regional Director Maytubby had predetermined his support for the SOS, his requests for feedback and for briefing on the issue from Plaintiffs would be no more than an exercise in futility and a sham. The Court is not prepared to make such determinations based on the use of the word "viable."

Second, Plaintiffs contend that Defendants deprived them of a neutral decision maker based on Defendants' commitment of federal funds and technical assistance in carrying out the SOS campaign. Specifically, Plaintiffs allege Defendants "put forward no legal basis for [their] provision of federal support and technical assistance to [Defendant-Intervenor]." Pls.' Mot., ECF No. 59, 43. But, under 25 U.S.C. § 2, the Secretary of the Interior has the authority to manage "all Indian affairs and [] all matters arising out of Indian relations." 25 U.S.C. § 2. "[A]ll

Indian affairs" includes disputes over tribal leadership. And, Plaintiffs cite nothing which would suggest that this broad statutory grant of authority would not extend to assisting tribes in resolving long-term leadership disputes.

Plaintiffs further contend that even if 25 U.S.C. § 2 provides some legal basis for Defendants' actions, "the flimsy legal basis for [Defendants'] actions is evidence of Defendant Maytubby's bias in favor of [Defendant-Intervenor]." Pls.' Reply to Def.-Int., ECF No. 68, 13. According to Plaintiffs, Regional Director Maytubby was so determined to support the leadership claim of Defendant-Intervenor that he "was willing to skirt the boundaries of his lawful authority." *Id.*

The Court disagrees with Plaintiffs' constricted reading of 25 U.S.C. § 2. This statute does not provide a "flimsy" basis for legal support. Instead, this broad statutory grant of power easily encompasses the provision of technical support, requested by one faction of tribal leadership, to determine the will of the Cayuga people in resolving a decade-old leadership dispute. Accordingly, the Court concludes that the provision of federal assistance in the SOS campaign does not provide support for Plaintiffs' claim that they were deprived of a neutral decision maker.

Finally, Plaintiffs allege more generally that Defendants' meetings and discussions with Defendant-Intervenor, to the exclusion of Plaintiffs, demonstrate that Plaintiffs were deprived of a neutral decision maker. As evidence of the ex parte nature of Defendants' dealings, Plaintiffs contend that Defendants did not respond to Plaintiffs' initial objections to the SOS process, that Defendants' quickly decided to support the SOS process, and that Defendants had multiple meetings and discussions with Defendant-Intervenor and without Plaintiffs.

The Court concludes that the record does not support Plaintiffs' allegations that Defendants favored Defendant-Intervenor's leadership claim. From the beginning of the process, Regional Director Maytubby urged Plaintiffs to consult with the BIA and with Mr. Halftown over the SOS process. AR-003262. Regional Director Maytubby received and considered Plaintiffs' objections to the SOS process. AR-003299-337; *See Supra* pg. 30. And, prior to issuing a decision on the validity of the SOS process, Regional Director Maytubby accepted an opening and a response brief from Plaintiffs on the merits of their claims. See AR-003876. Assistant Secretary Black similarly requested and accepted an opening and a response brief from Plaintiffs on the merits of their claims and on the alleged errors in Regional Director Maytubby's decision. AR-003772-875. Taken as a whole, this process suggests a good-faith attempt to reconcile two competing views and to render a decision in line with Cayuga law.

In alleging a biased decision maker, Plaintiffs ignore evidence in the record and attempt to find a hidden intent behind Defendants' decisions and interactions. For example, Plaintiffs acknowledge that they were given the opportunity to submit objections to the SOS before the campaign took place. But, they allege that Defendants did not give them sufficient time to submit those objections. This allegation is belied by the record which shows both that Defendants gave Plaintiffs an extension of time to submit their objections and that Plaintiffs did in fact submit objections which Defendants considered prior to the SOS campaign. AR-003266; AR-003299-337.

Similarly, Plaintiffs attempt to infer a devious intent behind Defendants' ex parte interactions with Defendant-Intervenor. But, Plaintiffs cite no requirement, legal or otherwise, prohibiting Defendants from meeting with only one tribal faction, at that faction's request. If Defendants were not permitted to meet independently with leadership factions, it is difficult to

imagine how Defendants could fulfill their responsibility for overseeing Indian affairs, including leadership disputes. *See* 25 U.S.C. § 2.

Plaintiffs cite *Professional Air Traffic Controllers Organization v. Federal Labor Relations Authority*, 685 F.2d 547 (D.C. Cir. 1982), for the proposition that one-sided communications can and do create bias on the part of the decision maker. But, *Air Traffic Controllers* dealt with a hearing which was required to be conducted in accordance with 5 U.S.C. § 577. 685 F.2d at 561. And, under § 577(d), ex parte communications between an agency and an interested person are prohibited. 5 U.S.C. § 577(d)(A), (B). But, § 577(d) applies only "when a hearing is required to be conducted in accordance with section 556 of this title." 5 U.S.C. § 577(a). As the adjudication at issue in this case was not required to be conducted in accordance with § 556, *Air Traffic Controllers'* statute-specific consideration is not relevant to the case before the Court. As this Court has previously noted "ex part communications are not prohibited for purposes of appeals—like the administrative appeal in this case—governed by 25 C.F.R. Part 2." March 27, 2018 Memorandum Opinion, ECF No. 42, 13 (citing *U.S. v. Navajo Nation*, 537 U.S. 488, 513 (2003)).

It is true that Defendants communicated independently with Defendant-Intervenor at times in order to provide assistance. But, Defendants also communicated independently with Plaintiffs at times, such as by urging Plaintiffs to provide comments and objections to Defendant-Intervenor's forthcoming SOS campaign. AR-003262. Accordingly, the Court does not find a bias towards Defendant-Intervenor based on some ex parte interactions and discussions.

Viewing the record as a whole, the Court concludes that Plaintiffs have not overcome the presumption that Defendants discharged their official duties without bias. This case is not like

that relied on by Plaintiffs, *Ranson v. Babbit*, 69 F. Supp. 2d 141 (D.D.C. 1999). In *Ransom*, the court invalidated the BIA's recognition of a change of government for an Indian tribe, finding that the BIA had applied inappropriate pressure on the tribe to embrace a particular form of government. 69 F. Supp. 2d at 154. Here, Defendants applied no pressure on Plaintiffs or on Defendant-Intervenor. Instead, Defendants merely contributed support to an SOS campaign that was initiated and conducted by group comprising one faction of a tribal leadership dispute.

Following the SOS campaign, Defendants provided both Defendant-Intervenor and Plaintiffs with the opportunity to present their arguments as to why Defendants should or should not accept the results of the SOS campaign. Defendants also provided Plaintiffs with a second opportunity, before a new decision maker, to present the merits of their claim on appeal. Ultimately, after considering arguments on both sides, Defendants determined that the SOS should be enforced as representing the will of the Cayuga people. Nothing in the record has convinced the Court that this ultimate determination was pre-determined or that the either of the two decision makers was biased in favor of Defendant-Intervenor.

The Court concludes that Defendants did not violate the APA and due process by failing to provide Plaintiffs with a neutral decision maker. Plaintiffs did not make a timely request for Regional Director Maytubby to recuse himself due to bias. But, even if Plaintiffs had made a timely request, the Court finds that Plaintiffs have not established that they were deprived of a neutral decision maker. For these reasons, the Court DENIES Plaintiffs' Motion for Summary Judgment on Counts 4 and 5 and GRANTS both Defendants' and Defendant-Intervenor's Cross-Motions for Summary Judgment on these Counts.

### E. Count 6- Due Process Violation for Appellate Reviewer's Participation in Underlying Decision

Finally, Defendants and Defendant-Intervenor move for summary judgment on Count 6 of Plaintiffs' Complaint. Plaintiffs do not move for summary judgment on this Count. In Count 6, Plaintiffs allege that Defendants violated Plaintiffs' right to due process when Assistant Secretary Black participated as both an agency decision maker and as an appellate review of an agency decision. Compl., ECF No. 1, ¶¶ 151-165. Specifically, Plaintiffs allege that Assistant Secretary Black participated in the December 2016 decision made by Regional Director Maytubby. Plaintiffs further allege that, after participating in making the December 2016 decision, Assistant Secretary Black then assumed jurisdiction over Plaintiffs' appeal of that decision. According to Plaintiffs, by participating in both the making and the review of Defendants' decision, Assistant Secretary Black acted in bad faith and violated Plaintiffs' due process rights.

The Court concludes that Defendants and Defendant-Intervenor are entitled to summary judgment on this Count for at least two reasons. First, Plaintiffs failed to preserve this argument. Second, assuming for the purposes of this Memorandum Opinion that Plaintiffs have a due process right to a separate decision maker and appellate reviewer, there is no evidence that this due process right was violated.

First, the Court concludes that Plaintiffs did not preserve this argument. Plaintiffs did not adequately raise this claim in their appellate brief to Assistant Secretary Black. Instead, in a footnote of their opening brief, Plaintiffs stated that they "argued before the IBIA that Acting Assistant Secretary Michael Black's participation in the Regional Director's decision making process should preclude him from adjudicating this appeal, … and respectfully preserve that

argument here." AR-003738. But, in his appellate decision, Assistant Secretary Black determined that making this argument in a footnote was insufficient. AR-003884 n.64.

Plaintiffs argue that they successfully preserved this claim. Plaintiffs concede that circuit courts may prohibit arguments from being raised in footnotes. But, Plaintiffs go on to argue that administrative appellate adjudicators are not obligated to comply with the appellate briefing rules of the circuit courts. Accordingly, Plaintiffs contend that raising the issue in a footnote of their appellate brief was sufficient to preserve the argument.

The Court concludes that, in finding that Plaintiffs did not preserve this argument, the Court is not unfairly holding Plaintiffs' briefing before Assistant Secretary Black to the standards of circuit courts. Instead, the Court is merely enforcing the administrative appellate adjudicator's own procedural rule. Assistant Secretary Black determined that Plaintiffs had not successfully raised this argument on appeal because they made the argument in a footnote. AR-003884 n.64. And, administrative agencies have the authority to enforce their own procedural rules. *See Perez v. Mortg. Bankers Ass'n*, 135 S.Ct. 1199, 1207 (2015). The fact that Defendants' prohibition on raising arguments in footnotes is in line with the rules of some circuit courts is irrelevant.

Second, even if Plaintiffs had preserved this claim, it fails on the merits. For purposes of this Memorandum Opinion the Court will assume without deciding that Plaintiffs have the due process right that they allege. But, even with this assumption, Plaintiffs have failed to show any violation of that due process right.

On a motion for summary judgment, all justifiable inferences are to be drawn in favor of the non-moving party. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). But, in order to defeat a motion for summary judgment, the nonmoving party must provide more than mere allegations. *See Walker v. Mattis*, 319 F. Supp. 3d 267, 271 (D.D.C. 2018). And here, Plaintiffs

offer no more than mere allegations that Assistant Secretary Black participated in Regional Director Maytubby's December 2016 decision. The only support that Plaintiffs provide for their claim is that Assistant Director Black was one of many who received copies of the parties' briefs to Regional Director Maytubby. But, this fact alone does not support Plaintiffs' allegation that Assistant Secretary Black actually participated in the December 2016 decision.

Moreover, Assistant Secretary Black filed a Declaration affirmatively denying Plaintiffs' claims. Specifically, Assistant Secretary Black stated:

> In the course of my tenure at BIA, I was generally aware of the leadership dispute at the Cayuga Nation of New York (Nation). However, at no point was I actively involved in the decision making process preceding the BIA Eastern Regional Director's December 15, 2016 decision (Decision) to recognize Clint Halftown and his associates as the proper leadership of the Nation. Prior to the issuance of the Decision, I neither discussed the details of the Decision with the Eastern Regional Office nor reviewed any drafts of the Decision. Nor did I otherwise participate in the consideration, drafting, editing, or any other review or discussion of the Decision.

Declaration of Michael S. Black, ECF No. 32-1, ¶ 4. Plaintiffs have presented no evidence to refute Assistant Secretary Black's affirmative denial that he in any way participated in the December 2016 decision.

Plaintiffs counter that even if Assistant Secretary Black was not *actively* involved in the December 2016 decision, he may have been *passively* involved in the decision. But, Assistant Secretary Black's Declaration forecloses allegations of even passive involvement. As Assistant Secretary Black stated, he did not "otherwise participate in the consideration, drafting, editing, or any other review or discussion of the Decision." *Id.*

Moreover, the only evidence of even passive involvement presented by Plaintiffs is that Assistant Secretary Black was one of many who received copies of the December 2016 briefing and that, at the time of the December 2016 decision, Defendant-Intervenor had an application pending for the United States to accept certain parcels of Cayuga land into trust. Neither of these

allegations provides support for Assistant Secretary Black's passive involvement in the December 2016 decision. First, as was previously explained, even if Assistant Secretary Black was one of a number of people who received copies of the briefing for the December 2016 decision, Assistant Secretary Black has affirmatively denied that he discussed the decision, reviewed the decision, or in any way participated in the consideration of the decision. And, Plaintiffs provide no evidence to refute Assistant Secretary Black's denials. Second, the fact that Defendant-Intervenor had a land trust application pending before the BIA in no way establishes that Assistant Secretary Black actively or passively participated in the December 2016 decision. Plaintiffs fail to connect the two events in any way.

Plaintiffs' bare allegations fail to provide any evidence of Assistant Secretary Black's active or passive participation in the December 2016 decision. As there is no record support for Plaintiffs' claim, Plaintiffs' mere allegations are insufficient to defeat Defendants' and Defendant-Intervenor's motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) (explaining that bare allegations do not defeat a properly-pled motion for summary judgment).

Possibly recognizing the lack of record support for their claim, Plaintiffs make one last attempt to avoid summary judgment. Plaintiffs argue that the Administrative Record is not complete. Plaintiffs further contend that the DOI inexplicably omitted all documents from the period between late June 2015 and June 7, 2016 in their response to Plaintiffs' Freedom of Information Act request. Plaintiffs argue that discovery is required to complete the Administrative Record and ask to Court to grant Plaintiffs' prior motion for discovery which had been held in abeyance during a February 12, 2018 teleconference. *See* March 27, 2018 Memorandum Opinion, ECF No. 40, 10 n.5.

The Court denies Plaintiffs' request for discovery to supplement the Administrative Record. Discovery is disfavored in APA cases, and before a court will grant a request for discovery in an APA case, the moving party must make "a significant showing ... that [the plaintiff] will find material in the agency's possession indicative of bad faith or an incomplete record." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d at 487-88 (D.C. Cir. 2011). Plaintiffs fail to make such a showing.

Moreover, the Court finds that the records that Plaintiffs contend are missing from the Administrative Record would not support their claim. Count 6 of Plaintiffs' Complaint alleges that Assistant Secretary Black "participated in the process that led to the Regional Director's Decision." Pls.' Reply to Def.-Int., ECF No. 68, 15. And, the process that led to Regional Director Black's December 2016 decision began no earlier than September 2016 when Defendants received dueling ISDEAA applications from Plaintiffs and Defendant-Intervenor. Accordingly, the allegedly omitted records from June 2015 to June 2016 could not show that Assistant Secretary Black participated in Regional Director Maytubby's December 2016 decision. And, Plaintiffs did not request review of decisions made prior to December 2016.

In summary, the Court concludes that Defendants did not violate due process by allowing Assistant Secretary Black to participate in the December 2016 decision and in the later appeal of that decision. Plaintiffs did not adequately preserve this claim. But, even if they had adequately preserved this claim, the claim fails on the merits as Plaintiffs provide only allegations and conclusory statements as support. For these reasons, the Court GRANTS both Defendants' and Defendant-Intervenor's Cross-Motions for Summary Judgment on Count 6. The Court also DENIES Plaintiffs' prior motion for discovery as Plaintiff has not met the high burden for obtaining discovery in an APA case.

## IV. CONCLUSION

Based on the above analysis, Defendants and Defendant-Intervenor are entitled to summary judgment on all claims. Plaintiffs are not entitled to relief on Count 1 of their Complaint because Defendants' determination that the SOS was a valid mechanism for allowing the Cayuga Nation to select its leadership was not contrary to Cayuga or federal law. Similarly, Plaintiffs are not entitled to relief on Count 2 of their Complaint because Defendants' decision to depart from its policy of non-involvement in matters of Cayuga leadership was not arbitrary or capricious. Likewise, Plaintiffs are not entitled to relief on Count 3 of their Complaint because Defendants reasonably explained why they found the SOS results reliable despite flaws pointed out in Plaintiffs' Expert Report. Plaintiffs are also not entitled to relief on Counts 4 and 5 of their Complaint because they were not deprived of due process as their claims were adjudicated by a neutral decision maker. Finally, Plaintiffs are not entitled to relief on Count 6 of their Complaint because they failed to produce any evidence showing that Assistant Secretary Black participated in the underlying agency action for which he adjudicated the appeal. And, Plaintiffs have not demonstrated that discovery is warranted on this claim.

For the foregoing reasons, the Court DENIES Plaintiffs' [59] Motion for Summary Judgment, GRANTS Defendants' [51] Cross-Motion for Summary Judgment, and GRANTS Defendant-Intervenor's [63] Cross-Motion for Summary Judgment. An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge